Ammar Harris #1116547
High Desert State Prison

United States District Court
District of Nevada

| Ammar Harris, | 2:22-CV-00560 |
| Plaintiff, | |
| vs | Hon. Judge Richard F. Boulware |
| State of Nevada; ex rel., | Mag. Judge Nancy J. Koppe |
| Clark County, et al. | |
| Defendants. | |

JURY TRIAL DEMANDED

VERIFIED AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTION AND DAMAGES

I.  Introduction

1.) This is an 42 USCS § 1983, 1988 action filed by Plaintiff
Ammar Harris, a pre-trial detainee, alleging violation of his
constitutional rights for Unlawful Search and Seizure, False
Imprisonment and Malicious Prosecution, seeking declaratory,
injunction and damages for all current and future persons
similarly situated.

## II. Jurisdiction/Venue

2.) This action is brought pursuant to 42 USCS § 1983, 1988, as well as the Fourth, Fifth, Eighth and Fourteenth Amendment of the United States Constitution. Jurisdiction is founded on 28 USCS § 1331, 1343, 1367 and NRS 41.031 and the aforementioned statutory and constitutional provisions. The Court has jurisdiction to grant class, declaratory, injunction relief pursuant to 28 USCS § 2201, 2202, 2463, 2284 and F.R.C.P. 23, 57 and 65.

3.) Venue lies properly in this Court pursuant to 28 USCS § 1391(b).

## III. Parties

4.) Plaintiff Ammar Harris at all times relevant was a resident of Clark County, NV.

5.) Defendant Steven B. "Wolfson", is a State actor as Clark County State Attorney, and as member Board of County Comissioners (BOCC). Defendant Wolfson is hereby sued in his official capacity. (Declaratory and Injunction only.)

6.) Defendant David L. "Stanton", is a State actor as Clark County State Attorney. Defendant Stanton is hereby sued in his official capacity. (Declaratory and Injunction only.)

7.) Defendant Pamela C. "Weckerly", is a State actor as Clark County State Attorney. Defendant Weckerly is hereby sued in her official capacity. (Declaratory and Injunction only.)

- 2 -

8.) Defendant Elissa "Luzaich", is a State actor as Clark County State Attorney. Defendant Luzaich is hereby sued in her official capacity. (Declaratory and Injunction only.)

9.) Defendant Bernie "Zadrowski", is a State actor as Clark County State Attorney. Defendant Zadrowski is hereby sued in his official capacity. (Declaratory and Injunction only.)

10.) Defendant Clark County, is a State actor as Clark County Municipality. Defendant Clark County is hereby sued in its official capacity.

11.) Defendant Clark County "Sheriff", is a State actor as Clark County Sheriff. Defendant Sheriff is hereby sued in his official capacity.

12.) Defendant Karen "Hughes", is a State actor as Reserved Deputy for Metropolitan Police Department, "MPD" as Lieutenant, P# 2928. Defendant Hughes is hereby sued in her official and individual capacity.

13.) Defendant D. "Hoier", is a State actor as Reserved Deputy for MPD as Sergeant, P# 4344. Defendant Hoier is hereby sued in his/her official and individual capacity.

14.) Defendant Catherine "Hui", is a State actor as Reserved Deputy for MPD as Detective, P# 8263. Defendant Hui is hereby sued in her official and individual capacity.

- 3 -

15.) Defendant A. "Beas", is a State actor as Reserved Deputy for MPD as Detective, P# 5208. Defendant Beas is hereby sued in his official and individual capacity.

16.) Defendant Christopher "Baughman", is a State actor as Reserved Deputy for MPD as Detective, P# N/A. Defendant Baughman is hereby sued in his official and individual capacity.

17.) Defendant A. "Bacca", is a State actor as Reserved Deputy for MPD as Detective, P# 8754. Defendant Bacca is hereby sued in his/her official and individual capacity.

18.) Defendant A. "Ortiz", is a State actor as Reserved Deputy for MPD as Detective, P# 14200. Defendant Ortiz is hereby sued in his/her official and individual capacity.

19.) Defendant K. "Bluth", is a State actor as Reserved Deputy for MPD as Detective, P# N/A. Defendant Bluth is hereby sued in his/her official and individual capacity.

20.) Defendant Wolfson, Stanton, Weckerly, Luzaich, Zadrowski, Clark County, Sheriff, Hughes, Hoier, Huti, Beas, Baughman, Bacca, Ortiz, Bluth, each of them at all times herein mentioned, was or is the agent, servant, and employee of each remaining defendants, and was at all times mentioned, acting under color of State Law, or acting within the course, scope, and authority of said agency, service and employment.

21.) Plaintiff have been forced to incur reasonable attorney's fee and costs pursuant to this action including, but not necessarily limited to those contemplated by 42 USCS § 1988.

## IV. Factual Allegations

I. Hughes, Hoier, Hui, Beas, Beas, Bauchman, Baca, Bluth and Ortiz Acted to Unlawfully Search and Seizure, Falsely Imprison and Maliciously Prosecute, Causing Significant Injury to Plaintiff in Violation of his Constitutional Rights

22.) On or about March 23rd, 2022, Plaintiff learned the following from Sgro and Roger Law Firm.

23.) On or about March 3rd, 2010, Hui and Bluth First made contact with Ashley "Fassbender" and Marissa "Valdez" Pickett during a Henderson Police Department, "HPD" prostitution raid.

24.) Upon information and belief, on or about May 17th, 2010, Valdez was arrested for prostitution and released. ("Valdez")

25.) On or about June 1st, 2010, Fassbender and Valdez admitted to engaging in acts of prostitution in a recorded interview with HPD. After said interview Fassbender and Valdez contacted Plaintiff needing a place to stay after being kicked out, He allowed them to stay with him. ("incident reports")

26.) On or about June 21st, 2010 Plaintiff and Valdez had a dispute regarding her being pregnant and wanting to have an abortion, as well as finances, she was asked to leave the residence. Upon leaving she called 911, alleging " a black guy just took my money." Hui, Beas, Hoier, Hughes and a camera crew filming for COPS responded to Valdez location to interview her, she was concerned with being pregnant by Plaintiff. (Valdez)

27.) On or about June 23rd, 2010 Plaintiff was detained at his residence without warrant or exigent circumstances justifying a warrantless entry and search of his home, Hui, Beas, Bluth, Hoier, Baughman and a camera crew filming for COPS entered and unlawfully searched and seized property belonging to him, he was then taken to Clark County Detention Center, " CCDC" and booked on a list of fictitious charges. (Incident reports)

28.) On or about June 25th, 2010 Plaintiff was release, the State's Attorney office rejected to prosecute pursuant to NRS 174.085.

29.) On or about July 22nd, 2010 Hui, Beas, Bara and Ortiz falsified documents and incident reports for procurement of an arrest warrant for Plaintiff in order to justify the seized property. (Incident reports)

30.) On or about May 26th, 2012 Plaintiff was rearrested, in the process lost his car, job and place of residence.

-6-

31.) Upon information and belief, Plaintiff's arrest on June 23rd, 2010 by Hui, Bulightman, Baca, Beco, Bluth, Ortiz, Hoier and a camera crew filming for COPS were truly motivated by financial incentives from "Langley Productions", as well as seizure of property to initiate civil asset forfeiture, such as the BMW he drove if they could successfully[1] charge with certain criminal offenses, this applies to all persons similarly situated.

32.) On or about June 13th, 2012 Plaintiff appeared in Las Vegas Justice Court case #10F12069X, "Zadrowski" made the following statement, " Catherine Hui?, Marissa Valdez-Pickett?, your honor, I have -- I'm forced to dismiss this case today on the state's motion pursuant to statute (NRS 174.085). For the record, I have subpoenaed the victim in the case and the police officer, Nobody is here. I'm frankly really not all that surprised that nobody is here today given the facts of the case; nevertheless, at this point the State would move to dismiss pursuant to statute (NRS 174.085).

33.) Plaintiff is hereby challenging the constitutionality of "NRS 174.085" on its face, as well as certain provisions such as 174.085(3),(4),(5),(6),(7) violates the United States Constitution. The law is clearly established. See Crist v. Bretz, 437 U.S. 28 (1978)

(1) Charge him with *

34) Hui, Hughes, Hoier, Baughman, Baca, Beas, Blutti and Ortiz failed to provide adequate law enforcement and/or acted in violation of Plaintiff's constitutional rights and/or acted pursuant to policy or custom and/or neglected their statutory responsibilities resulting to Plaintiff's injury and/or depriving him of liberty and/or property without due process of the law and/or equal protection under the law, conduct was deliberate indifference to Plaintiff's rights or violated clearly established statutory or constitutional rights of which a reasonable person would have known.

II. Sheriff Authorized A Policy or Custom Which Led to Plaintiff's Constitutional Rights Being Violated

35) Plaintiff hereby incorporates all his supporting facts to Count I of this Complaint, as if fully stated herein.

36) Upon information and belief, "[1]Sheriff authorized a program subjecting his subordinates Hui, Hughes, Hoier, Baughman, Baca, Beas, Blutti and Ortiz to "ride along" with Langley Productions to film the Reality TV show "COPS" to increase financial revenue for Clark County, in order to keep the Contractual Agreement/Revenue ongoing, he deliberately disregarded[2] Violations committed by them against Plaintiff and all persons similarly situated.

_____

(1) Sheriff authorized*, (2) Violations*

~ 8 ~

37.) Sheriff knew and/or should have known Hui, Hughes, Hoier, Baughtman, Baca, Beas, Bluth, and Ortiz violated Plaintiff's rights based on reports, annual progress summaries, lawsuits, misconducts, misconduct reports, memorandums, internal reviews, state rejection of cases, warrantless searches, etc, after learning of violations, he failed to remedy wrong or created policy or custom under which unconstitutional practices occurred or allowing such policy or custom to continue or he was deliberate indifference in managing subordinates who cause unlawful condition or event.

38.) Sheriff promulgated, created, implemented, promoted or possessed responsibility for continued operation of ride along policy or custom which caused unlawful search and seizure, False Imprisonment and Malicious Procurement of Arrest Warrant and his conduct was deliberate indifference to Plaintiff's rights, and other persons similarly situated.

39.) Sheriff failed to provide adequate law enforcement and/or properly train, supervise, direct or control actions of Hui, Hughes, Hoier, Baughtman, Baca, Beas, Bluth and Ortiz who caused Plaintiff's injury and/or authorized policy or custom which led to Plaintiff's constitutional rights being violated and/or neglected his statutory responsibilities resulting to Plaintiff's injury and/or depriving him of liberty and/or property without due process of the law and/or equal protection under the law, conduct was deliberate indifference to Plaintiff's rights or violated clearly established statutory or constitutional rights of which a reasonable person would have known.

- 9 -

III. Clark County Policy or Custom Were Moving
Force to Plaintiff's Constitutional Rights Violation

40.) Plaintiff hereby incorporates all his supporting facts to
Court I, II of this Complaint, as if fully stated herein.

41.) Clark County pursuant to its government policy or custom
of allowing the MPD to ride along with Langley Productions
to record and/or film content for a reality based show titled
COPS to generate financial revenue for said department, put
Plaintiff and all persons similarly situated in risk of having
their constitutional rights violated in order to secure a
product worthy of publication for COPS by curtailing search
warrants leading and/or resulting to Unlawful search and
seizure, False Imprisonment and Malicious Procurement of
Arrest Warrant, Plaintiff's constitutional violations are the
direct moving force of said policy or custom.

42.) Clark County pursuant to policy or custom violated
Plaintiff's Constitutional Rights resulting to his injury
and/or depriving him of liberty and/or property without due
process of the law and/or equal protection under the law,
conduct was deliberate indifference to Plaintiff's rights or
violated clearly established statutory or constitutional rights
of which a reasonable person would have known.

IV. Wolfson, Stanton, Weckerly, Luzaich Actions and/or Failures Violated Plaintiff's Constitutional Rights

43.) Plaintiff hereby incorporates all his supporting facts to Count I of this Complaint, as if fully stated herein.

44.) On or about February 24th, 2013 Plaintiff was arrested Los Angeles, CA for an Arrest Warrant in Clark County, NV.

45.) On or about March 21th, 2013 Wolfson authorized a Grand Jury, Stanton, Weckerly handled the proceedings returning a case against Plaintiff. (Grand Jury)

46.) On or about June 6th, 2013 Plaintiff's attorney's filed a motion to dismiss indictment pursuant to NRS 174.085 alleging violation of statute. On or about June 14th, 2013 Wolfson, Stanton intentionally misled the Court declaring "the Defendant bailed out on the six felony charges that evening. He remained so for two years prior to him being taken into custody on the outstanding warrant for his arrest." (Dismiss)

47.) On or about September 4th, 2013 Plaintiff's attorney's held a hearing with Stanton, Luzaich infront of the Court where Stanton said the following "saying that a reasonable person under these various conditions would not have known charges were pending, and therefore, he was not a fugitive."

48.) The Court said the following "....We have a letter here that indicates it is dated now, but it's reflecting what apparently can be seen by the detention services division at CCDC that the release was related to a DA denial..." ( Sept 4th)

49.) On or about June 24th, 2013 Robert Aguero performed an extraction of Plaintiff's mobile device, revealing a series of text messages between him and Valdez. (Extraction)

50.) On or about September 4th, 2013 Fassbender gave an interview to Plaintiff's attorney revealing she did not believe Valdez allegations. ( Fassbender)

51.) On or about September 19th, 2013 Fassbender visited Plaintiff at CCDC informing that after the trial Valdez meet with Stanton, Luzaich, regarding money she was owed, and that his attorney's did not try to protect him. On or about September 20th, 2013 Plaintiff was wrongfully convicted.

52.) On or about December 15th, 2016 The Supreme Court of Nevada # 65377 Order of Reversal and Remand of Plaintiff's case due to the District Court abused its discretion by denying his motion for self-representation. On or about January 14th, 2017 The District Court Clerk # C299275 signed the Receipt For Remittitur. (Reversed)

53.) On or about November 19th, 2019 Plaintiff's attorney filed a Motion to dismiss "Indictment" declaring the failure of Wolfson, Stanton, Weckerly and Luzaich to present exculpatory evidence to the Grand Jury pursuant to NRS 172.145

54.) Plaintiff hereby incorporates Indictment supporting facts and Argument to this complaint, as if fully stated herein.

55.) On or about August 24th, 2020 Plaintiff was attacked at Ely by an inmate and stabbed in the Brain causing him to become physically disabled, Upon information and belief, the inmate gave an interview citing information learned in the media about this case being the motivation.

56.) Plaintiff is relying on the EggShell Skull doctrine

57) Wolfson, Stanton, Weckerly, Luzaich has Plaintiff once scheduled for a retrial in April of 2023, in Violation of the Double Jeopardy Clause, he does not have an adequate remedy at law, Plaintiff will be forced to endure the personal strain, public embarrassment and expense of a criminal trial more than once for the same offense, the harassment by a case brought in bad faith and misconduct, where the threat cannot be eliminated by defense against a single criminal prosecution.

58.) On or about July 24th, 2022 Plaintiff Filed a Writ of Mandamus with the Supreme Court of Nevada # 85060, challenging the constitutionality of NRS 174.085 and dismiss of indictment due to Violation of Double Jeopardy as well as Prosecutorial Misconduct with holding exculpatory evidence in violation of NRS 172.145. On or about August 10th, 2022 The Supreme Court of Nevada denied the petition.

59.) State of Nevada, Wolfson, Stanton, Weckerly, Luzaich neglected their Statutory responsibilities and/or Failed their constitutional duties and/or acted to violate statutory laws and/or constitutional rights resulting to Plaintiff's physical injury and/or injury and/or unnecessary wanton and wanton infliction of pain and/or depriving Him of liberty without due process of the law and/or equal protection under the law, conduct was deliberate indifference to Plaintiff's rights and/or Health and Safety or violated clearly established statutory or constitutional rights of which a reasonable person would have known.

V. Negligence or Gross Negligence or Reckless or Intentional and/or With Intentional Infection of Emotional Distress in Violation of NRS 41.031

60.) Plaintiff hereby incorporates all his supporting Facts to Count I, II, III, IV of this Complaint, as if fully stated herein.

~14~

61.) Wolfson, Stanton, Weckerly, Luzaick, Clark County, Sheriff, Hui, Hughes, Hoier, Bears, Baughman, Baca, Bluth, Ortiz conduct was negligence or gross negligence or reckless or intentional causing Plaintiff intentional infection of emotional distress due to actions or inactions has exacerbated his mental health conditions such as anxiety, depression which he is currently taking Cymbalta for causing physiological and ~~plus~~ psychological Harm such as panic attacks, chest pains, hyper ventilation, hypertension, anger, suicidal ideations, nightmares, heighted state of fear and paranoia.

VI. Wolfson, Stanton, Weckerly, Luzaick Legal Malpractice in Violation of NRS 41.031 and Professional Code of Conduct

62.) Plaintiff hereby incorporates all His supporting Facts to Count IV of this Complaint, as if fully stated Herein.

### V. Claims for Relief

63.) Defendants, their agents and employees, with Knowledge of Plaintiff's rights Had Unlawfully searched and seized property, Falsely imprisoned, Malicious procurement of arrest warrant and with bad faith prosecuted, thereby endangering his health and safety, leading to reversal of conviction and physical injury, Unnecessary and wanton infliction of pain. Such acts and omissions of the Defendants violate rights secured to Plaintiff under the Fourth, Fifth, Eighth and Fourteenth Amendment to the United States Constitution.

64.) Defendants, their agents and employees, with knowledge of Plaintiff's right had a duty under the Fourth, Fifth, Eighth, and Fourteenth Amendment to the United States Constitution to not deny him of liberty and/or property without due process and/or equal protection under the law and/or taking property for public use without just compensation and/or subjecting him to unnecessary and wanton infliction of pain and agony.

65.) Defendants actions and/or omissions were negligent and/or reckless and/or intentional.

66.) Plaintiff has no adequate and sufficient remedy at law with which to address the wrongs alleged herein and will continue to suffer irreparable harm from the conditions of Defendants unless he is granted the equitable relief prayed for herein.

67.) As a direct and proximate result of the above described actions and omissions of Defendants, plaintiff has suffered general damages in the amounts in excess of $75,000 exclusive of interest and costs, the exact amounts of which will be proven at trial.

Prayer

WHEREFORE; Plaintiff prays for relief and judgment against the Defendants, and each of them as follow:

1.) That the Court determines and enter judgment declaring that the acts and omissions of the Defendants, as set forth above, violates rights secured to Plaintiff by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitutions;

2.) That upon hearing, the Court issue a TRO/preliminary injuction:

a.) Enjoining the Defendants, their employees, agents and successors in office to dismiss and/or stay proceedings in District Court, Eighth Judicial # C-249275, until the resolution of this action;

3) That each Defendants pay General damages in the amount of $75,000 for Pain, suffering and Shock;

4.) That each Defendant pay Punitive damages in the amount of $75,000 on account of wrong done to Plaintiff was aggravated by circumstances of malice, wanton, wicked and deceptive conduct;

5.) That each Defendant pay Compensatory damages in the amount of $150,000;

6.) That the Defendants be required to pay pre-judgment interest, legal cost and expenses, including reasonable provisions for Plaintiff's attorney fees;

7.) That the Court grant such further and additional relief that is appropriate herein.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable herein.

Dated this 18th day of August, 2022.

Respectfully Submitted,
/s/ Mr. Harris

# Verification

I, Ammar Harris have read the foregoing complaint and hereby verify that the matters therein are true, except as to matters upon information and belief, and as to those, I believe them to be true and all papers, pleadings and documents on file therein.

I certify under penalty of perjury that the foregoing is true and correct. 28 USC § 1746 and 18 USC §§ 1621

Executed at Clark County, NV
Dated this 18th day of August, 2022.

Ammar Harris # 1116547
HDSP; P.O. Box 650
Indian Springs, NV
89070
/s/ Mr. Harris

Certificate of Service

Plaintiff hereby request that service of the above and foregoing
be Electronic Filed to the following:

> Aaron D. Ford
> Nevada Attorney General
> Email: usdcfilings@nv.ag.gov
>
> Steven B. Wolfson
> Clark County State Attorney
> Email: steven.wolfson@clarkcountyda.com
>
> Anthony P. Sgro
> Sgro and Roger Law Firm
> Email: tsgro@sgroandroger.com

Respectfully Submitted,
/s/ Mr. Harris

EXHIBIT   A - "Incident Reports"

INCIDENT REPORTS

15 Pages



**ANTHONY P. SGRO**
**DAVID J. J. ROGER**
**JENNIFER W. ARLEDGE**
**COLLEEN N. SAVAGE**
**ALANNA C. BONDY**
**NICHOLAS V. SCOTTI**
**JAYME N. RICHARDSON**
**DANIELLE E. DUMIRE**
**KELLY B. STOUT**

March 11, 2022

**VIA USPS**
Ammar Harris, #1116547
PO Box 650
High Desert Prison
Indian Springs, Nevada 89070-0650

> **Re:** *STATE OF NEVADA VS. AMMAR HARRIS*
> **CASE NO. C-13-289275**

Dear Mr. Harris:

Enclosed are the following items related to the above referenced matter.

- Incident report
- DA incident report
- Request for prosecution
- Ashley interview
- Marissa statement
- Business records for Brilliant Inc.
- Search warrant dated 7/22/10
- Twitter direct messages
- Phone extraction
- Business records for Eye Candy Enterprises

Respectfully,

*/s/Tanya Hayden*

TANYA HAYDEN., *Paralegal*
*to Sgro & Roger*

ACB/th

Enclosures: As stated

**Incident Report**

HENDERSON POLICE
223 LEAD ST,
HENDERSON, NEVADA 89015

**Incident Number: 10-04092**

### Narratives

ENTERED DATE/TIME: 3/3/2010 11:57:00
NARRATIVE TYPE: INCIDENT
SUBJECT: FBR NARRATIVE
AUTHOR: PERDUE, WILLIAM

On 02/26/2010 I, Detective W. Perdue #1101 authored an application for search warrant for the residence of 475 Toucan Ridge Henderson, NV 89012 which was authorized by the Honorable Henderson Justice Court Judge R. Burr. Due to the fact it was anticipated that firearms would be located within the residence I authored an anticipatory application for search warrant to obtain a DNA buccal swab, digital photograph, and fingerprint capture from the following persons. Jordan Williams, Jenny Quintana, Jessica Medina, Rayna Felix and any other person located within the residence of 475 Toucan Ridge Henderson, NV 89012 at the time of search warrant service on the date of 03/03/2010 between the hours of 0300 and 1000. Also the stipulation was placed within the warrant that a firearm must be located within the residence in order to serve the warrant. The anticipatory search warrant was authorized by the Honorable Henderson Justice Court Judge R. Burr.

On 03/03/2010 at approximately 0530 hours the Henderson Police Department and North Las Vegas Police Department SWAT units served the search warrant at 475 Toucan Ridge Henderson, NV 89012. The Henderson Police Department SWAT unit advised that Officers B. Pollard and T. Hastie observed Jordan Williams, Ashley Fassbender, Jessica Medina, and Marissa Valdez-Pickett exit the master bedroom of the residence. The SWAT unit took all the aforementioned subjects into custody. Custody of the subjects was turned over to Henderson Police Department Detectives K. Tonry, R. Christopher, K. Slattery, G. Rockwell, and B. Wagner. SWAT Officer J. Dera advised he located a Mossberg shotgun under the master bedroom bed.

During the service of the warrant by SWAT Jenny Quintana drove onto the roadway of Toucan Ridge in a silver Corvette bearing Nevada plates (182UVE). She was stopped by officers and detained.

During the service of the warrant by SWAT Rayna Felix drove onto the roadway of Toucan Ridge in a gray BMW bearing Nevada plates (175VRU). She was stopped by officers and detained.

Detective Griffin later authored and application for search warrant for both of the aforementioned vehicles which was authorized by the Honorable Henderson Justice Court Pro Tem Judge Eugene Martin. (service of this warrant is documented later in the report)

The following Henderson Police Department personal were on scene:

J. Green
S. Hampton
R. Allison
R. Griffin
L. Gibson

00054

Printed by: perduew
Printed date/time: 3/9/10 13:21

## Incident Report

HENDERSON POLICE
223 LEAD ST,
HENDERSON, NEVADA 89015

Incident Number: 10-04092

C. Weske
D. Woolman
J. Ebert
K. Tonry
R. Christopher
K. Slattery
G. Rockwell
B.Wagner
A. Brunette
E. Little
P. Farrell (CSA)
T. Barber (CSA)

The following ATF personal were on scene:

T. Chittum
M. Wear
J. Tokos
E. Fox
T. Olson

The following LVMPD personal were on scene:

C. Hui
K. Bluth

I spoke with Jordan Williams while he was sitting on the curb after being escorted from the residence. I asked Jordan William if he lived at 475 Toucan Ridge Henderson, NV 89012 he said "no". I told Jordan Williams that I would like to explain to him why I was serving a search warrant at his residence. I told him I also wanted to ask him some questions pertaining to the on going investigation. Jordan Williams told me that he did not want to talk with me and that he wanted a lawyer. I told Jordan Williams that if he chooses to speak with me at a later date with his attorney present to call me.

I spoke with Marissa Valdez-Pickett and advised her of her Miranda rights to which she said she understood and would speak with me witnessed by Detective Christopher. Marissa provided a verbal a written statement that she moved from Texas to 475 Toucan Ridge Henderson ,NV with her friend Ashley Fassbender after being recruited by the company Eye Candy Girlz. Marissa advised she has smoked marijuana inside the residence but that she had no knowledge of firearms in there. Marissa stated that Jordan Williams and Jessica Medina sleep in the master bedroom. Her room was the first room upstairs on the left (bedroom #2). That Ashley Fassbender sleeps in the room on the second floor on the right at the end of the hall (bedroom #3). That Jenny

00055

**Incident Report**

HENDERSON POLICE
223 LEAD ST
HENDERSON, NEVADA 89015

Incident Number: 10-10726

Through my investigation of all witnesses' accounts I was unable to determine the primary physical aggressor and looked at the physical evidence.

I looked closely at the scratches on Ashley's chest that went from the left side of her neck to her right chest. The scratches were long and continuous. Looking at the scratches, and the fact that Ashley had a couple of broken nails on her right hand, it appeared as though the scratches on Ashley's chest may have been self inflicted. If the scratches to the chest were self inflicted then Ashley may have also caused the scratches on her face to be self inflicted as well.

Due to the fact there were multiple witnesses to verify each persons account of the incident and no independent witnesses, and the fact that the injuries could have been from a battery or self inflicted, I was unable to establish probable cause to affect an arrest.

Photographs were taken of Ashley, Jenny, and the residence and submitted into the Henderson Police Department Digital Evidence System.

Ashley, Jenny, Marissa, Hailey, and Yvonne completed voluntary witness statements.

Ashley and Jenny were issued domestic violence blue cards.

Ashley and Marissa collected their items and were given a courtesy transport to the HPD West Substation.

Due to the fact probable cause was unable to be established and no arrest was made, I request this case be closed.

cc: None
Attachments: 5

ENTERED DATE/TIME: 6/9/2010 17:54:44
NARRATIVE TYPE: SUPPLEMENT
SUBJECT: SUPPLEMENT
AUTHOR: PERDUE, WILLIAM

On 06/01/2010 I, Detective W. Perdue #1101 was notified that Henderson patrol officers were responding to the address of 475 Toucan Ridge Henderson, NV. I spoke with the on duty supervisor Sgt. Zobrist and informed him of an ongoing prostitution investigation involving the residence. Sgt. Zobrist advised that Ashley Fassbender and Marissa Valdez wanted to speak with me.

Detective L. Vincent #798 and I arrived in the area of Toucan Ridge at which time we conducted a digitally

HENDERSON POLICE
223 LEAD ST
HENDERSON, NEVADA 89015

Incident Number: 10-10726

recorded interview with Ashley and Marissa in my departmental vehicle. Both Ashley and Marissa advised that Jordan Williams makes the females associated with the residence work in strip clubs. The females are encouraged to solicit customers at the club for acts of prostitution. The girls must provide Jordan with seventy percent of their earnings.

Ashley and Marissa also advised that Jordan has lived at 475 Toucan Ridge Henderson, NV for an extended period of time prior to HPD serving a warrant 10-04092 at the residence when he was taken into custody.

A digital copy of the interview was uploaded into the digital evidence system under this report number and report number 10-04092. please refer to the copy of the interview for further details.









SW 2010___554___

LVMPD Event #100623-2334

FILED

Aug 9  7 54 AM '10

JUSTICE COURT
LAS VEGAS NEVADA
BY_____
DEPUTY

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

| STATE OF NEVADA | ) | | Harris, Ammar |
|---|---|---|---|
| | ) | ss: | DOB: 03-31-86 |
| COUNTY OF CLARK | ) | | SSN: 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 |

Detective **A. Beas, P# 5208**, being first duly sworn, deposes and states that he is the affiant herein, and that he is a Detective with the Las Vegas Metropolitan Police Department, currently assigned to the **Vice Section**, having been employed by the Department for **14** years.

There is probable cause to believe that certain property hereinafter described will be found at the following described premises, to-wit:

**Digital Storage Devices, impounded on LVMPD 67A form (or property report) under LVMPD event # 100623-2334, currently located in the LVMPD evidence vault, 3201 Technology Court, Las Vegas, Clark County, Nevada 89101, specifically:**

- **A white and silver Apple IPhone 16GB, serial # 8401738N3NQ.**

The property referred to and sought to be seized consists of the following:

1. **Digitally stored records, information and data, which may constitute evidence of Ammar Harris's involvement in the planning or commission of the crime(s) of Kidnap, Coercion, Pandering by Force, Robbery, Sexual Assault and Ex-Felon Possession Of Firearm, between the dates of June 2, 2010 and June 21, 2010.**

2. **Digitally stored records, information and data which would tend to establish the identity of persons who were in sole or joint control of the aforementioned digital storage devices during the period of time between June 2, 2010 and June 21, 2010.**

1



b)     The amount of data that may be stored in the hard drives and electronic storage device(s) is enormous, and the number or size of the hard drives and removable storage devices that will have to be searched pursuant to this warrant is not known.

c)     The data to be seized may be located anywhere on the hard drives and electronic storage device(s), including hidden files, program files, and "deleted" files that have not been overwritten.

d)     The data may be encrypted, or inaccessible without a password, and may be protected by self destruct programming, all of which take time to bypass.

e)     Because data stored on a computer or electronic storage device(s) can be destroyed or altered rather easily, either intentionally or accidentally, the search must be conducted carefully and in a secure environment.

f)     To prevent alteration of data and insure the integrity of the search, clones (master copies) of all data storage devices will be made. The clones (master copies) will then be searched and this process will take time and special equipment.

For this reason, your Affiant prays for the authorization to seize and examine the aforementioned items.

WHEREFORE, Affiant requests that a Search Warrant be issued directing a search for and seizure of the aforementioned items at the location set forth herein.

AFFIANT

SUBSCRIBED and SWORN to before me this 22th day of July, 2010.

JUDGE

CERTIFIED COPY
The document to which this certificate is attached is a full, true and correct copy of the original on file and of record in Justice Court of Las Vegas Township, in and for the County of Clark, State of Nevada.
By: _____ Deputy
Date: _____ 8-9-10

5

SW 2010 ___534___

VOF12069X

FILED

SEARCH WARRANT    EVENT NUMBER 100621-1468

Aug 9  7 53 AM '10

SEARCH WARRANT

JUSTICE COURT
LAS VEGAS NEVADA

BY _____ DEPUTY

| | | |
|---|---|---|
| STATE OF NEVADA | ) | Harris, Ammar |
| | ) ss: | DOB 03-31-86 |
| COUNTY OF CLARK | ) | SSN 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 |

The State of Nevada, to any Peace Officer in the County of Clark, proof by affidavit having been made before me by Detective A.Beas, P# 5208, said Affidavit attached hereto and incorporated herein by reference, that there is probable cause to believe that certain property, namely:

1. **Digitally stored records, information and data, which may constitute evidence of Ammar Harris's involvement in the planning or commission of the crime(s) of Pandering, Living From The Earnings Of A Prostitute, Living With a Prostitute and Furnishing Transportation to a Prostitute, between June 2, 2010 and June 21, 2010.**

2. **Digitally stored records, information and data which would tend to establish the identity of persons who were in sole or joint control of the aforementioned digital storage devices during the period of time between June 2, 2010 and June 21, 2010.**

**Is presently located at or upon:**

**Digital Storage Devices, impounded on LVMPD 67A form (or property report) under LVMPD event # 090215-0096, currently located in the LVMPD evidence vault, 3201 Technology Court, Las Vegas, Clark County, Nevada 89101, specifically:**

- **A white and silver Apple IPhone 16GB, serial # 8401738N3NQ.**

And as I am satisfied that there is probable cause to believe that said property is located as set forth above and that based upon the Affidavit attached hereto there are sufficient grounds for the issuance of the search warrant.

## SEARCH WARRANT    EVENT NUMBER 100621-1468

You are hereby commanded to search forthwith said premises for said property, serving this warrant between 7:00 am and 7:00 pm, and if the property is there to seize it, prepare a written inventory of the property seized, and make a return to me within ten days.

**DATED THE 22nd day of July, 2010**

JUDGE

CERTIFIED COPY
The document to which this certificate is attached is a full, true and correct copy of the original on file and of record in Justice Court of Las Vegas Township, in and for the County of Clark, State of Nevada.
By: _____ Deputy
Date: _____8-9-10_____

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## MONEY ACCOUNTING REPORT

Event Number: 100631 - 1468    Date & Time: 6-31-10  1340 hrs

Suspect: HARRIS  AMMAR

Check One ONLY  ☐ Evidence  ☐ Found  ☒ Deposit in General Account
☐ Seizure  ☐ Safekeeping  ☐ Recovered  ☐ Do NOT Deposit in General Account

IMPOUNDING OFFICER: HUI  P#: 8863  VICE BUREAU/SECTION

VERIFYING OFFICER: A. BEAS  P#: 5208  VICE BUREAU/SECTION

(REQUIRED FOR $500 OR MORE)

TOTAL AMOUNT IMPOUNDED: _____

| DENOMINATIONS | X | ACTUAL NO. OF BILLS/COINS | | AMOUNT |
|---|---|---|---|---|
| $1.00 | X | 7 | = | 7 00 |
| $5.00 | X | 2 | = | 10 00 |
| $10.00 | X | | = | |
| $20.00 | X | 6 | = | 120 00 |
| $50.00 | X | | = | |
| $100.00 | X | 4 | = | 400 00 |
| COINS | | | = | |
| Other | | | = | |
| | | TOTAL | $ | 537 00 |

SUPERVISOR VERIFYING AND MONITORING: [signature]  P#: 5345  CBB/83  BUREAU/SECTION

(REQUIRED FOR $500 OR MORE)

YF11.OW • ACCOUNTING  ·  PINK • EVIDENCE BAU

 **Incident Report** 

DISTRICT ATTORNEY

LAS VEGAS, NEVADA 89101

Incident Number: LLV100621001468

AFTER THE INCIDENT, MARISSA TOLD HARRIS THAT SHE WANTED TO GO HOME TO TEXAS AND
THAT SHE HAD CALLED A TAXI. HARRIS CANCELLED THE TAXI AND DROVE HER TO THE AIRPORT. -
HARRIS' FEMALE FRIEND "BRI" WAS IN THE CAR WITH HER AND HARRIS. "BRI" AND HARRIS
DROPPED MARISSA AT THE AIRPORT AND JUST DROPPED ALL HER CLOTHES AND BELONGINGS ON
THE FLOOR. MARISSA THEN CALLED HER FRIEND, JUSTIN JONES (DOB/12-16-88), TO PICK HER UP.
JUSTIN LIVES AT 1610 MONTESSOURI STREET AND OFFERED MARISSA TO STAY WITH HIM AT HIS
HOUSE UNTIL SHE WOULD GO BACK HOME TO TEXAS.

I ASKED MARISSA WHY SHE HAD WAITED SO LONG TO REPORT THE INCIDENT AND SHE SAID SHE
WAS AFRAID OF HARRIS. MARISSA STATED THAT HARRIS OWNS A GUN AND THAT HE KEPT THE
GUN IN HIS ROOM. HARRIS ALSO HAD MADE THREATS TO HER AND HER FRIEND ASHLEY
FASSBENDER, TELLING THEM THAT IF THEY CALLED THE COPS HE WOULD KILL THEM. MARISSA
ALSO TOLD ME THAT HARRIS WAS KNOWN FOR PIMPING GIRLS BACK IN ATLANTA. MARISSA STATED
THAT SHE IS WILLING TO PROSECUTE AND GET A SEXUAL ASSAULT EXAM, BUT THAT SHE WAS
AFRAID THAT IF HARRIS WAS TO FIND OUT SHE CALLED THE COPS, HE WOULD KILL HER. MARISSA
TOLD ME THAT SHE COULD BE PREGNANT WITH HARRIS' BABY AND THAT SHE WANTED TO HAVE
HARRIS PAY FOR THE ABORTION.

PATROL FOLLOW-UP: □S/A DET.  S. MILLER, P#6507, NOTIFIED
□VICE DET.  C. HUI, P#8263, CS V-19 RESPONDED
□VICE SGT.  HOIER, P# 4344, CS 533, NOTIFIED & RESPONDED
□VICE LT. KAREN HUGHES, P#2928, RESPONDED

## Signatures

_____     _____
Reporting Officer                                                      Date

_____     _____
Supervisor                                                               Date

EXHIBIT    B - " Valdez "

MARISSA VALDEZ-PICKETT

46 Pages

# Las Vegas Metropolitan Police Department

12 Mar 2013

## VALDEZ-PICKETT, MARISSA M

CS # : 3043288

Trans. No. : 1NEC05000116474

Charge(s)



Orig CFP Iss: 5/17/2010

Date of Birth: ~~6/11/1991~~

Sex : Female

Race : White

Height : 5'8"

Weight : 140

Hair Color : Brown

Eye Color : Hazel

FOR LAW ENFORCEMENT USE ONLY

Copyright © 2011 All rights reserved. Las Vegas Metropolitan Police Department

| Valdez | : | He goes by Jada...but I believe his name is Terrence Harris. |
|---|---|---|
| Det. Hui | : | Terren Terrace? |
| Valdez | : | Terrence Harris. ..ence...all e's. |
| Det. Hui | : | Te... |
| Valdez | : | rrence ... |
| Det. Hui | : | So Terrence Terrence... |
| Valdez | : | No...no..no...his first name is Terrence, last name is Harris. H-a-r-r-i-s. |
| Det. Hui | : | Okay. I have the same problem as you. (Laughing) Okay but he goes by Jada. |
| Valdez | : | Yeah. |
| Det. Hui | : | And he's a black male adult about 26, 5'10, medium build? |
| Valdez | : | Mmmhmm (meaning yes). |
| Det. Hui | : | And would you be able to pick him out of a picture.... |
| Valdez | : | Yes. |
| Det. Hui | : | if I showed you... |
| Valdez | : | I have a picture of him if you want to see it. |
| Det. Hui | : | I ..I do will get to that afterwards. |
| Valdez | : | I showed them already. |
| Det. Hui | : | Okay. Don't let me forget about that. |
| Valdez | : | Okay. |

| Det. Hui | : | Okay. So tell me about how you met him? When you met him? And then go from there. |
|---|---|---|
| Valdez | : | Well...um..after we got kicked out of Carmen's house Ashley had already been talking to him and they were friends and she would go out with him and say he was really nice. I like him. Like saying all this stuff ....you can (inaudible) ..yourself if you want to. |
| Det Hui | : | Okay...oh..okay,...we'll do that. |
| Valdez | : | Ummm...that he's really nice and (inaudible) and she called him and um..he said yeah you could come and like I don't want you...I don't want to leave you on the streets. Like I don't want you to be on the streets like he was doing us a favor. Never once did he ask for money or anything. |
| Det. Hui | : | At this time? |
| Valdez | : | yes. |
| Det. Hui | : | And this was a week ago. |
| Valdez | : | Um..it was..no it wasn't a week ago it was June 2nd. That day we left Carmen's is the day we got to his house June 2nd. |
| Det Hui | : | Okay. |
| Valdez | : | I believe but it will be on the report it I'm wrong,...the police report. |
| Det. Hui | : | Okay. From Ashley? |
| Valdez | : | Well umm...it will be on the police report the day that ...the day we left...that Jada and...and that Carmen and Jada were fighting Ashley. |
| Det. Hui | : | Oh..it will be on Henderson's police report. |
| Valdez | : | Yeah..if I have the date wrong it will be on there. |
| Det. Hui | : | Okay. |

| | | |
|---|---|---|
| Valdez | : | But it should be June 2nd. |
| Det. Hui | : | And because on tape..no nobody's going to know what were talking about ...were talking about the incident that occurred at Carmen and Jordan William's house with Ashley when Henderson PD arrived. And they filed...Ashley filed a report with Henderson PD... |
| Valdez | : | Against Jada..and Carmen. |
| Det Hui | : | Okay. And ...um.. |
| Valdez | : | but nothing happen because they couldn't prove it. |
| Det. Hui | : | that's the day you guys left? |
| Valdez | : | Mmmhmm (meaning yes). |
| Det. Hui | : | Okay so you guys left there and you went over and you met him on June 2nd and you started staying at his house? |
| Valdez | : | Mmmhmm (meaning yes). |
| Det. Hui | : | And then what? |
| Valdez | : | At his apartment. Um..um...he never said anything about any money he..just that he was doing us a favor and me and Ashley both told him that we were trying to save up our money and get our own place that we weren't going ...we didn't want to stay there very long and he was okay with that. |
| Det. Hui | : | Okay. |
| Valdez | : | Um..I left San Antonio um...a couple days later on June 4th..because my sister's graduation was June 5th, Saturday... |
| Det. Hui | : | Okay. |
| Valdez | : | And I didn't get back till this past Friday which was the 20th.. Or not the 20th...I got back Friday though. Friday morning. |

| Det Hui | : | Okay. Who picked you up? |
|---|---|---|
| Valdez | : | Um...Jada did. |
| Det. Hui | : | Okay. |
| Valdez | : | The guy Jada. Because there was a Jada at the house and then there... |
| Det. Hui | : | Okay so Jada. ...picked you up on Friday morning. |
| Valdez | : | Mmmhmm (meaning yes) |
| Det. Hui | : | In what vehicle? |
| Valdez | : | Um..it's a ...I think it's um..645 CI BMW. Cause it was the same one as the Beemer back at Carmen's house but it was white and it's convertible, black rims, black tint, black top. |
| Det. Hui | : | Okay. |
| Valdez | : | Um..picked me up..went to work that night, that Friday night.. |
| Det. Hui | : | Went to work where? |
| Valdez | : | Little Darlings |
| Det. Hui | : | Okay |
| Valdez | : | Um...went to work...um...came home the next day everything was fine um...I came home Saturday morning everything was fine. Went back to work Saturday night um...I made more money then I had ever made before so I was really excited um..I made 9 something, so I cashed out um..giving the club 2..$420 I still have the receipt...giving them $420 so I had $500 something left and um...whenever I woke up in the morning...or I woke up at 3:00, I went to sleep around 6 or 7. Woke up at 3, um..he told me to put my money in this box that he had and I started asking him why...like what do you mean...like why ..why am I going to put it...like he just put it in the box, put it in the |

box, kept telling me and I was like telling him like no..we already talked about this I told you I was going to keep my money. I'm trying to save my money so I can leave. Um...he was like...he was like I'm not going to ask you again..put your money in the fucking box...like yelling at me and I never did it um...so whenever I didn't do it he went over to ...he went over to my purse, got my wallet out of my purse and took it. Um..after that this..this all happen yesterday..after that I was going..I was walking towards him asking him why are you taking my money? Like what are you doing? Why are you taking my money? Why are you doing this and um...he just got real mad he turned around grabbed my neck and put me against the sliding glass door.

Det. Hui    :    Okay.

Valdez    :    Um...and he was like...um....

Det. Hui    :    He grabbed your neck with both of his hands?

Valdez    :    No. Just one of his hands.

Det. Hui    :    Which...do you remember which one?

Valdez    :    Mmmm...probably his right hand. Oh okay well he like ...(inaudible) sliding glass door he was like you're not getting your fucking money back. You're not going to get it back until he started walking away and I went towards him again..why? Why aren't you going to give me my money? And he was like...he was like...if you come at...come at me again I swear to God I am going to knock you the fuck out. ..(inaudible)...grabbed me by my neck or he had me by my throat and he just pushed me back onto the bed. And then he took my wallet out into the living room um...and he gave it to his roommate Brie..and she kept it in the room with her...and then um..

Det. Hui    :    Took it into the living room?

Valdez    :    No. He took...he gave it to her in her bedroom.

Det. Hui    :    Okay.

| | | |
|---|---|---|
| Valdez | : | Umm..I started getting all my things ready to go...I had all my bags packed ... |
| Det. Hui | : | I'm sorry...he threw you on the bed? |
| Valdez | : | Mmmmhmm (meaning yes) ..and then like right after that after he threw me on the bed I was like having a panic attack and I was sitting on the bed and I couldn't breath and he was telling me to stop like I was over exaggerating but I was like.he was why are you ..why are you crying..I was like I'm scared like what do you mean why am I crying..I'm scared. And um...he like...he was smoking..he like opened the sliding glass door and he was smoking a cigarette and he was like see...now your making me feel bad...like I'm the bad guy. |
| Det. Hui | : | Okay. |
| Valdez | : | ...Like I'm the bad guy and um....like I'm the bad guy and then he like he grabbed my hand and he like went and laid down on the bed like I didn't put that in there I didn't think it was real... |
| Det. Hui | : | That's okay. |
| Valdez | : | he just laid down on the bed and he was just like ummm..now you're making me feel bad and all this stuff and he was like so what..like what are you on..or telling me all this stuff and I was like I just want to leave I don't want to be here. |
| Det. Hui | : | Okay. |
| Valdez | : | And he was like..do..are he was like I think you're making a hasty decision and I think you should think about it. I was like what do you mean I was like what do you mean I was like you choked me I was like been ..been in an abusive relationships before I know when to leave..I know when to get out. |
| Det. Hui | : | Okay. |
| Valdez | : | ...and he ummm..and he was like that was it..and he then like walked out of the room and he went to sleep umm...while I got...he was |

asleep in the living room while I got all my stuff out of there..and I wanted to leave but I couldn't leave because Brie had my wallet and I couldn't ask her because she wouldn't give it to me of course ..you know...she's ...she's helping him.  And so I called a cab and everything ...I called a cab and they had came and like I was..I woke him up to get like the ...him to buzz number whatever..to open the gate for the cab...and he wouldn't do it he told me to like call them and cancel it or whatever so I did and um...I cancelled it and then like..he was talking to me more and I was still trying to tell him to give me my money and he wasn't giving it back...he still wasn't giving it back to me...telling me I wasn't getting it back and then ..umm he was like he was saying he gave it to Brie...He was like I gave your money to Brie and now she thinks it's unfair that you want it back.

Det. Hui    :    Okay.

Valdez    :    and ummm...

Det. Hui    :    How much money was it?

Valdez    :    $600.00

Det. Hui    :    In cash?

Valdez    :    Mmmhmmm (meaning yes)

Det. Hui    :    Okay.

Valdez    :    And before that the second day I got there like on June 3rd he took $160 from me..I was counting in my wallet um...just counting it in the backseat and he was like what is that...he was like let me see that..and he was sitting in the front seat and I was sitting right here and I handed it to him and he took it and I never got it back.  Even when I went home the next day.

Det. Hui    :    Okay.  So you call the cab.  What company?

Valdez    :    um...I don't know I have the number though.

| Det. Hui | : | Okay. You called the cab you ordered it and then what happen. He told you to cancel it... |
| Valdez | : | and so I cancelled it..ummm...Okay...the cab was 702-384-2322. |
| Det. Hui | : | 384-2322? Does it tell you what time you called? |
| Valdez | : | Ummm...that was 7:30 and then I called 7:20.. |
| Det. Hui | : | p.m. or a.m.? |
| Valdez | : | p.m. |
| Det. Hui | : | Okay. When Brie had your wallet was your ID and stuff in there? |
| Valdez | : | Mmmhmm (meaning yes) |
| Det. Hui | : | Is that why you couldn't leave? |
| Valdez | : | Yeah. |
| Det. Hui | : | Because you needed that. |
| Valdez | : | Yes. |
| Det. Hui | : | Okay. Okay so you..he...you call the cab after he told you, you cancelled it then what happen? |
| Valdez | : | Umm...after that we were...were in the house still and I was kind of like I was calmed down because I didn't want to start yelling and then him start yelling and I didn't want it to escalate again so I was talking to him calm and I was saying to him I didn't understand why he was taking my money. Why he was keeping it. Umm...and then after I packed all my stuff umm...he like made me get in the shower with him and I told him I didn't want to...I didn't want to get in the shower I was like I don't want to get in I was like I don't want to take a shower...I just want to leave. I just want to go. He was like you don't want to take a shower what and saying all this stuff but he was like come on, grabbed me by my arm and pulling me towards |

the shower. I didn't know what to do I didn't want to fight him so I just went along with it but when I was in the shower he was like ...trying...he was like I won't try anything I promise...he's like I won't try anything I promise...I was like okay...so we got into the shower and then he was like ...he was like but I didn't promise that you wouldn't do anything...and I was I didn't do anything like and then he started like kissing me and I was like...I was like scared and I was pissed off I just didn't want to be around him and I was just standing there like showered myself and he was kissing me so once I wasn't cooperating or whatever he just like finally gave up and so we got out of the shower and he left the room and that was it.

Det. Hui    :    So he attempted to sexually assault you but he didn't actually?

Valdez    :    Well he was like touching me.

Det. Hui    :    Okay

Valdez    :    and I was telling him that I didn't want to get in the shower with him umm...

Det. Hui    :    Okay. I'm sorry but I need you to define touching your breasts, touching your...

Valdez    :    Well he was kissing on my neck and touching on my boobs.

Det. Hui    :    Okay.

Valdez    :    and touching me with his hands on my vagina.

Det. Hui    :    Okay. Did he have any digital penetration?

Valdez    :    Ummm....Yes.

Det. Hui    :    Okay. With his fingers?

Valdez    :    Yes. On the second day I was there umm...I ...I ...haven't talked that part yet. The second day after the rape. I was telling everything that happen yesterday.

Det. Hui     :     And all this still happen in the shower right?

Valdez     :     Mmmhhmm (meaning yes)

Det. Hui     :     Were you scared? Tell me how you felt when he put you in the shower with him.

Valdez     :     I was just scared like I didn't ..I didn't want to be there...I didn't ..I didn't want to talk to him, I didn't want to look at him like he was getting mad at me because I wasn't looking at him. He was like you can't look at me now or what? And I was like...ummuhum (meaning no).

Det. Hui     :     Were you afraid he would hurt you?

Valdez     :     Yeah. He had choked me I didn't know what he was going to do. Ashley told me he was crazy but I mean I didn't know..

Det. Hui     :     Did you think he had the ability to put you in the hospital or possibly kill you?

Valdez     :     Yeah. If he wanted to.

Det. Hui     :     Okay. When ...Okay what happen after that?

Valdez     :     Mmmmm...after that ....

Det. Hui     :     You get out of the shower you get dressed I assume.

Valdez     :     Mmmhmmm..(meaning yes) and I got dressed, he got dressed and he just left the room and he went to the living room.

Det. Hui     :     And then what did you do?

Valdez     :     Ummm...I was getting...I continued to get my things ready to leave and umm..then later on he was like I think I'm mistaken that was earlier in the day..that was before I packed everything but I know I had packed a lot of things already. Umm...and then I just continued to pack the rest of my stuff and umm...and I was going to call a cab

and he wouldn't let me call the cab because he wouldn't give me money he wasn't going to give me any money for a cab or to get on the plane or anything and he was...he was like I'll ship all your stuff to you..and but I didn't ..I don't trust him to do that so I didn't. I was like no I'll just take it because we're calculating how much it was going to be to take all my things on a plane and I was...I was like I have money I will pay for it. I don't care how much it costs I'll pay for it.

Det. Hui    :    Okay.

Valdez    :    ...and he didn't let me he wasn't giving me any of my money back umm...and then he sent Brie in..in my room to talk to me umm...and she was saying that..that it's not she was like do you feel entitled to your money? Do you think I should give it back to you because I had stayed there ...I'd stayed there for umm...from the 2nd to the 4th for two days before I left for ten days, came back and I had been there three days ...yesterday was the third day.

Det. Hui    :    Okay.  So she was trying to insinuate that the money was hers because you were there for three days.

Valdez    :    Yeah.  But nobody had ever talked to me about money.  He was saying that he was doing it to help us.

Det. Hui    :    Okay.  So Brie comes in the room she starts talking to you about that and then when does she finally leave the room?

Valdez    :    She just talked to me for a little while and then she left.  I don't know what time it was.

Det. Hui    :    Okay.  And then what happen from there?

Valdez    :    Ummm...she was just explaining to me that I wasn't getting my money back.

Det. Hui    :    Okay.

| Valdez | : | That I was entitled to it. And I was like I don't understand I was like nobody ever told me about any kind of money. Nobody ever said anything like that. If someone told me I had to pay rent I had to ..I have to support myself here if I was going to stay here I needed to pay for my own things I need to pull my own weight then I would but nobody ever told me that. |
|---|---|---|
| Det. Hui | : | Okay. |
| Valdez | : | And..and I told Brie I was trying to save up my money and she was like well that's not my problem. |
| Det. Hui | : | Okay. And then what. Is that when you left? |
| Valdez | : | Um...and then they wouldn't let me call a cab until he..she still had my wallet... |
| Det. Hui | : | What did he say about you can't call the cab. Did he take your phone from you? |
| Valdez | : | Well he took it from me at first and then he gave it back because I kept getting text messages and then Justin had called me. |
| Det. Hui | : | When do you think he took your phone...at what point? |
| Valdez | : | Ummm...I'll see what time Justin called me. |
| Det. Hui | : | Why did he take your phone? So that you wouldn't be able to leave? |
| Valdez | : | I don't know why he took it. |
| Det. Hui | : | What do you think? |
| Valdez | : | So he...just so he would have my phone so I wouldn't have shit. So I wouldn't have money and I wouldn't have a phone. |
| Det. Hui | : | Okay. So you couldn't leave so you couldn't call a cab? |
| Valdez | : | Justin called me around 4. Yeah. |

| Det. Hui | : | So you couldn't call the police do you think? |
|---|---|---|
| Valdez | : | Probably. |
| Det. Hui | : | Okay. |
| Valdez | : | Justin called me around 4:13 so he probably had it for about 20 minutes. |
| Det. Hui | : | Okay. When he gave you your phone back did he say anything when he gave it back. |
| Valdez | : | No. Cause it was ringing. |
| Det. Hui | : | Okay. And then ...and then what happen. |
| Valdez | : | Ummm...after I talked to Brie I took all my stuff out of his bedroom and I put it in the room and I had a bunch of bags like a bunch of bags cause it wasn't only my stuff it was me and Ashley's stuff. |
| Det. Hui | : | Okay. |
| Valdez | : | And so there was a bunch of it and ummm...he was like man..he was like oh Ashley called him because he had been calling Ashley all day or whatever and Ashley wasn't answering the phone cause Ashley's like afraid of him she doesn't want to talk to him she doesn't want to say anything to him ummm...so he was calling her and she wasn't answering and I was talking to her during the day you know telling her what's going on, texting her, telling her ummm...all the stuff that had happen and ummm...she..and then like she finally called him and she was like well what's going on. He was like...he was like...what..he was like your going to come at me your going to come at me like that, yo want to try again. And then I don't know what Ashley said I didn't hear....I didn't hear anything she said but umm..after that he was like man I was ...I was going to give you $200.00 dollars so you wouldn't go home broke but fuck now your not getting shit. Umm...and so I left and .... |
| Det. Hui | : | And then you left? |

| | | |
|---|---|---|
| Valdez | : | Yeah. |
| Det. Hui | : | And you went to the airport or you left because Brie took you to the airport right? |
| Valdez | : | Yeah. Brie took me to the airport, she like got all my stuff or we all he like he helped take all my stuff and put it in her car and umm...then she dropped me off at the airport and like in the passenger parking lot and umm...passenger pick up parking lot and put it all on the sidewalk and |
| Det. Hui | : | Last night? |
| Valadez | : | he...he told her ...yeah... |
| Det. Hui | : | about 7 p.m. Is that about right? |
| Valdez | : | Mhhmmm (meaning yes) |
| Det. Hui | : | Okay. |
| Valdez | : | Yeah 7 or 8. |
| Det. Hui | : | Okay. |
| Valdez | : | Wait let me... |
| Det. Hui | : | Did she drive the BMW? |
| Valdez | : | No she didn't. She has some kind of Toyota. |
| Det. Hui | : | What color? |
| Valdez | : | Black. Okay that must have been... |
| Det. Hui | : | Did he ....go ahead. |

| | | |
|---|---|---|
| Valdez | : | That must have been around 8:30 or after 8:30 because I was in the ..no...sometime between 8:30 and 9:00 that I left that I went to the airport. |
| Det. Hui | : | Okay. |
| Valdez | : | And ummm...she just put all my....he told..told her not to give me my ID and not to give me my wallet until I had all my shit out and I was out of the car. |
| Det. Hui | : | Did she finally give your wallet back to you? |
| Valdez | : | Yeah.  She did. |
| Det. Hui | : | Do you have any items at his house? |
| Valdez | : | No.  Other than money no. |
| Det. Hui | : | What's his ..what's his address do you know? |
| Valdez | : | Ummm...it's 250 E. Flamingo the Meridian. |
| Det. Hui | : | What's the apartment number. |
| Valdez | : | Building 3, Apartment #417 |
| Det. Hui | : | Has he been calling you at all? |
| Valdez | : | No.  He hasn't called me. |
| Det. Hui | : | Has Brie? |
| Valdez | : | No.  I don't have Brie's number.  She doesn't have mine. |
| Det. Hui | : | Describe Bre for me. |
| Valdez | : | Ummm....she's about 5'6", she's black, umm...can't weigh anymore then 120 maybe 110-115 lbs., ummm... |

| Det. Hui | : | Black hair I assume. |
|---|---|---|
| Valdez | : | Well she has...she's black but she dyed her hair like a golden blondish color. |
| Det. Hui | : | Okay. |
| Valdez | : | Brown eyes. |
| Det. Hui | : | What does she do to get by?  What does she do to make money? |
| Valdez | : | As far as I know she works at Fendi. |
| Det. Hui | : | Is she involved in prostitution? |
| Valdez | : | I don't think so. |
| Det. Hui | : | Did he try to get you involved in prostitution? |
| Valdez | : | No.  But ummm..he told me he has girls that are in prostitution. Whenever I...Whenever I told him ...whenever he was taking my money I was like..what is...what is this ..this isn't some pimp shit and he kind of like smirk like yes it is bitch. |
| Det. Hui | : | So were you under the impression that he was trying to turn you out? |
| Valdez | : | After that yeah I was but whenever I had got there the first week I was there I had talked to him, ummm..Ashley went to go apply at my work and I guess she didn't have the proper ID and whenever she got in the car he was like man a hoe would get slapped for some shit like that or something like that and I was like what...like what do you mean I was like you're going to hit her and like I had conversation with him later on and I was telling him I was like will you ever hit her...and he was like I don't want to lie to you.  And I was like will you ever hit me and he was like I don't think you'll give me a reason to hit you.  I was like what do you mean, I was like so I'm never going to make a mistake is that it like you're not going to hit me I'm never going to make a mistake and ummm....I don't remember him saying anything after that but I told him I was like I'm not trying to |

get involved ...I don't want a pimp, I'm not trying to get involved in anything like that I just want to leave like..I don't want to have anything to do with pimps I'm trying to save money and go and ummm...and far as I knew he understood....but went over yesterday I told him it wasn't some pimp shit and he kind of smirked like yeah it is.

Det. Hui     :     Okay. How many girls did he has that work for him?

Valdez     :     He didn't tell me he just vaguely mentioned girls back in Atlanta and he tried getting me and Ashley to go to Atlanta.

Det. Hui     :     Did he say it was for prostitution?

Valdez     :     He said it was to work and ....

Det. Hui     :     So by work did you assume it was for prostitution?

Valdez     :     Well I assumed it was for dancing because he never mentioned prostitution in front of me. But I think that he did that on purpose because if he said anything about prostitution I wouldn't go along with it at all.

Det. Hui     :     Do you think Brie works as a prostitute for him?

Valdez     :     No. I don't think so. She's ..

Det. Hui     :     What Fendi does she work at?

Valdez     :     I don't have an idea.

Det. Hui     :     Okay. So when did the shotgun come into play? Didn't he choke you with a shotgun?

Valdez     :     No. He didn't choke me with a shotgun. He after he choked me he like he grab..like there was ...he sleeps on the right side of the bed and the shotgun...I don't know if it was a shotgun...it looks like a big black gun..it's like maybe this...

| Det. Hui | : | A long gun? |
| Valdez | : | Yeah. |
| Det. Hui | : | Okay. |
| Valdez | : | It wasn't a handgun. It had two things on it... |
| Det. Hui | : | Black? |
| Valdez | : | ...like to grip things... |
| Det. Hui | : | Okay. Is it black? |
| Valdez | : | Mmmhmm (meaning yes). |
| Det. Hui | : | And it's next to the bed? |
| Valdez | : | Mmmhmmm (meaning yes). |
| Det. Hui | : | In his room? |
| Valdez | : | Mmmhmmm (meaning yes). |
| Det. Hui | : | Has he ever told you why he has it? |
| Valdez | : | No. |
| Det. Hui | : | Okay. So what did he do with the gun? |
| Valdez | : | He just took it out of the room. He said something about don't get crazy or I'm going to have to get crazy..or something like that. |
| Det. Hui | : | What did you think that meant? How did you take that? |
| Valdez | : | Oh..I mean ...I don't..I doubt he's afraid to use a gun like he told me before that he held a gun to some girl's head because she was talking back to him (inaudible)...he didn't want to shoot her he didn't want to hit her so he cut off all her hair. |

| | | |
|---|---|---|
| Det. Hui | : | When did that happen? |
| Valdez | : | I don't know he just said it was awhile back...or he did mention...(inaudible).... |
| Det. Hui | : | He told you this story? |
| Valdez | : | Yeah. He just said he did it. |
| Det. Hui | : | So did you think that when he went and took the gun did you find in threatening to you? |
| Valdez | : | Yeah. |
| Det. Hui | : | That he was trying to intimidate you? |
| Valdez | : | Yeah. He didn't point it at me or anything but he like grabbed it and walked out of the room with it. |
| Det. Hui | : | And made that little comment. Okay. When he was chok..was that the same day? |
| Valdez | : | What? |
| Det. Hui | : | That was right after he was done choking you right? |
| Valdez | : | Mmmhmmm (meaning yes). |
| Det. Hui | : | Okay. When he choked you did you pass out? Did you lose consciousness? |
| Valdez | : | No. I couldn't breathe I was like having a panic attack after that but it wasn't... |
| Det. Hui | : | So it was strong enough to stop your breathing though for a brief time... |

| | | |
|---|---|---|
| Valdez | : | Well I think I was just scared that I was having a panic attack I don't think it was from him choking me. He didn't choke me for a long time...he went like this ..against the wall... |
| Det. Hui | : | Okay. |
| Valdez | : | ...for a little while and then he stopped and after I went back to him again he was like just long enough (inaudible),...I'm going to knock you the fuck out..and then pushed me. |
| Det. Hui | : | Okay. Did he strike you at all? |
| Valdez | : | No. |
| Det. Hui | : | Is your red mark on your neck from there. |
| Valdez | : | No...it's probably just me doing ..... |
| Det. Hui | : | Okay. |
| Valdez | : | Yeah...no. I don't breathe easy so I don't have marks or anything on me. |
| Det. Hui | : | Okay. What's your.... |
| Valdez | : | I have bruises here they might be from him but I don't remember ..I don't..I don't usually ...I'm not clumsy or anything but I don't know how I got these. |
| Det. Hui | : | Okay. What happen on the ...the one day you wanted to tell me about? |
| Valdez | : | The second day that I got there ummm...he made me get in the shower with him and he made me give him oral sex and when I told him no when I told him I didn't want to do it anymore and when I stopped I just like pulled my face away...umm...he just was like masturbating in front of me...and then ejaculated just like on my face and here...on my chest and umm...he stood me up and he turned me |

|  |  | around and ummm...and made me have sex with him...have sex with him. |
|---|---|---|
| Det. Hui | : | Okay. |
| Valdez | : | I was saying to him I didn't want to and after we got out of the shower I told him not to say anything to Ashley because I was like scared because I felt like embarrassed and like scared and like I did something wrong because before I got there Ashley like umm....because he was trying to make it seem like I wanted it and I didn't. |
| Det. Hui | : | Did you tell him that you didn't want him? |
| Valdez | : | I told him I didn't want to. |
| Det. Hui | : | Okay. |
| Valdez | : | I didn't want to get in the shower with him because he was like him and Ashley were talking and you know and like and I don't like black guys ....(inaudible) .. I don't like black people in general like I'm not trying to be racist but guys like that I just have every black guy I have ever met was just like rude and like him just like ugly like to me I just wanted to be next to Jada because Jada..Jada was like Jordan. |
| Det. Hui | : | Yeah. |
| Valdez | : | And I didn't want to be around him and I just...I didn't want to be there at all..and I told him not to tell Ashley because like just not to tell her anything because I didn't want her to be mad at me and um.. |
| Det. Hui | : | Did you get into the shower with him or did he force you? |
| Valdez | : | Well he made me get in the shower. He didn't like he was just like telling me come on..come on like quit telling me no just get..just get in the shower. |

| Det. Hui | : | Okay. I assume that was so long ago that you have showered since right? |
|---|---|---|
| Valdez | : | Yeah. |
| Det. Hui | : | You've had sex with others since then too huh? |
| Valdez | : | Umm...just Justin. |
| Det. Hui | : | Okay. So when you got out of the shower you were still kind of scared? |
| Valdez | : | Mmmhmm (meaning yes) |
| Det. Hui | : | Did he use a condom in the shower? |
| Valdez | : | No. |
| Det. Hui | : | ...I know that is a stupid question but I have to ask. Okay. Did he have an orgasm inside you? |
| Valdez | : | No. As far as I know he didn't. |
| Det. Hui | : | Why did you come back after the 4th? |
| Valdez | : | Because I didn't trust him with all my stuff. |
| Det. Hui | : | So you came back to get your stuff. |

*[handwritten margin note:]* if I forced her to have sex why she came back? Plus now there's no evidence, no rape kit.

| Valdez | : | Yeah. I thought...I didn't ..I didn't have that relationship with him like him and Ashley were talking and .and while I was gone Ashley was here...Ashley was here with him and she was afraid of him like he had now...now that I talked to her she told her everything he did to me he was telling her what he did to her and saying that he ..she was like he had her on the floor like holding her down he was slapping her around and she was just telling him I'm sorry...I'm sorry just so he'd stop...and he was like throwing all the stuff around and um...just being crazy. But if there's some kind of like kit that I can |

take like um...like a ...like a rape thing I want to take it because Justin didn't hurt me and Jada did hurt me.

Det. Hui : Okay. When you say he hurt you. He was...was he rough?

Valdez : Yeah.

Det. Hui : Okay. How much money do you think that he took from you total? I guess $160.00 the first time right?

Valdez : and then $100 my friend wired me...

Det. Hui : When was that?

Valdez : Umm...he wired it to my..to Ashley for me. Cause I wasn't in town and she needed money for like food and stuff. Umm..my friend...my friend Paul umm....Folson if you want that information.

Det. Hui : Okay.

Valdez : Ummm...Ashley might have the receipt for Western Union. Fuson.

Det. Hui : What is it?

Valdez : F-u-s-o-n. Yeah.

Det. Hui : And it was Western Union?

Valdez : Yeah.

Det. Hui : And what day was that?

Valdez : Umm...I don't know I wasn't here.

Det Hui : Can you get me that information?

Valdez : Yeah.

| | | |
|---|---|---|
| Det. Hui | : | Or if I can call Paul and get it. So $100 dollars from when it was wired to you, he took that. |
| Valdez | : | Mmmhmm (meaning yes) |
| Det. Hui | : | and he took the $160... |
| Valdez | : | and he was saying that umm..that he used all this money that I owed him money because he owed her money to pay for all this stuff and whenever I had mentioned it that Ashley used my money she used $200 dollars. $200 dollars that I had. $100 no...I guess it was just the $100 that Paul gave me but I wasn't here for that. |
| Det. Hui | : | Okay. Does he have any computers or anything in the house? |
| Valdez | : | Yes. |
| Det. Hui | : | Does he use any Craigslist to do any posting or anything that you know of? |
| Valdez | : | I'm not sure. He has a bunch of business cards says Manager and Photographer and this bullshit. |
| Det. Hui | : | Does this say...(inaudible) |
| Valdez | : | Manager usually means pimp. |
| Det. Hui | : | Does it say a company? |
| Valdez | : | No. It just says Jada. |
| Det. Hui | : | Do you believe that he's a pimp? |
| Valdez | : | Yeah. I wouldn't put it past him. He..He didn't do it to me and he didn't do it to Brie that I saw and I know he didn't do it to Ashley but he talked about it that he ..I have girls in Atlanta that ..that are begging me to come out here and duh-duh-duh-duh..like .... |

*Handwritten note at bottom left:* Bitch you't trying to Jam me of without admitting she who has.

Interview with Marissa Valdez-Pickett
EV#100621-1468
Page 26 of *

| | | |
|---|---|---|
| Det. Hui | : | Do you think it is your impression that he just didn't get around to completely turning you out yet? |
| Valdez | : | I don't think he got around to it. I think if I would have stayed longer it would have just got worse. And then after all that stuff he was like this isn't me and I don't like doing this kind of thing and I don't like to yell at people but he always talks about it..like yesterday before I left he was like telling me he was like it's not going to be this way ..it's not going to be...it won't ...it's not going to happen again umm...now I see how you react and I know I can't talk to you like that, it's not going to happen..And I was like what do you mean it's not...you talked about shooting people and killing people and just doing things just because why am I suppose to believe that it's not going to happen again. |
| Det. Hui | : | Right. |
| Valdez | : | and he was like well you do make a valid point. |
| Det Hui | : | Did you have your own bedroom over there? |
| Valdez | : | uhhuhh (meaning no) |
| Det. Hui | : | Where..you slept in his room? |
| Valdez | : | Mmmhmm (meaning yes) |
| Det. Hui | : | Where did Brie sleep? |
| Valdez | : | In her room. |
| Det. Hui | : | So she had a room and then you slept in the room with him. |
| Valdez | : | We lived in a two bedroom apartment. |
| Det. Hui | : | Did you have voluntarily have sex with him? |
| Valdez | : | No. |

Handwritten annotations: WTF (LOL)

| Det. Hui | : | Is there anything else that you think that maybe I left out that you want to talk about? |
|---|---|---|
| Valdez | : | Umm...He took down my information whenever Brie had my ID I guess she wrote down all my information. That my social security card was in there and my ID with my mom's address is on there and if I brought new drama his way he would send someone to my mom's house. |
| Det. Hui | : | Okay. |
| Valdez | : | And I know that he has been in jail before. He said that he was in jail for two years before....but he didn't tell me for what. |
| Det. Hui | : | Have you...how long..have you seen that gun in ..with..his possession since you moved in...in June 2nd? |
| Valdez | : | What do you mean? Has it always been there? |
| Det. Hui | : | Has it always been there? |
| Valdez | : | Mmmhmm (meaning yes) |
| Det. Hui | : | What about Brie? Does she ever touch it or mess with it? |
| Valdez | : | I don't know she doesn't really go into his room unless she talks to him and I..I haven't been in her room. |
| Det. Hui | : | Okay. Umm.. |
| Valdez | : | And before I left he told me he would sell me if he wanted to. |
| Det. Hui | : | Was Brie...he would sell you if he wants to? |
| Valdez | : | Yeah. He was like ...he was like I can give someone ...he was like I tell someone...I can call some..one of my boys um..right now and tell him to give me $5000 dollars and sell your ass if I wanted to. |
| Det. Hui | : | Did he elaborate any further on that? |

| Valdez | : | No. |
|---|---|---|
| Det. Hui | : | Okay. Was Brie there when he was choking you? |
| Valdez | : | umm...she wasn't there but I know she knew about it because ... |
| Det. Hui | : | She wasn't in the apartment? |
| Valdez | : | No, she was in the apartment but she wasn't in the bedroom. |
| Det. Hui | : | Okay. |
| Valdez | : | He took me in the bedroom but I know she knew about it because whenever she came and tried to rationalize with me why I wasn't getting my money back she was like was it bad? |
| Det. Hui | : | Were you screaming loud enough to where she would hear it? |
| Valdez | : | No. He was screaming. |
| Det. Hui | : | He.. |
| Valdez | : | and then ..but I know like she saw me because whenever I walked out um...went in the living room behind him and whenever he gave him the wallet...whenever he gave her the wallet I was right there. |
| Det. Hui | : | Okay. |
| Valdez | : | He was like take this. |
| Det. Hui | : | So he said here take this, he gave Bre the wallet.... |
| Valdez | : | and she then just went into her room and hid it I guess. |
| Det. Hui | : | Okay. And then did you ask Brie for the wallet back? |
| Valdez | : | No I didn't talk to her. |
| Det. Hui | : | Cause you were scared? |

| Valdez | : | Well I mean I couldn't ..it would be like asking him cause she was going to tell him anyway..but then whenever I told her I was can you count it in front of me? And she was like count your money in front of you? She was like you don't know how much you have...and I was like ...I was like yeah but I want you to count it in front of me...I want you tell me how much I have in there. ..and she didn't do it. |
|--------|---|---|
| Det. Hui | : | Okay. |
| Valdez | : | She just like walked out and went to him and she was like she thinks she deserves for me to show her, count her money in front of her and he was like...he was sitting on the couch..and she..and he was like oh she's tripping or she's..she got me fucked up or something like that. |
| Det. Hui | : | Okay. This ends my interview. Same people are present. It's June 21, 2010, and the time is 1432 hours. |

**VEGAS METROPOLITAN POLICE DEPARTMENT**
**INCIDENT REPORT**

Page 1 of 6

Event # 100621 - 1468

| Specific Crime(s) | | | | Attempt | City | | | | Sect/Beat |
|---|---|---|---|---|---|---|---|---|---|
| SEXUAL ASSAULT / ROBBERY / ATT. PANDERING / KIDNAP | | | | ☐ | ☒FLD ☐M | ☐TELE ☒County ☐GM | ☐STA ☒F | | 1 |

| Location of Incident: (Number & Street) | Bldg. # | Apt. # | City | State | Zip Code |
|---|---|---|---|---|---|
| 250 E. FLAMINGO | 3 | 417 | LV | NV | 89109 |

| Occurred | Month 06 | Day 03 | Year 10 | Day/Wk THUR | Time UNK | Report Taken | Month 06 | Day 21 | Year 10 | Time 1149 | Bias Crime Y N Ⓤ | Gang Related Y N Ⓤ | Substance Abuse Y N Ⓤ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| On / Btwn. | 06 | 19 | 10 | SAT | 1600 | Citzn Advsd Follow-Up Ⓨ N N/P | Connecting Reports VOL STMT / WTS |

If Arrest was made, name Arrestee(s) on appropriate page and place # of Arrestees in box ▶ ▶ ▶ 0

| | P # 0754 | Reporting Officer A. BACA | Squad EA24 | Follow-Up Y N |
|---|---|---|---|---|
| Was there a witness? ☒ Victim ☐ Other | Can suspect vehicle be identified? | P # | | |
| Can suspect be named? | Is stolen property traceable? (identifiable?) | P # 14200 | Reporting Officer A. ORTIZ | Squad EA24 |
| Can suspect be located? | Is there physical evidence present? | P # | Supervisor Approving Report | Follow-Up Y N |
| Can suspect be described? | Is there significant M.O.? | | | |
| Can suspect be identified? | Criminalistics work performed? | P # | I.D. Specialist | |

**▼ ALWAYS LIST VICTIM(s) FIRST ▼**

| # | Veh # | Statement (Y) Can I.D. (Y) Obtained? Y Suspect? N | Name (Last / First / Middle) OR Business Name VALDEZ - PICKETT MARISSA MAR |
|---|---|---|---|

| Date of Birth 06/11/41 | Social Security # 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 | Race H | Sex F | Ht. 5'8 | Wt. 135 | Hair BRNZ | Eyes | Work Schdl. (Hrs / Days Off) VARIES | Business / School LITTLE DARLINGS |
|---|---|---|---|---|---|---|---|---|---|

| Residence Address: (Number & Street) 21545 PRIEST RD | Bldg./Apt.# | City SAN ANTONIO | State TX | Zip Code 78112 | Res. Phone: 210-902-9135 |
|---|---|---|---|---|---|

| Cellular Phone 210-621-0990 | International Phone | Email Address MARISSAMARIEVALDEZ@YAHOO.com |
|---|---|---|

| Bus. (Local) Address: (Number & Street) | Bldg./Apt.# | City | State | Zip Code | Occupation | ☐ Tourist: Depart Date |
|---|---|---|---|---|---|---|

| # | Veh # | Statement Y Can I.D. Y Obtained? N Suspect? N | Name (Last / First / Middle) OR Business Name |
|---|---|---|---|

| Date of Birth | Social Security # | Race | Sex | Ht. | Wt. | Hair | Eyes | Work Schdl. (Hrs / Days Off) | Business / School |
|---|---|---|---|---|---|---|---|---|---|

| Residence Address: (Number & Street) | Bldg./Apt.# | City | State | Zip Code | Res. Phone: Bus. Phone: |
|---|---|---|---|---|---|

| Cellular Phone | International Phone | Email Address |
|---|---|---|

| Bus. (Local) Address: (Number & Street) | Bldg./Apt.# | City | State | Zip Code | Occupation | ☐ Tourist: Depart Date |
|---|---|---|---|---|---|---|

| # | Year | Make BMW | Model 645 | Value |
|---|---|---|---|---|

| DESCRIPTION | 6 Golf Cart | 12 Off-Road | 18 Trailer |
|---|---|---|---|
| 1 2-door | 7 Hatchback | 13 Pickup | 19 Utility Truck |
| 2 4-door | 8 Mini Trk/Camper | 14 P/up w/Camper | 20 Van/Mini Van |
| 3 Bicycle | 9 Mini Trk/Utility | 15 RV | 99 Other (describe) |
| ④ Convertible | 10 Moped | 16 Snowmobile | BLK - RMS. TOP |
| 5 Dirt Bike | 11 Motorcycle | 17 Station Wagon | |

| License # | State | LIC Type | Mo./Yr. |
|---|---|---|---|

| VIN # | FEATURES | |
|---|---|---|
| | 4 Ft-Bumper | 20 4-WheelDrive | 34 Extra Antenna | 43 Door Panels Gone |
| COLOR 1 24 (top) | 5 R-Bumper | 21 Sunroof | 35 Primer | 44 Broken Windows |
| COLOR 2 24 (bottom) | 12 Bucket Seats | 22 Special Trees | 36 Rust | 45 Loud Muffler |
| COLOR 3 24 (mkldte) | 13 Bench Seats | 25 Special Rims | 37 Decorative Paint | 46 Trailer Hitch/Towbar |

| | 25 Yellow | 15 T-Top | 26 Roll Bar | 38 Metallic Paint | 49 Damage to Front |
|---|---|---|---|---|---|
| 1 Unknown 7 Bronze 13 Lt. Green 19 Purple, | 26 Primer/Blk | 16 Vinyl Top | 28 Spotlights | 39 Painted Inscription | 50 Damage to Rear |
| 2 Beige 8 Brown 14 Green 20 Red | 27 Primer/Gray | 17 Hubcaps | 29 Level Altered | 40 Sticker on Body | 51 Damage to Side |
| 3 Black 9 Copper 15 Dk. Green 21 Silver | 28 Chrome | | 31 Tinted Windows | 41 Sticker on Window | |
| 4 Lt. Blue 10 Cream 16 Maroon 22 Tan | 29 Lavender | **Lost/Stolen** | # of Plates | ☐ Front Where is Other Plate? | P # / Date / Time |
| 5 Blue 11 Gold 17 Orange 23 Turquoise | 30 Multi | **Plates Only** | Missing | ☐ Rear | WVS |
| 6 Dk. Blue 12 Gray 18 Pink ㉔ White | 99 Other | Vehicle used in Commission of Crimes? | ☐ YES ☐ NO | Event #'s | |

| ☐ Registered: Owner's Name (Last, First, Middle) or Firm Name | Date of Birth | Social Security # |
|---|---|---|
| ☐ Legal: | | |

| Address: (Number & Street) | Bldg./Apt.# | City | State | Zip Code | Res. Phone: Bus. Phone: |
|---|---|---|---|---|---|

**▼ S = Stolen   D = Damaged   L = Lost   E = Stolen, but Retained by Security ▼** — Property Listing Complete? Ⓨ N U

| Pers. # | SDLE Status | UCR Code* | Make or Brand / Model | Color(s) | Caliber Size | Barrel Length | S=Ser.# O=OAN M=Misc | Serial Number / OAN | Qty. | Description (Include other Marks of I.D.) | Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | S | A | | | | | | | 1 | $600 CASH | $600 |

| * UCR CODE CATEGORIES ▶ | A Cash/Notes/Casino Chips/etc. | E Office Equip. (Incl. Computers) | H Household Goods/Appliances | K Miscellaneous (Bicycles/Auto Parts/ |
|---|---|---|---|---|
| | B Jewelry & Precious Metals | F TVs/Stereos/Cameras/VCRs/Phones | I Consumable Goods (Incl. Drugs) | Badges/etc.) |
| | C Clothing & Furs | G Firearms (NOT Ammo or Scopes) | J Livestock (NOT Domestic) | |

LVMPD 603-A (REV. 8-07)

**LAS VEGAS METROPOLITAN POLICE DEPAR**
**INCIDENT REPORT**

Page 2 of 6

Event #
100621 - 1468

| # 2 | Veh. 1 | Statement Y Obtained? N | Name (Last, First, Middle) HARRIS, TERRIENCE | Monikers JAISUM | ID # |
|---|---|---|---|---|---|

| Age or DOB 26 | Social Security # | Race B | Sex M | Ht. 5'8" | Wt. 170 | Hair BRO | Eyes | Business / School | Occupation |
|---|---|---|---|---|---|---|---|---|---|

| Address: (Number & Street) 250 E. FLAMINGO | Bldg./Apt. # 3/417 | City LAS VEGAS | State N.V. | Zip Code | Res. Phone (404) 563-1148 |
|---|---|---|---|---|---|
| | | | | | Bus. Phone: |

| Last Seen Wearing | | | Citation # | A L | P# Taking ATL | Date | Time |
|---|---|---|---|---|---|---|---|

| # 3 | Veh. 2 | Statement Y Obtained? N | Name (Last, First, Middle) WRIGHT, BRIANA | Monikers | ID # |
|---|---|---|---|---|---|

| Age or DOB 10-23-81 | Social Security # 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 | Race B | Sex F | Ht. 53 | Wt. 105 | Hair BRO | Eyes BRO | Business/School AMERICAN GREETINGS | Occupation |
|---|---|---|---|---|---|---|---|---|---|

| Address: (Number & Street) 230 E. FLAMINGO | Bldg/Apt # B/417 | City LV | State NV | Zip Code 89109 | Res. Phone: 440-503-1084 |
|---|---|---|---|---|---|
| | | | | | Bus. Phone: |

| Last Seen Wearing BLUE/WHITE STRIPPED DRESS | | | Citation # |
|---|---|---|---|

**Narrative** 603B must be completed, whether suspect is in custody or not.

ON JUNE 21, 2010 AT APPROX. 1245 HRS I WAS DISPATCHED TO 1610 MONTESSOURI ST REFERENCE A SEXUAL ASSAULT AND ROBBERY COMPLAINT. UPON MY ARRIVAL I CONTACTED MARISSA VALDEZ-PICKETT 06-11-91 WHO TOLD ME THAT SHE HAD BEEN A VICTIM OF SEXUAL ASSAULT AND ROBBERY. MARISSA TOLD ME THAT ON JUNE 2 2010 SHE HAD MOVED IN WITH HARRIS, TERRIENCE AT 250 E. FLAMINGO BLD.3 APT#417. MARISA TOLD ME SHE MOVED IN WITH HARRIS BECAUSE SHE DIDN'T HAVE ANY PLACE TO LIVE, AND THAT HARRIS HAD OFFERED HIS PLACE JUST FOR A WEEK OR SO UNTIL SHE COULD FIND A PLACE TO LIVE. MARISA TOLD ME THAT SHE OFFERED TO PAY FOR RENT FOOD, AND CIGARRET

| ASSAULT DATA | LARCENY CLASSIFICATION | BURGLARY DATA |
|---|---|---|
| 1  Hands, Fist, Feet (with substantial injury) | A  Pocket-Picking<br>B  Purse-Snatching<br>C  Shoplifting<br>D  From Any Coin Oper. Machine | E  From Building (Exc. Shoplifting &<br>   Coin Oper. Machine)<br>F  From Autos (Exc.Parts & Access)<br>G  Other ___ | 1  Residence<br>3  Night (6 pm-6 am)<br>6  Force | 2  Non-Residence<br>4  Day (6 am-6 pm)   5  Unknown<br>7  No Force |
| 2  Hands, Fist, Feet (without substantial injury) | | | |

| PREMISE (general) | 14  Fast Food Restaurant | 29  Office | PREMISE (specific) | RELATIONSHIP TO SUSPECT |
|---|---|---|---|---|
| *Occupied?* (Y) N | 15  Fenced Yard | 30  Park | 1  Elevator | 1  None |
| 1  Airport | 16  Garage/Carport | 31  Public Building | 2  Driveway | 2  Co-Worker/Partner |
| 2  Apartment | 17  Gas/Service Station | 32  Rental Storage | 3  Parking Lot | 3  Former Co-Worker/Partner |
| 3  Bank/Savings/Credit Union | 18  Grocery Store | 33  Restaurant | 4  Rest room' | 4  Fiance |
| 4  Bar/Lounge | 19  Hospital | 34  Retail Business | (5)  Room | 5  Spouse |
| 5  Bus Station/Bus | 20  Hotel/Motel | 35  School/Child Care | 6  Sporting Event | 6  Former Spouse |
| 6  Casino | 21  Industrial Complex | 36  Shopping Mall | 99  Other ___ | (7)  Roommate |
| 7  Church | 22  Jail/Prison | 37  Single Family Residence | SURROUNDING AREA | 8  Former Roommate |
| 8  Condo/Townhouse | 23  Lake/Waterway | 38  Sports Complex | 1  Alley | (9)  Friend/Acquaintance |
| 9  Construction Site | 24  Liquor Store | 39  Store Room/Shed | 2  Adjacent Open Field | 10  Immediate Family |
| 10  Convenience Store | 25  Medical Office | 40  Street/Roadway/Alley | (3)  Middle of Block | 11  Neighbor |
| 11  Convention Facility | 26  Mobile Home | 41  Vehicle | 4  Corner | 12  Relative by Marriage |
| 12  Desert | 27  Mountain Area | 42  Warehouse | 5  Cul-de-Sac | 13  Rival Gang Member |
| 13  Dormitory | 28  Movie Theater | 99  Other ___ | 99  Other ___ | 99  Other ___ |

Patrol Follow-Up S.

SIA DET. S. MILLER P# 6507 NOTIFIED

VICE DET. C. HUI P# 8263 "V19" RESPONDED

VICE SGT. MOISER P#4344 NOTIFIED "533" RESPONDED

VICE LT. KAREN HUGHES P# 2928 RESPONDED

Page 3 of 6

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**INCIDENT REPORT**

Event # 100621-1468

| SEE COLOR LIST ON P.1A |
|---|
| **CLOTHING COLOR** |
| Headwear |
| Coat |
| Shirt |
| Pants |
| Shorts |
| Skirt |
| Shoes |

**BUILD**
1 1 Thin
②2 Medium
3 3 Heavy
4 4 Muscular

**HANDEDNESS**
1 1 Left
②2 Right

**HAIR LENGTH**
①1 Over Ears
2 2 Short
3 3 Bald/Shaved
4 4 Balding
5 5 Varied Length
6 6 Shoulder Length
99 99 Other

**HAIR STYLE**
1 1 Afro
②2 Curly
3 3 Jeri Curls
4 4 Straight
5 5 Braided
6 6 Thin
7 7 Ponytail
8 8 Flat Top
9 9 Shaved Design
99 99 Other

**FACIAL HAIR**
1 1 Clean Shaven
2 2 Unshaven
3 3 Full Beard
④4 Goatee
⑤5 Moustache
6 6 Sideburns
99 99 Other SOUL PATCH

**SPEECH MANNER**
1 1 Not Heard
②2 Not Unusual
3 3 Apologetic
4 4 Articulate
⑤5 Bad Grammar
6 6 Polite
⑦7 Profane/Abusive
99 99 Other

**SPEECH CHARACTERISTICS**
1 1 Accent
2 2 Stutter
3 3 Lisp
4 4 Slurred
5 5 Loud
6 6 Soft
7 7 Slow
8 8 Rapid
⑨9 Not Unusual
99 99 Other

**APPEARANCE**
1 1 Stocking Mask
2 2 Ski Mask
3 3 Bandana Mask
4 4 Costume Mask
5 5 Facial Disguise
6 6 Ragged/Transient
7 7 Business Clothes
⑧8 Casual Clothes
9 9 Uniform
10 10 Coat/Jacket
11 11 Dressed as Opp. Sex
12 12 Distinctive Jewelry
99 99 Other

**TEETH**
1 1 Normal
2 2 Missing/Gaps
3 3 Protrude/Overbite
4 4 Decayed
5 5 Crooked
6 6 Broken
7 7 Gold Design/Cap
8 8 Silver Design/Cap
9 9 Braces
99 99 Other

**EYES**
①1 Normal
2 2 Crossed
3 3 Small
4 4 Large
5 5 Afflicted Eye
6 6 Glasses
7 7 Contact Lenses
8 8 Different Colors
99 99 Other

**COMPLEXION**
1 1 Fair
②2 Medium
3 3 Dark
4 4 Suntanned
5 5 Acne
6 6 Pock Marks
7 7 Freckled
99 99 Other

**INJURY/CONDITION**
1 1 None Observed
2 2 Cast
3 3 Crutches
4 4 Cane
5 5 Limping
6 6 Bandages
7 7 Bleeding/Blood Stains
8 8 Appeared Sick
9 9 Appeared Intoxicated/UICS
99 99 Other

**TATTOOS (describe in narrative)**
①1 Name
2 2 Initials
③3 Words
4 4 Picture
5 5 Number/s
⑥6 Symbol/s

**SCARS / MARKS / TATTOOS & INJURIES (Location Identifiers)**
S = Scar    M = Mark
T = Tattoo    I = Injury
1 None Observed
2 Head
3 Left Cheek
4 Right Cheek
5 Chin
6 Forehead
7 Lip
8 Nose
9 Left Ear
10 Right Ear
11 Eyebrow/Eyes
12 Neck
13 Left Upper Arm
14 Right Upper Arm
15 Left Forearm
16 Right Forearm
17 Left Hand
18 Right Hand
19 Finger(s)
20 Chest
21 Back
22 Left Leg
23 Right Leg
99 Other

**PRIMARY MEANS OF ATTACK**
1 1 Handgun
②2 Shotgun
3 3 Rifle
4 4 Simulated Gun
5 5 Unknown Gun
⑥6 Strongarm
7 7 Threats
8 8 Drugs/Poison
9 9 Knife
10 10 Explosives
11 11 Vehicle
12 12 Club/Tire Iron
13 13 Blunt Object
14 14 Fire/Incendiary Devices
99 99 Other UNK BLD

**WEAPON FEATURES**
1 1 Chrome/Nickel/Stainless
②2 Blue Steel
3 3 Distinctive Grips
4 4 Automatic
5 5 Revolver
6 6 Large Frame
7 7 Small Frame
8 8 Short Barrel
9 9 Long Barrel
10 10 Double Barrel
11 11 Over/Under
12 12 Sawed Off
13 13 Bolt Action
14 14 Lever Action
15 15 Pump Action
99 99 Other

(Make/Model/etc.)

*SUSPECT DESCRIPTION*

---

**LIST THE PERSON MISSING IN THE SPACE PROVIDED BELOW**

| ☐ Adult CHECK ONE | ☐ Voluntary | ☐ Involuntary | ☐ Unknown | Missing Before? | Y N | Last Seen by Whom? | | Last Seen with Whom? |
|---|---|---|---|---|---|---|---|---|
| ☐ Juvenile CHECK ONE | ☐ Abducted by Stranger | ☐ Voluntary | | Where Last Seen? | | Date | Time | Probable Destination |
| | ☐ Abducted by Parent | ☐ Cause Unknown | | | | | | |

How Long at Present Address?

Previous Address (Number & Street) | Bldg./Apt.# City | State Zip Code | Place of Birth

Last Seen Wearing | Description of Jewelry | Scars, Tattoos, Teeth Info, etc.

| Blood Type | Fingerprints Available? Y N | Footprints Available? Y N | Body X-Rays? Y P N | Dental Records? Y N | Corrected Vision? Y N | Circumcision? Y N N/A | Photo Attached? Y N |
|---|---|---|---|---|---|---|---|

Cust. Parent / Lgl. Guardian (if Juv.) - Relative (if adult) | Relationship | ☐ Natural ☐ Step | Medical Info (medicines used, etc.)

Address (Number & Street) | Bldg./Apt.# City / State / Zip | Res. Phone: | Work Schdl. (Hrs / Days Off)
| | Bus. Phone: |

Parent / Legal Guardian (if juvenile) - Relative (if adult) | Relationship | Address (Number & Street) | Bldg./Apt.# City / State / Zip

*MISSING PERSON*

---

Year | Make | Brand (model) | Hull Identification # (HIN) | State Registration # | State / Year Reg.

| **VESSEL TYPE** | **HULL MATERIAL** | **TYPE PROPULSION** | Boat Length | Boat Color Primary Secondary | Engine Make & Model | H.P. |
|---|---|---|---|---|---|---|
| ☐ Runabout ☐ Canoe ☐ Cruiser ☐ Housebt ☐ Jet Ski ☐ Other | ☐ Wood ☐ Rubber ☐ Metal ☐ Other ☐ Fiberglass | ☐ Outboard ☐ In/Out ☐ Inboard ☐ Sail ☐ Oars/Pad ☐ Jet | | | | |

Engine Serial # | Propulsion Serial # | Value | Marks of Identification

*BOAT & TRAILER*

**TRAILER INFORMATION**

Year | Trailer Brand | Trailer License # | State | Year | Style | Trailer Length | # of Axles | Trailer Color | Primary | Secondary

Trailer VIN # | | Value | Marks of Identification

LVMPD 603 - B (REV. 9-97)

Page __4__ of __6__

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**INCIDENT REPORT**

Event # _100621 - 1468_

### ANY INFORMATION GIVEN SHOULD BE DETAILED IN NARRATIVE

| ENTRY/EXIT POINT | | |
|---|---|---|
| (Include Attempt) | ENTRY | |
| 1 Unknown | | |
| 2 Adjacent Building | EXIT | |
| 3 Attic/Crawl Space | | |
| 4 Balcony | | |
| 5 Coin Operated Machine | | |
| 6 Doggie Door | | |
| 7 Door | | |
| 8 Duct/Vent | | |
| 9 Fence | | |
| 10 Fire Escape | | |
| 11 Floor | | |
| 12 French Door | | |
| 13 Garage/Carport | | |
| 14 Roof | | |
| 15 Skylight | | |
| 16 Sliding Door | | |
| 17 Wall | | |
| 18 Window | | |
| 99 Other | | |

**ENTRY LOCATION**
1 Unknown
2 North
3 South
4 East
5 West
6 Front

**7 Rear**
**8 Side**
**99 Other**

**ENTRY OR ATTEMPT METHOD**
1 Admitted - No Force
2 Bodily Force
3 Broke Hole in Wall
4 Climbed In/Over/Thru
5 Concealment
6 Cut
7 Explosion/Burned
8 Fraud/Hoax
9 Kicked In
10 Knob Twist
11 Lock Punch
12 Open for Business
13 Pried/Jimmied
14 Smash & Grab
15 Unlocked
99 Other ____

**ENTRY TOOL**
1 Bolt Cutters
2 Chemicals
3 Club Type Object
4 Coat Hanger/Wire
5 Cutting Torch
6 Drill/Saw
7 Explosives

8 Glass Cutter
9 Key
10 Knife
11 Lock Pick/Card
12 Lock Puller
13 Pry Bar
14 Rock/Brick
15 Screwdriver
16 Vehicle
17 Vice Grips/Pliers
99 Other ____

**VEHICLE ENTRY**
P = Passenger Side   D = Driver Side
1 Front Door/Window
2 Rear Door/Window
3 Vent/Wing Window
4 Cargo Window
5 Windshield/Back Glass
6 Trunk/Hood
7 Roof/Top
8 Open Bed/Trailer
9 Camper Shell
10 Unlocked
99 Other ____

**SAFE ENTRY**
1 Drill
2 Explosives
3 Hammered

CIRCLE
P   D

4 Key/Combination
5 Pry/Peel
6 Removed from Premises
7 Torch
8 Unlocked
99 Other ____

**SUSPECT ACTIONS**
1 Ate/Drank on Premises
2 Attempted to Defeat Alarm
3 Covered Hands (Gloves, etc)
4 Cut Self/Bled at Scene
5 Cut/Disconn. Phone Cord
6 Defeated Alarm
7 Defecated/Urinated
8 Disabled Vehicle
9 Gang Graffiti/Markings
10 Had Property Close to Scene
11 Knew Loc./Hidden Valuables
12 Left Note or Message
13 Left Tools at Scene
14 Lived/Stayed on Premises
15 Malicious Damage
16 Ransacked
17 Selective in Loot
18 Suspect Left Personal Property
19 Took Keys
20 Took Time/Methodical
21 Tripped Alarm, Returned Later

22 Turned Lights On/Off
23 Used Lookout/Accomplice
24 Used Matches
25 Used Tools Found at Scene
26 Wiped/Removed Prints
27 Shoplifting
99 Other (See Narrative)

**VICTIM LOCATION**
1 Home
2 Church
3 In Hospital
4 Moving
5 On the Premises
6 Out of Town
7 Place of Entertainment
8 Shopping
9 Work/School
99 Other ____

**ADDITIONAL FACTORS**
1 Alarm Inoperative
2 Home Invasion
3 Key Hidden On/By Premises
4 Premises Under Construction
5 Premises Vacant
6 Similar Crimes in Neighborhood
7 Victim of Similar Crime
99 Other ____

| Maid | Inspectress | Electronic Locks  Y  N | Video Surveillance  Y  N |
|---|---|---|---|

### ANY INFORMATION GIVEN SHOULD BE DETAILED IN NARRATIVE

**PRE-INCIDENT CONTACT**
1 None
2 Gambling
3 Making Arrest
4 Opening/Closing –Business
5 Party
6 Shopping
7 Sleeping
8 Traffic Related
9 Walking
99 Other _LIVING TOGETHER?_

**VICTIM CONDITION**
1 Under 18
2 Over 65
3 Alone
4 Intoxicated/UICS
5 Physically/Mentally -- Challenged
6 Tourist
99 Other ____

**SUSP(s) SOLICITED/OFFERED**
1 Aid For Vehicle
2 Assistance
3 Con Game/Scam
4 Drugs
5 Information
6 Merchandise
7 Money
8 Ride
9 Sex
10 Use Phone
11 Work/Repair
99 Other ____
99 Other _CONCERNED FOR WELFARE OF VICTIM_

**SUSPECT(s) ACTIONS**
1 Choked/Strangled Victim
2 Covered Victim's Face
3 Cut/Stabbed Victim
4 Fired Shots
5 Forced Entry
6 Grabbed Purse
7 Had Victim Bag Property
8 Had Victim Lie Down
9 Handcuffed/Tied Victim
10 Hit/Assaulted After Act
11 Hit/Assaulted During Act
12 Hit/Assaulted Prior to Act
13 Locked Victim in Room/Area
14 Moved Victim's Location
15 Multiple Suspects
16 Picked Pocket

**SUSPECT(s) PRETENDED TO BE**
1 Customer
2 Job Applicant
3 Military Person
4 Police Officer
5 Renter/Buyer
6 Repair/Serviceman
7 Salesman

8 Seeking Someone
9 Sick
10 Survey/Census
99 Other ____

17 Presented Note
18 Pulled/Held/Grabbed Victim
19 Ritual/Occult Related
20 Shot Victim
21 Suspect's Face Concealed
22 Yelled Gang/Club Name
99 Other Unusual/MO Behavior

**SEXUAL ACTS**
1 Anal Intercourse
2 Ejaculated
3 Fondled/Sexual Abuse
4 Had Victim Bathe/Shower
5 Had Victim Disrobe
6 Had Victim Masturbate Subject
7 Homosexual Assault/Acts
8 Indecent Exposure
9 Masturbated Victim
10 Oral Sex
11 Showed Photos – Magazines / Movies

12 Used Sexual Paraphernalia
13 Vaginal Intercourse
99 Other _EJACULATED ON VICTIMS FACE_

**VEHICLE INVOLVEMENT**
1 Suspect A Pedestrian
2 Suspect Disabled – Victim's Vehicle
3 Suspect Forced – Victim to Curb/Stop
4 Suspect Forced Way – Into Victim's Vehicle
5 Suspect Hid In Victim's Vehicle
6 Suspect In Vehicle
7 Suspect Took Victim's Vehicle
8 Victim A Pedestrian
9 Vict. Forced Into Susp. Vehicle
10 Victim In Vehicle
99 Other ____

**S VEGAS METROPOLITAN POLICE DEPART**
**INCIDENT REPORT**

Event # 100621-1468

**Narrative** BUT, THAT HARRIS REFUSED TO TAKE THE MONEY. MARISSA TOLD ME THAT SHE HAD MEET HARRIS THROUGH HER FRIEND ASHLEY FASSBENDER. MARISSA STATED THAT ON JUNE 3 AT APPROX. 1500 HRS HARRIS FORCED HER TO GET IN THE BATHROOM, TAKE HER CLOTHES OFF, AND GET IN THE SHOWER. HARRIS THEN PROCEEDED TO TAKE HIS CLOTHES OFF AND GET IN THE SHOWER WITH HER. HARRIS THEN FORCED HER TO GIVE HIM ORAL SEX. WHEN MARISSA TOLD HARRIS THAT SHE WAS NOT GOING TO GIVE HIM ORAL SEX HARRIS CONTINUED TO MASTURBATE IN FRONT OF HER, WHILE SHE WAS SITTING IN THE SHOWER FLOOR TELLING HIM TO STOP. MARISSA STATED THAT AFTER A COUPLE OF MINUTES HARRIS EJACULATED ON HER FACE, THAN HARRIS PROCEEDED TO PICK HER UP FORCEBLY TURN HER AROUND WITH HE BACK TOWARDS HIS CHEST AND FORCERLY PENETRATED HIS PENIS IN HER VAGINAL. MARISSA STATED THAT HARRIS PROCEEDED TO RAPE HER WHILE SHE WAS TELLING HIM TO STOP. MARISSA STATED THAT HARRIS WAS NOT WEARNG A CONDOM, BUT THAT SHE BELIEVES HE DID NOT EJACULATED IN HER. AFTER THE INCIDENT MARISSA AND HARRIS GOT OUT OF THE SHOWER AND GOT DRESSED. MARISSA STATED THAT THE CLOTHES SHE WAS WEARING AFTER THE INCIDENT HAS BEEN WASHED.
MARISSA TOLD ME THAT ON JUNE 20 AT SAME LOCATION 250 E. FLAMINGO BLD 3, APT#417 HARRIS HAD GRABBED HER PURSE FROM HER ROOM AND HAD TAKEN HER WALLET OUT OF THE PURSE ATTEMPTING TO LOOK FOR MONEY. MARISSA TOLD HARRIS TO GIVE HER THE WALLET BACK, BUT HARRIS GOT VIOLENT AND VERBALLY ABUSIVE. WHEN MARISSA ATTEMTED TO GET HER WALLET FROM HARRIS HE PUT HIS HAND AROUND HER NECK PUSHED HER AGAINST THE WALL AND PROCEEDED TO STRANGULATE HER. AFTER A COUPLE OF SECONDS HARRIS LET GO AND PROCEEDED TO TAKE $600 OUT OF HER WALLET, AND PUT THEM IN HIS POCKET. HARRIS THEN FORCE MARISSA IN THE SHOWER FOR THE SECOND TIME AND MADE HER TAKE HER CLOTHES OFF AND GET IN THE SHOWER. HARRIS THEN GOT IN THE SHOWER WITH HER AND FORCED HER TO TOUCH HIS PENIS, WHEN

**NARRATIVE**

Page 6 of 6

S VEGAS METROPOLITAN POLICE DEPART

**INCIDENT REPORT**

Event # 100621-1468

Narrative

MARISSA TOLD HIM THAT SHE DID NOT WANT TO TOUCH HIS PENIS. HARRIS FORCED HIS FINGER IN HER VAGINAL. MARISSA STATED THAT SHE TOLD HARRIS TO STOP BUT THAT HE CONTINUED TO ASSAULT HER. AFTER THE INCIDENT MARISSA TOLD HARRIS THAT SHE WANTED TO GO HOME TO TEXAS AND THAT SHE HAD CALLED A TAXI. HARRIS CANCELLED THE TAXI AND DROVED HER TO THE AIRPORT. HARRIS FEMALE FRIEND "BRI" WAS IN THE CAR WITH HER AND HARRIS. BRI AND HARRIS DROPPED MARISSA AT THE AIRPORT AND JUST DROPPED ALL HER CLOTHES AND BELONGINGS ON THE FLOOR. MARISSA THEN CALLED HER FRIEND JUSTIN JONES D.O.B 12-18-86 TO PICKE HER UP. JUSTIN LIVES AT 160 MONTESSOURI ST. AND OFFERED MARISSA TO STAY WITH HIM AT HIS HOUSE UNTIL SHE WOULD GO BACK HOME TO TEXAS. I ASKED MARISSA WHY SHE HAD WAITED SO LONG TO REPORT THE INCIDENT AND SHE SAID SHE WAS AFRAID OF HARRIS. MARISSA STATED THA HARRIS OWNS A GUN AND THAT HE KEPT THE GUN IN HIS ROOM. HARRIS ALSO HAD MADE TREATS TO HER AND HER FRIEND ASHLEY FASSBENDER, TELLING THEM THAT IF THEY CALLED THE COPS HE WOULD KILL THEM. MARISSA ALSO TOLD ME THAT HARRIS WAS KNOWN FOR PIMPING GIRLS BACK IN ATLANTA. MARISSA STATED THAT SHE IS WILLING TO PROSECUTE AND GET A SEXUAL ASSAULT EXAM, BUT THAT SHE WAS AFRAID THAT IF HARRIS WAS TO FIND OUT SHE CALLED THE COPS HE WOULD KILL HER. MARISSA TOLD ME THAT SHE COULD BE PREGNANT WITH HARRIS'S BABY, AND THAT SHE WANTED TO HAVE HARRIS PAY FOR THE ABORTION.

NARRATIVE

LVMPD 603-C (REV. 9-97)





Printed by: doughee
Printed date/time:  3/6/13 10:36

 **Incident Report** 

Page 1 of 8

DISTRICT ATTORNEY

LAS VEGAS, NEVADA  89101

**Incident Number: LLV100621001468**

## Incident Summary

| | |
|---|---|
| Incident Type:  CRIMINAL INCIDENT | Report Type:  FIELD INCIDENT REPOI |
| Inc Occurred Address:  250 E FLAMINGO RD 3 417 LAS VEGAS, NV 89109 | Sector/Beat:  L1/L1 |
| Inc Occurred Start:  06/03/2010 00:00    Inc Occurred End:  06/19/2010 16:00 | Report Taken:  06/21/2010 11:49 |
| Domestic: N        Bias Motivation:  UNKNOWN        Gang Related:  U    Substance:  U | |
| Contact Nature: | Reported Date/Time:    06/21/2010 11:49 |
| Reporting Officer:  BACA, A  8754           Primary Assigned Officer:   HUI, C  8263 | |
| Case Status:  OPEN       Disposition: CLOSED BY ARREST - ADULT | Disposition Date:   06/21/2010 12:00 |

### Offenses

| | | |
|---|---|---|
| Statute Code:  SEXA200.366A | | Enhancers: |
| Statute Desc:  SEXUAL ASSAULT | | |
| Counts:    2      Statute Severity:  FELONY | | |
| Statute Code:  ROBB200.380A | | Enhancers: |
| Statute Desc:  ROBBERY | | |
| Counts:    1      Statute Severity:  FELONY | | |
| Statute Code:  PROS201.300 | | Enhancers:  ATT |
| Statute Desc:  PANDERING | | |
| Counts:    1      Statute Severity:  FELONY | | |
| Statute Code:  KIDN200.310C | | Enhancers: |
| Statute Desc:  KIDNAP SECOND DEGREE | | |
| Counts:    1      Statute Severity:  FELONY | | |

### Officers

| Event Association | Emp# | Badge# | Name | Squad# |
|---|---|---|---|---|
| PRIMARY REPORTING OFFICER | 8754 | 8754 | BACA, A  8754 | EA24 |
| REPORTING OFFICER | 14200 | 14200 | ORTIZ, A  14200 | EA24 |
| SUPERVISOR | 4344 | 4344 | HOIER, D  4344 | V2 |
| PRIMARY ASSIGNED OFFICER | 8263 | 8263 | HUI, C  8263 | |

### List of Attachments

| Type: | Report ID: | Report Date: | Report Summary: |
|---|---|---|---|
| VOLUNTARY STATEMENT | 8263 | 06/21/2010 11:49 | VALDEZ-PICKETT, MARISSA MARIE JONES, JUSTIN KENNETH |
| WITNESS LIST | 8263 | | REQUEST FOR PROSECUTION - HARRIS, AMMAR ASIM FARUQ - ID#2753819 |
| TEMPORARY CUSTODY RECORD | 8263 | 06/23/2010 22:00 | HARRIS, AMMAR ASIM FARUQ ID#2753819 |
| DECLARATION OF ARREST | 8263 | 06/23/2010 22:00 | HARRIS, AMAR ASIM FARUQ ID#2753819 |
| PROPERTY RPT | 8263 | 06/24/2010 13:40 | EVIDENCE |
| ADDITIONAL CRIME INFORMATION | 8263 | 06/24/2010 13:40 | MONEY ACCOUNTING REPORT |

Printed by: doughee
Printed date/time:   3/6/13 10:36

 **Incident Report** 

Page 2 of 8

**DISTRICT ATTORNEY**

LAS VEGAS, NEVADA  89101

**Incident Number: LLV100621001468**

## Persons Involved

**Person#: 0001**          **MNI:** 9108164                                      **Can ID Suspect:**   Yes
**Event Association:**   VICTIM                              **Contact Date/Time:**
**Name:**   VALDEZ-PICKETT, MARISSA MARIE
                                         **DOB:** 06/11/1991        **Age:** 18 - 18    **Sex:** FEMALE       **Race:**  HISP/LATIN AMER
**Height:** 5' 8"   - 5' 8"        **Weight:** 135 - 135 lbs     **Eye Color:** HAZEL             **Hair Color:** BROWN
**Address:** 21545 PRIEST RD  SAN ANTONIO, TEXAS 78112                            **Sector/Beat:**
**Phone Type 1:**   CELLULAR        **Phone# 1:**  (210) 621-0990      **Ext 1:**
**Phone Type 2:**   RESIDENCE/HON   **Phone# 2:**  (210) 902-9135      **Ext 2:**

**Occupation:**                                        **Employer/School:**   LITTLE DARLINGS

### Characteristics

**Characteristic Type:**        **Further Defined By:**        **Description:**
    E-MAIL ADDRESS                                           MARISSAMARIEVALDEZ@YAHOO.COM

**Person#: 0002**          **MNI:** 9108185                                      **Can ID Suspect:**   No
**Event Association:**   SUSPECT                             **Contact Date/Time:**
**Name:**   WRIGHT, BRIANA
                                         **DOB:** 10/31/1981        **Age:** 28 - 28    **Sex:** FEMALE       **Race:**  BLACK/AFRO AMER
**Height:** 5' 3"   - 5' 3"        **Weight:** 105 - 105 lbs     **Eye Color:** BROWN             **Hair Color:** BROWN
**Address:** 250 E FLAMINGO RD 3 417 LAS VEGAS, NEVADA 89109                      **Sector/Beat:**   L1/L1
**Phone Type 1:**   RESIDENCE/HON   **Phone# 1:**  (440) 503-1084      **Ext 1:**
**Phone Type 2:**                   **Phone# 2:**                      **Ext 2:**

**Occupation:**                                        **Employer/School:**   AMERICAN GREETINGS

### Characteristics

**Characteristic Type:**        **Further Defined By:**        **Description:**
    SKIRT COLOR                     MULTI-COLORED             BLU/WHI STRIPED DRESS

Printed by: doughee
Printed date/time:  3/6/13 10:36

 **Incident Report** 

Page 4 of 8

DISTRICT ATTORNEY

AS VEGAS, NEVADA  89101

Incident Number: LLV100621001468

## Property Involved

Property #  0001

| | | |
|---|---|---|
| Event Assoc/Orig status:  STOLEN | Evidence:  No | |
| Current Status:  STOLEN | Original Status Date:  6/21/2010 11:49:00 | Original Value:  $600.00 |
| Property Type: | Current Status Date:  6/21/2010 11:49:00 | Current Value:  $600.00 |
| Description:  US CURRENCY | | |
| Make/Brand: | Model: | |
| Color: | Quantity:  1 | |
| Serial/Lot#: | Owner Applied#: | |
| NCIC Date: | NCIC Reported By: | |
| NCIC#: | NCIC Cancelled: | |

Printed by: doughee
Printed date/time:  3/6/13 10:36

 **Incident Report** 

Page 5 of 8

DISTRICT ATTORNEY

AS VEGAS, NEVADA  89101

Incident Number: LLV100621001468

## Modus Operandi

| | |
|---|---|
| **Against Persons:** | Y |
| **Against Property:** | N |
| **Occupied:** | Y |
| **General Premise 1:** | APARTMENT |
| **General Premise 2:** | |
| **Specific Premise:** | ROOM |
| **Surrounding Area 1:** | MIDDLE OF BLOCK |
| **Surrounding Area 2:** | |
| **Surrounding Area 3:** | |
| **Relationship to Suspect 1:** | ROOMMATE |
| **Relationship to Suspect 2:** | FRIEND / ACQUAINTANCE |
| **Weapon Type 1:** | |
| **Automatic:** | N |
| **Weapon Type 2:** | |
| **Automatic:** | N |
| **Weapon Type 3:** | |
| **Automatic:** | N |

### Crime Against Property

| | | | |
|---|---|---|---|
| **# of Premises Entered:** | | **Suspect Action 1:** | |
| **Entry Point:** | | **Suspect Action 2:** | |
| **Exit Point:** | | **Suspect Action 3:** | |
| **Entry Loc 1:** | | **Suspect Action 4:** | |
| **Exit Loc 1:** | | **Suspect Action 5:** | |
| **Entry Loc 2:** | | **Additional Factor 1:** | |
| **Exit Loc 2:** | | **Additional Factor 2:** | |
| **Entry Method 1:** | | **Additional Factor 3:** | |
| **Exit Method 1:** | | **Additional Factor 4:** | |
| **Entry Method 2:** | | **Additional Factor 5:** | |
| **Exit Method 2:** | | **Security Type:** | |
| **Entry Tool 1:** | | **Victim Location:** | |
| **Exit Tool 1:** | | **Electronic Locks:** | N |
| **Entry Tool 2:** | | **Video Serveillance:** | N |
| **Exit Tool 2:** | | **Maid:** | |
| **Vehicle Entry:** | | **Inspectress:** | |
| **Safe Entry:** | | | |

### Crime Against Persons

| | | | |
|---|---|---|---|
| **Pre-Incident Contact 1:** | LIVING TOGETHER | **Suspect Action 1:** | CHOKED  VICTIM |
| **Pre-Incident Contact 2:** | | **Suspect Action 2:** | HIT/ASSAULTED DURING ACT |
| **Pre-Incident Contact 3:** | | **Suspect Action 3:** | MOVED VICTIM'S LOCATION |
| **Victim Condition 1:** | ALONE | **Suspect Action 4:** | MULTIPLE SUSPECTS |
| **Victim Condition 2:** | | **Suspect Action 5:** | |
| **Victim Condition 3:** | | **Sex Crime 1:** | EJACULATED/MASTURBATED VICTIM |
| **Victim Condition 4:** | | **Sex Crime 2:** | FONDLED/ORAL SEX/VAGINAL INTERCC |
| **Victim Condition 5:** | | **Sex Crime 3:** | HAD VICTIM BATHE/SHOWER/EJACULA |
| **Suspect Solicited 1:** | ASSISTANCE | **Sex Crime 4:** | HAD VICTIM DISROBE |
| **Suspect Solicited 2:** | | **Sex Crime 5:** | HAD VICTIM MASTURBATE SUBJECT |
| **Suspect Pretended to Be:** | CONCERNED FOR VICTIM'S WELFA | **Vehicle Involvement 1:** | SUSPECT A PEDESTRIAN |
| | | **Vehicle Involvement 2:** | VICTIM A PEDESTRIAN |

Printed by: doughee
Printed date/time:  3/6/13 10:36

 **Incident Report** 

Page 6 of 8

DISTRICT ATTORNEY

AS VEGAS, NEVADA  89101

Incident Number: LLV100621001468

## Crime Scene

Investigator:                                    Investigation Results:

### Photography
| | |
|---|---|
| Black & White Negatives Exposed: | N |
| Color Negatives Exposed: | N |
| Photography/Other: | |

### Fingerprints
| | |
|---|---|
| Latent Print Processing Conducted: | N |
| Latent Fingerprints Lifted: | N |
| Latent Palmprints Lifted: | N |
| Latent Fingerprint Results: | |
| Latent Palmprint Results: | |
| Latent Prints/Other: | |

### Weapon/Projectiles
| | |
|---|---|
| Projectiles Recovered: | N |
| Casings Recovered: | N |
| Cartridges Recovered: | N |
| Weapons Recovered: | N |
| Weapons/Other: | |

### Impressions
| | |
|---|---|
| Footware Impressions: | N |
| Footware/Tire Casting: | N |
| Footware/Tire Photographed: | N |
| Tire Impressions: | N |
| Original Footware/Tire Surface Recovered: | N |
| Footwear/Tire Impressions/Other: | |

### Body Fluids
| | |
|---|---|
| Blood-like Substances Recovered: | N |
| Body Fluid Controls: | N |
| Body Fluids/Other: | |

### Toolmarks
| | |
|---|---|
| Original Toolmark Surface Recovered: | N |
| Tools Recovered: | N |
| Toolmark Casting: | N |
| Toolmarks/Other: | |

Refer to Property Report:                        N

Crime Scene Description:

 **Incident Report** 

DISTRICT ATTORNEY

AS VEGAS, NEVADA  89101

Incident Number: LLV100621001468

## Narratives

ENTERED DATE/TIME: 6/29/2010 10:02:23
NARRATIVE TYPE:  INCIDENT CRIME REPORT
SUBJECT:  SEXUAL ASSAULT/ROBBERY/ATT PANDERING/KIDNAP
AUTHOR: BACA, A 8754

ON JUNE 21, 2010 AT APPROXIMATELY 1245 HOURS, I WAS DISPATCHED TO 1610 MONTESSOURI STREET REFERENCE A SEXUAL ASSAULT AND ROBBERY COMPLAINT.  UPON MY ARRIVAL, I CONTACTED MARISSA VALDEZ-PICKETT (DOB/06-11-91) WHO TOLD ME THAT SHE HAD BEEN A VICTIM OF SEXUAL ASSAULT AND ROBBERY.  MARISSA TOLD ME THAT ON JUNE 2, 2010, SHE HAD MOVED IN WITH TERRENCE HARRIS AT 250 E. FLAMINGO, BUILDING 3, APARTMENT 417.  MARISSA TOLD ME SHE MOVED IN WITH HARRIS BECAUSE SHE DID NOT HAVE ANY PLACE TO LIVE AND THAT HARRIS HAD OFFERED HIS PLACE JUST FOR A WEEK OR SO UNTIL SHE COULD FIND A PLACE TO LIVE.  MARISSA TOLD ME THAT SHE OFFERED TO PAY FOR RENT, FOOD AND CIGARETTES, BUT THAT HARRIS REFUSED TO TAKE THE MONEY.  MARISSA TOLD ME THAT SHE HAD MET HARRIS THROUGH HER FRIEND ASHLEY FASSBENDER.

MARISSA STATED THAT ON JUNE 3 AT APPROXIMATELY 1500 HOURS, HARRIS FORCED HER TO GET IN THE BATHROOM, TAKE HER CLOTHES OFF AND GET IN THE SHOWER.  HARRIS THEN PROCEEDED TO TAKE HIS CLOTHES OFF AND GET IN THE SHOWER WITH HER.  HARRIS THEN FORCED HER TO HIVE HIM ORAL SEX.  WHEN MARISSA TOLD HARRIS THAT SHE WAS NOT GOING TO GIVE HIM ORAL SEX, HARRIS CONTINUED TO MASTURBATE IN FRONT OF HER WHILE SHE WAS SITTING IN THE SHOWER FLOOR TELLING HIM TO STOP.  MARISSA STATED THAT AFTER A COUPLE OF MINUTES, HARRIS EJACULATED ON HER FACE.  THEN HARRIS PROCEEDED TO PICK HER UP, FORCIBLY TURN HER AROUND WITH HER BACK TOWARDS HIS CHEST AND FORCIBLY PENETRATED HIS PENIS IN HER VAGINA.  MARISSA STATED THAT HARRIS PROCEEDED TO RAPE HER WHILE SHE WAS TELLING HIM TO STOP.  MARISSA STATED THAT HARRIS WAS NOT WEARING A CONDOM, BUT THAT SHE BELIEVES HE DID NOT EJACULATE IN HER.  AFTER THE INCIDENT, MARISSA AND HARRIS GOT OUT OF THE SHOWER AND GOT DRESSED.  MARISSA STATED THAT THE CLOTHES SHE WAS WEARING AFTER THE INCIDENT HAVE BEEN WASHED.

MARISSA TOLD ME THAT ON JUNE 20 AT THE SAME LOCATION, 250 E. FLAMINGO, BUILDING 3, APARTMENT 417, HARRIS HAD GRABBED HER PURSE FROM HER ROOM AND HAD TAKEN HER WALLET OUT OF THE PURSE, ATTEMPTING TO LOOK FOR MONEY.  MARISSA TOLD HARRIS TO GIVE HER THE WALLET BACK, BUT HARRIS GOT VIOLENT AND VERBALLY ABUSIVE.  WHEN MARISSA ATTEMPTED TO GET HER WALLET FROM HARRIS, HE PUT HIS HAND AROUND HER NECK, PUSHED HER AGAINST THE WALL AND PROCEEDED TO STRANGULATE HER.  AFTER A COUPLE OF SECONDS, HARRIS LET GO AND PROCEEDED TO TAKE $600 OUT OF HER WALLET AND PUT THEM IN HIS POCKET.  HARRIS THEN FORCED MARISSA IN THE SHOWER FOR THE SECOND TIME AND MADE HER AKE HER CLOTHES OFF AND GET IN THE SHOWER.  HARRIS THEN GOT IN THE SHOWER WITH HER AND FORCED HER TO TOUCH HIS PENIS.  WHEN MARISSA TOLD HIM THAT SHE DID NOT WANT TO TOUCH HIS PENIS, HARRIS FORCED HIS FINGER IN HER VAGINA.  MARISSA STATED THAT SHE TOLD HARRIS TO STOP, BUT THAT HE CONTINUED TO ASSAULT HER.

Printed by: doughee
Printed date/time:  3/6/13 10:36

 **Incident Report** 

Page 8 of 8

DISTRICT ATTORNEY

AS VEGAS, NEVADA 89101

**Incident Number: LLV100621001468**

AFTER THE INCIDENT, MARISSA TOLD HARRIS THAT SHE WANTED TO GO HOME TO TEXAS AND THAT SHE HAD CALLED A TAXI.  HARRIS CANCELLED THE TAXI AND DROVE HER TO THE AIRPORT. HARRIS' FEMALE FRIEND "BRI" WAS IN THE CAR WITH HER AND HARRIS.  "BRI" AND HARRIS DROPPED MARISSA AT THE AIRPORT AND JUST DROPPED ALL HER CLOTHES AND BELONGINGS ON THE FLOOR.  MARISSA THEN CALLED HER FRIEND, JUSTIN JONES (DOB/12-18-86), TO PICK HER UP. JUSTIN LIVES AT 1610 MONTESSOURI STREET AND OFFERED MARISSA TO STAY WITH HIM AT HIS HOUSE UNTIL SHE WOULD GO BACK HOME TO TEXAS.

I ASKED MARISSA WHY SHE HAD WAITED SO LONG TO REPORT THE INCIDENT AND SHE SAID SHE WAS AFRAID OF HARRIS.  MARISSA STATED THAT HARRIS OWNS A GUN AND THAT HE KEPT THE GUN IN HIS ROOM.  HARRIS ALSO HAD MADE THREATS TO HER AND HER FRIEND ASHLEY FASSBENDER, TELLING THEM THAT IF THEY CALLED THE COPS HE WOULD KILL THEM.  MARISSA ALSO TOLD ME THAT HARRIS WAS KNOWN FOR PIMPING GIRLS BACK IN ATLANTA.  MARISSA STATED THAT SHE IS WILLING TO PROSECUTE AND GET A SEXUAL ASSAULT EXAM, BUT THAT SHE WAS AFRAID THAT IF HARRIS WAS TO FIND OUT SHE CALLED THE COPS, HE WOULD KILL HER.  MARISSA TOLD ME THAT SHE COULD BE PREGNANT WITH HARRIS' BABY AND THAT SHE WANTED TO HAVE HARRIS PAY FOR THE ABORTION.

PATROL FOLLOW-UP: ☐S/A DET.  S. MILLER, P#6507, NOTIFIED
☐VICE DET.  C. HUI, P#8263, CS V-19 RESPONDED
☐VICE SGT.  HOIER, P# 4344, CS 533, NOTIFIED & RESPONDED
☐VICE LT. KAREN HUGHES, P#2928, RESPONDED

## Signatures

Reporting Officer                                                      Date

Supervisor                                                              Date

Registered Agent

## Georgia Secretary of State
### Brian P. Kemp

Corporations • Elections • News Room • Professional Licensure • Securities

**Search**
By Business Name
By Control No
By Officer
By Registered Agent

### Registered Agent Information

Agent Name    Harris, Ammar

**Businesses Represented by this Agent ...**

Click on the Business Entity Name or Control No to view more information.

| Business Entity Name | Control No | Type | Status | Entity Creation Date |
|---|---|---|---|---|
| BRILLIANT, INC | 06100211 | Profit Corporation | Admin. Dissolved | 11/16/2006 |

Records Returned 1 to 1

*Please note this may not be a complete list of companies represented by this agent. Data from the old system has many duplicate entities. So we will need to combine all information about an entity into one record.*

Corporation Filings

Page 1 of 1

Search
▲ By Business Name
▲ By Control No
▲ By Officer
▲ By Registered Agent

Georgia Secretary of State
Brian P. Kemp

Corporations • Elections • News Room • Professional Licensure • Securities

Please note: The documents displayed on this page are made available solely for the convenience of our customers and may not represent the complete and official record for this entity.

Date: 9/18/2013

Current Name: BRILLIANT, INC

| Image | Date | Document |
|---|---|---|
|  | 11/21/2006 | New Filing |
|  | 4/1/2007 | Annual Registration |
|  | 10/13/2009 | Annual Registration |
|  | 8/20/2011 | Administrative Dissolution |

➤ View the images on-line!! Netscape users, use the N button.

EXHIBIT    C - "Zadrowski"

BERNIE ZADROWSKI

3 Pages

1

1    CASE NO. <u>ORDER</u>

2    DEPARTMENT NO. 1

3

4         IN THE JUSTICE COURT OF LAS VEGAS TOWNSHIP

5             COUNTY OF CLARK, STATE OF NEVADA

6                     *  *  *  *  *

7
     THE STATE OF NEVADA,          )
8                                   )
          Plaintiff,               )
9                                   )
               vs.                 )      CASE NO. 10F12069X
10                                  )
     AMMAR HARRIS,                  )
11                                  )
          Defendant.               )
12   _____)

13                   <u>REPORTER'S TRANSCRIPT</u>

14                            <u>OF</u>

15                       <u>PROCEEDINGS</u>

16        BEFORE THE HONORABLE DEBORAH LIPPIS
                  JUSTICE OF THE PEACE
17
             WEDNESDAY, JUNE 13, 2012
18                  9:00 A.M.

19

20   APPEARANCES:

21     For the State:      BERNIE ZADROWSKI, ESQ.
                           Deputy District Attorney
22
       For the Defendant:  JULIA MURRAY, ESQ.
23                         KATHLEEN HAMERS, ESQ.
                           Deputies Public Defender
24

25   Reported by:  Shawna J. McIntosh, RPR, CCR No. 770

2

```
 1              LAS VEGAS, NEVADA, JUNE 13, 2012

 2                      *  *  *  *  *

 3

 4

 5          THE COURT:  Ammar Harris.

 6              Good morning, ladies.

 7          MS. MURRAY:  Good morning.  Julia Murray and

 8   Kathleen Hamers from the Public Defender's office.

 9          MR. ZADROWSKI:  Judge, if I may have a

10   moment?

11          THE COURT:  Yes.

12          MR. ZADROWSKI:  Catherine Hui?

13              Marissa Valdez-Pickett?

14              Your Honor, I have -- I'm forced to

15   dismiss this case today on the State's motion

16   pursuant to statute.  For the record, I have

17   subpoenaed the victim in the case and the police

18   officer.  Nobody is here.  I'm frankly really not all

19   that surprised that nobody is here today given the

20   facts of the case; nevertheless, at this point the

21   State would move to dismiss pursuant to statute.

22          THE COURT:  Sir, I'm going to dismiss your

23   case on the State's motion pursuant to statute.  They

24   can refile.  Your attorneys can explain all of the

25   ramifications of that to you, but today it is
```

SHAWNA J. MCINTOSH, RPR, CCR NO. 770
(702) 671-3464

3

3

```
 1   dismissed pursuant to statute and you are ordered

 2   released.

 3            THE DEFENDANT:  Thank you.

 4            MS. MURRAY:  Thank you, Your Honor.

 5            MS. HAMERS:  Thank you.

 6            THE COURT:  You're welcome, ladies.

 7

 8                  (Proceedings concluded)

 9                       --o0o--

10

11   Attest:  Full, true, and accurate transcript of

12            proceedings.

13

14                 _____/s/ Shawna J. McIntosh_____

15            Shawna J. McIntosh, RPR, CCR No. 770

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT    D "Langley Productions"

LANGLEY PRODUCTION

5 Pages

# DONALDSON ✚ CALLIF

August 14, 2013

**VIA FAX AND CERTIFIED U.S. MAIL**

Joseph Perez
Criminal Investigator II
330 S. Third Street, Suite #800
Las Vegas, NV 89155

> **RE:    LANGLEY PRODUCTIONS, INC. / *NEVADA V. HARRIS* / SUBPOENA
> DUCES TECUM**

Dear Mr. Perez,

Our firm is counsel for Langley Productions, Inc.  This letter is in response to the Office of the Special Public Defender's request for the production of any and all of the following archived "COPS" video footage referencing the following dates and persons (the "Subpoena"):

**6/21/10 & 6/22/10:  Detective C. Hui, Detective A. Beas, Any/All Officers present, Marissa Valdez-Picket (alleged victim), Justin Jones (witness) and Cynthia Jones (witness);**

**6/23/10:  Detective C. Hui, Detective A. Beas, Any/All Officers present, Ammar Harris (suspect), and Briana Wright (suspect).**

Together, this footage accounts for several hours of footage, most of which is not relevant to the subject matter of *The State of Nevada v. Harris*.  Langley Productions objects to the Subpoena on several grounds, but primarily on the ground that Defendant's subpoena fails to overcome the qualified reporter's privilege both codified in Nevada's Shield Law (Nev. Rev. Stat. § 49.275) and precedent established by the Supreme Court of Nevada in *Diaz v. Eight Judicial Dist. Court*, 993 P.2d 50 (Nev. 2000).

All of the subpoenaed material (collectively, the "Material"), which consists of unpublished, confidential newsgathering materials, is protected by Nevada's Shield Law, codified in Nevada's Revised Statutes at Section 49.275. The Shield Law states the following:

> [N]o ... employee of any ... television station may be required to disclose any published or unpublished information obtained or prepared by such person in such person's professional capacity in gathering, receiving or processing information for

**Michael C Donaldson        Lisa A Callif        Dean R Cheley        Christopher L Perez**
400 South Beverly Drive, Suite 400, Beverly Hills, California, 90212  Office 310-277-8394  Fax 310-277-4970

Aug. 14. 2013  5:26PM   Michael C. Donaldson                    No. 0518   P. 3

Case 2:22-cv-00560-RFB-NJK   Document 39   Filed 09/29/23   Page 93 of 251

Langley Productions, Inc.
Nevada vs. Harris - Subpoena
8/14/2013

communication to the public ... in any legal proceedings, trial, or investigation (1) [b]efore any court, grand jury, ... jury or any officer thereof... *Id.*

The statute does not provide exceptions to this rule. The legislature has thereby granted "almost absolute protection to [such persons] from disclosure of his confidential sources" in order to favor the "public's interest in access to information." *Newton v. Nat'l Broad. Co., Inc., 109 F.R.D. 522, 530 (D. Nev. 1985)*. Based on this statute and the relevant case law, the Material falls within this definition and therefore is protected from disclosure.

As a production company gathering information for communication to the public, Langley falls within the Shield Law's protected class. Langley's ride-along videos, which include the Material, are primarily included in informative documentary programs broadcast on television. The Material was collected for a one-hour series for Courtroom Television Network d/b/a truTV. The series was to take viewers behind the scenes of various law enforcement agencies in Las Vegas, providing an in-depth look at the inner workings of the Sheriff's Department, the Vice Squad, and the Violent Crimes Unit and other law enforcement divisions and agencies. The unused footage has been kept by Langley for future projects of the same nature.

One Nevada case on the Shield Law is particularly instructive. In *Diaz v. Eight Judicial Dist. Court*, 993 P.2d 50 (Nev. 2000), victims were killed in an auto accident. Five relatives of the deceased victims filed a wrongful death action against the State, State Highway Patrol, and a towing company that released a towed vehicle to an allegedly intoxicated driver. This released vehicle was involved in the fatal accident. During discovery, the relatives sought to compel a news reporter who investigated the traffic accident to answer questions.

The court allowed the reporter to invoke the reporter's privilege, in turn overturning two Nevada cases that stated the privilege could not be invoked once something was published. As a result, the *Diaz* court extended Nevada's Shield Law to protect "both published and unpublished information from disclosure." *Id.* at 95. Furthermore, while confidentiality may be an important factor, it is "not the defining factor in the existence of the reporter's privilege, nor does confidentiality play a role in determining whether a reporter has waived the privilege" because the Shield Law protects all information "obtained by a reporter in his or her capacity as a journalist and which is intended for dissemination." *Id.* at 100.

The Material is of a confidential nature because of the relationship that exists between Langley production crews, Langley employees and officers of the law in capturing, editing and disclosing the Material. In short, Langley would never be able to create "ride-along" programs like COPS and Vegas Strip without the trust and confidence of the officers who allow them to investigate and report on the events that Langley is capturing. Langley's compliance with the Subpoena would have a deleterious effect on the relationship between Langley and the cooperative peace officers who participate in Langley programs.

Even if the Material were not considered "confidential," *Diaz* is clear that confidentiality is not the defining factor in determining the applicability of the reporter's privilege.

ᴬᵘᵍ. ¹⁴. ²⁰¹³ ³.²¹ᵖᵐ   ᴹⁱᶜʰᵃᵉˡ ᴼ. ᴰᵒⁿᵃˡᵈˢᵒⁿ                          No. 0518   P.  4

Case 2:22-cv-00560-RFB-NJK   Document 39   Filed 09/29/23   Page 94 of 251

Langley Productions, Inc.
Nevada vs. Harris - Subpoena
8/14/2013

Moreover, even if some of the Material were considered to be outside the scope of the reporter's privilege, the wholesale request named in the Subpoena is substantially overbroad because it is not limited by subject matter and seeks several hours of footage that could not possibly have anything to do with the case at trial.

The delay in responding to the subpoena dated July 2, 2013 is due to Langley's need to assign its employees to locate and review the Material, which amounts to several hours of footage, to determine whether it was even available and to what extent it was related to the case at trial. Langley also had to engage outside counsel that was experienced in subpoena requests when the reporter's privilege applies.

If you have any questions or comments, please do not hesitate to reach out to me directly at the contact information listed herein.

Sincerely,

CHRIS L. PEREZ

CLP/jmm

Cc:  Karen Hori [karen@cops.com]
      Ron Tropp [rjtropp@aol.com



## TIRE AND LOADING INFORMATION

| SEATING CAPACITY | TOTAL 4 | FRONT 2 | REAR 2 |
|---|---|---|---|

The combined weight of occupants and cargo should never exceed **350** kg or **772**

| ORIGINAL TIRE SIZE | COLD TIRE INFLATION PRESSURE | |
|---|---|---|
| 245/40 R 19 | FRONT | 270 kPa, 39 PSI |
| 275/35 R 19 | REAR | 320 kPa, 46 PSI |
| COMPACT SPARE TIRE | COLD TIRE INFLATION PRESSURE | |
| 00 | | 0 kPa, 0 PSI |

SEE OWNER
MANUAL F
ADDITION
INFORMATI

2 122 606

645iA    VEHICLE TYPE PASSENGER CAR
MFD BY BAYERISCHE MOTORENWERKE AG  04/05
GVWR    4971 lbs  2255 kg
GAWR FRONT  2381 lbs  1080 kg  REAR  2778 lbs  1260 kg
THIS VEHICLE CONFORMS TO ALL APPLICABLE US
FEDERAL MOTOR VEHICLE SAFETY, BUMPER AND THEFT
PREVENTION STANDARDS IN EFFECT ON THE DATE OF
MANUFACTURE SHOWN ABOVE

WBAEK73445B326996



EXHIBIT    E - "NRS 174.085"

NRS 174.085 / BILL 270

39 Pages



BILL SUMMARY
69th REGULAR SESSION
OF THE NEVADA STATE LEGISLATURE

PREPARED BY
RESEARCH DIVISION
LEGISLATIVE COUNSEL BUREAU
Nonpartisan Staff of the Nevada State Legislature

## ASSEMBLY BILL 270
### (Enrolled)

Assembly Bill 270 authorizes a prosecuting attorney to voluntarily dismiss a complaint without prejudice in certain circumstances. The bill stipulates that such a dismissal must occur before a preliminary hearing in felony or gross misdemeanor cases or before trial in misdemeanor ones. The bill does not allow cases that have been previously filed by the State of Nevada and subsequently dismissed to be dismissed without prejudice. Upon dismissal of a case, the measure authorizes the court to order the defendant released from custody or to release bail.

If a prosecuting attorney files a subsequent complaint concerning the same matter, the bill requires that the case be assigned to the same judge who heard the initial complaint. Further, the bill directs the court to issue an arrest warrant or provide bail requirements only if the defendant does not appear in court after being properly summoned in connection with the complaint.

Finally, the measure allows a prosecuting attorney to voluntarily dismiss information without prejudice in cases initiated by the attorney.

### Background Information

Testimony indicated that existing law does not provide for the state to dismiss a case without being barred from bringing forth a subsequent indictment or further information. Witnesses reported that this measure was prompted by a series of sexual assault cases in Clark County and would be used sparingly.

— As Introduced — **A.B. 270**

ASSEMBLY BILL NO. 270–COMMITTEE ON JUDICIARY

(ON BEHALF OF CLARK COUNTY)

MARCH 13, 1997

Referred to Committee on Judiciary

SUMMARY—Allows prosecuting attorney to dismiss criminal case without prejudice in certain situations. (BDR 14-658)

FISCAL NOTE:    Effect on Local Government: No.
                Effect on the State or on Industrial Insurance: No.



EXPLANATION – Matter in italics is new; matter in brackets [ ] is material to be omitted.

AN ACT relating to criminal procedure; allowing a prosecuting attorney to dismiss a case without prejudice in certain situations; and providing other matters properly relating thereto.

THE PEOPLE OF THE STATE OF NEVADA, REPRESENTED IN
SENATE AND ASSEMBLY, DO ENACT AS FOLLOWS:

1      **Section 1.**  NRS 174.085 is hereby amended to read as follows:
2      174.085  1.  If [the] *a* defendant was formerly acquitted on the ground of
3  *a* variance between the indictment, information or complaint and proof, or the
4  indictment, information, or complaint was dismissed upon an objection to its
5  form or substance, or in order to hold [the] *a* defendant for a higher offense
6  without a judgment of acquittal, it is not an acquittal of the same offense.
7      2.  [Whenever the] *If a* defendant is acquitted on the merits, he is
8  acquitted of the same offense, notwithstanding [any] *a* defect in *the* form or
9  substance in the indictment, information, or complaint on which the trial was
10  had.
11      3.  When [the] *a* defendant is convicted or acquitted, or has been once
12  placed in jeopardy upon an indictment, information or complaint, except as
13  *otherwise* provided in [subsection 5,] *subsections 5 and 6,* the conviction,
14  acquittal or jeopardy is a bar to another indictment, information or complaint
15  for the offense charged in the former, or for an attempt to commit the same,
16  or for an offense necessarily included therein, of which he might have been
17  convicted under that indictment, information or complaint.
18      4.  In all cases where a jury is discharged or prevented from giving a
19  verdict by reason of [any] *an* accident or other cause, except where the



2

– 2 –

1  defendant is discharged during the progress of the trial or after the cause is
2  submitted to them, the cause may be again tried.
3      5.  *The district attorney, or the attorney general in a case that he has*
4  *initiated, may voluntarily dismiss a complaint:*
5      *(a)  Before a preliminary hearing if the crime with which the defendant is* 
6  *charged is a felony; or*
7      *(b)  Before trial if the crime with which the defendant is charged is a*
8  *misdemeanor,*
9  *without prejudice to the right to file another complaint, unless the court finds*
10 *that this would prejudice a substantial right of the defendant. After the*
11 *dismissal, the court may enter an order relating to the custody of the*
12 *defendant pending the filing of a new charge.*
13     *6.*  The district attorney [of any county] , *or the attorney general in a case*
14 *that he has initiated,* may voluntarily dismiss an indictment [, information or
15 complaint at any time prior to] *or information before* the actual arrest or
16 incarceration of the defendant without prejudice to the right to bring another
17 indictment [, information or complaint.] *or information.* After *the* arrest or
18 incarceration of the defendant, [he may do so,] *the district attorney or*
19 *attorney general may voluntarily dismiss an indictment or information*
20 without prejudice to [such right,] *the right to bring another indictment or*
21 *information* only upon good cause shown to the court and upon written
22 findings and a court order to that effect.
23     **Sec. 2.**  NRS 178.562 is hereby amended to read as follows:
24     178.562  1.  [An] *Except as otherwise provided in NRS 174.085, an* 
25 order for the dismissal of the action, as provided in NRS 178.554 and
26 178.556, [shall be] *is* a bar to another prosecution for the same offense.
27     2.  The discharge of a person accused upon preliminary examination [shall
28 be] *is* a bar to another complaint against him for the same offense, but [shall]
29 *does* not bar the finding of an indictment or filing of an information.

⓼




* A B 2 7 0 *

**3**

**MINUTES OF THE
ASSEMBLY COMMITTEE ON JUDICIARY**

**Sixty-ninth Session
April 7, 1997**

The Committee on Judiciary was called to order at 9:05 a.m., on Monday, April 7, 1997. Chairman Bernie Anderson presided in Room 3142 of the Legislative Building, Carson City, Nevada. Exhibit A is the Agenda. Exhibit B is the Guest List.

**COMMITTEE MEMBERS PRESENT:**

       Mr. Bernie Anderson, Chairman
       Ms. Barbara Buckley, Vice Chairman
       Mr. Clarence (Tom) Collins
       Ms. Merle Berman
       Mr. Don Gustavson
       Mr. Dario Herrera
       Mrs. Ellen Koivisto
       Mr. Mark Manendo
       Mr. Dennis Nolan
       Ms. Genie Ohrenschall
       Mr. Richard Perkins
       Mr. Brian Sandoval
       Mrs. Gene Segerblom

**COMMITTEE MEMBERS ABSENT:**

       Mr. John Carpenter       (Excused)

**STAFF MEMBERS PRESENT:**

       Risa L. Berger, Committee Counsel
       Juliann K. Jenson, Senior Research Analyst
       Joi Davis, Committee Secretary

**OTHERS PRESENT:**

       Alan B. Rabkin, Attorney at Law, Nevada Bankers Association
       John C. Morrow, Chief Administrative Deputy, Washoe County Public
           Defender's Office
       Dennis Neilander, Nevada Gaming Control Board
       Ben Graham, Nevada District Attorneys' Association

**4**

Assembly Committee on Judiciary
April 7, 1997
Page 4

Chairman Anderson noting no further testimony on the bill, indicated he would entertain a motion.

ASSEMBLYWOMAN OHRENSCHALL MOVED DO PASS S.B. 141.

ASSEMBLYWOMAN SEGERBLOM SECONDED THE MOTION.

THE MOTION CARRIED UNANIMOUSLY BY THOSE PRESENT.

**ASSEMBLY BILL 270 -     Allows prosecuting attorney to dismiss criminal case without prejudice in certain situations.**

Ben Graham, representing the Nevada District Attorneys' Association, provided an amendment to A.B. 270 (Exhibit C) which addressed concerns from David Gibson of the Clark County Public Defender's Office. He stated the bill primarily addressed preliminary hearings wherein a low standard of proof (probable cause) was required. He stated prosecutors wanted the opportunity to dismiss a case over at the preliminary examination level when proof beyond a reasonable double was questionable but be able to return to the case when stronger evidence was made available to secure a conviction. He noted that presently if the state moved to dismiss a case before a preliminary hearing, the state was barred from returning to court with that defendant; although the charges could be brought before a grand jury.

Mr. Graham noted the bill applied only in "rare occasions." In addition, if there was abuse of the proposed law, the provisions on page 2, lines 9-10 ". . . without prejudice unless the court finds that a substantial right of the defendant has been violated" provided adequate protection to the defendant. He added the bill did not affect the defendant from a double jeopardy standpoint since double jeopardy was only applicable at the trial stage. Mr. Anderson relayed his understanding was double jeopardy was applicable when a defendant was found guilty.

Ms. Buckley asked Mr. Graham to clarify if presently the district attorney could dismiss a case and then later bring the same case before a grand jury. He replied that was a possibility; however, Clark County and Washoe County were the only counties that had a grand jury and that process was burdensome.

Ms. Buckley asked if the district attorney's office was allowed to bring charges against a defendant then dismiss those charges when the evidence was no good, would that encourage the filing of cases prematurely. Mr. Graham responded the problem was a defendant may already be in custody pursuant to an arrest on probable cause and the paperwork was not necessarily completed,

5

Assembly Committee on Judiciary
April 7, 1997
Page 5

so the state would like to be able to dismiss those charges until further evidence
was obtained.

Mr. Sandoval asked if A.B. 270 could lead to over-zealous prosecutors
repeatedly arresting persons then later dismissing the charges. Mr. Graham said
it was entirely possible considering in Clark County alone there were
approximately 17,000 felony cases filed every year. He reminded that any
prejudice or violation of the rights of the defendant were addressed by
sanctions. Mr. Graham asserted sanctions included dismissal of the case,
money sanctions, contempt of court, and disbarment.

John Morrow, Chief Administrative Deputy, Washoe County Public Defender's
Office, testified against A.B. 270 stating for years the Nevada Revised Statutes
specifically provided that a prosecutor may not dismiss a case without prejudice.
In other words, once a prosecutor dismissed a case, the presumably innocent
citizen could not be brought back into court again on that matter.

He asserted the legislation of A.B. 270 was dealing with "unprepared
prosecutors." He stated case law in Nevada had long held that a prosecutor
better be prepared before he brought a case to a preliminary hearing. Mr.
Morrow commented that a prosecutor had the opportunity to make a written
motion prior to a preliminary examination for a continuance if there was good
cause. Mr. Morrow concluded the passage of A.B. 270 could hamper the
efforts of Senate Bill 40.

Mr. Collins asked if an individual could be arrested several times based on the
same set of facts. Mr. Morrow affirmed that was correct and that was an area
for potential abuse that was of concern to him.

Ms. Ohrenschall commented that multiple arrests could affect an individual's
criminal record and required that individual to clean their record somehow.

Mr. Perkins commented on Mr. Morrow's concerns for the possibility of abuse in
arresting and re-arresting individuals, and asked if that possibility was already
present before the filing of a complaint in that A.B. 270 only affected the
process after the complaint was filed. Mr. Morrow affirmed that was true;
however, A.B. 270 went a step further by providing more people to abuse the
process—namely prosecutors.

Mr. Anderson asked if the prosecutor had a greater advantage in getting cases
on the court calendar. Mr. Morrow answered criminal rules of procedure were
enacted to mandate that a case must proceed to preliminary examination no
later than 15 days after arraignment.

Assembly Committee on Judiciary
April 7, 1997
Page 6

Mr. Graham, in response to Ms. Ohrenschall's concern as to a citizen having to "seal" their criminal record due to multiple arrests, stated the process for sealing records was not difficult or costly and the average citizen performed it frequently with little problem. He said the bill was simply designed to allow the prosecution to dismiss marginal cases that were not ready to proceed to preliminary examination.

Mr. Anderson asked if the passage of A.B. 270 would give the prosecution an advantage that previously had not existed.   Mr. Graham replied absolutely not.

Mr. Sandoval asked if the intent behind this legislation could not be accomplished by giving the prosecution the ability to dismiss a case with prejudice rather than dismissing the case without prejudice. Mr. Graham replied the prosecution currently could dismiss a case with prejudice but then was barred from bringing the charges again in justice court. The bill would allow them to dismiss without prejudice on rare occasions when a case was not developed prior to the preliminary examination. Chairman Anderson announced the committee would consider A.B. 270 during a work session. There being no further business for the committee, the meeting was adjourned at 10:05 a.m.

RESPECTFULLY SUBMITTED:

Joi Davis, Committee Secretary

APPROVED BY:

Assemblyman Bernie Anderson, Chairman

DATE:_____April 29, 1997_____

7

DATE:      April 7, 1997

TO:        Chairman Anderson and Committee Members

FROM:      Ben Graham   *Ben*

RE:        AB 270 - Suggested Amendment

Herewith please find a copy of AB 270 set for hearing Monday, April 7, at 9:00 a.m.   The District Attorneys Association is urging passage of this measure but is requesting an amendment to delete the wording on page 2, end of line 10 through line 12.

    10. [...after the...
    11.
    12. ...new charge.]

This would eliminate a concern regarding potential orders from the court.

Submitted to the Committee on Judiciary on 4/7//97
by  Ben Graham, Nevada District Attorneys Association

**EXHIBIT  C**

8

**A.B. 270**

### ASSEMBLY BILL NO. 270—COMMITTEE ON JUDICIARY

#### (ON BEHALF OF CLARK COUNTY)

#### MARCH 13, 1997

Referred to Committee on Judiciary

SUMMARY—Allows prosecuting attorney to dismiss criminal case without prejudice in certain situations. (BDR 14-658)

FISCAL NOTE:   Effect on Local Government: No.
Effect on the State or on Industrial Insurance: No.



EXPLANATION – Matter in italics is new; matter in brackets [ ] is material to be omitted.

AN ACT relating to criminal procedure; allowing a prosecuting attorney to dismiss a case without prejudice in certain situations; and providing other matters properly relating thereto.

THE PEOPLE OF THE STATE OF NEVADA, REPRESENTED IN
SENATE AND ASSEMBLY, DO ENACT AS FOLLOWS:

1    **Section 1.**   NRS 174.085 is hereby amended to read as follows:
2        174.085   1.   If [the] *a* defendant was formerly acquitted on the ground of
3    *a* variance between the indictment, information or complaint and proof, or the
4    indictment, information, or complaint was dismissed upon an objection to its
5    form or substance, or in order to hold [the] *a* defendant for a higher offense
6    without a judgment of acquittal, it is not an acquittal of the same offense.
7        2.   [Whenever the] *If a* defendant is acquitted on the merits, he is
8    acquitted of the same offense, notwithstanding [any] *a* defect in *the* form or
9    substance in the indictment, information, or complaint on which the trial was
10   had.
11       3.   When [the] *a* defendant is convicted or acquitted, or has been once
12   placed in jeopardy upon an indictment, information or complaint, except as
13   *otherwise* provided in [subsection 5,] *subsections 5 and 6,* the conviction,
14   acquittal or jeopardy is a bar to another indictment, information or complaint
15   for the offense charged in the former, or for an attempt to commit the same,
16   or for an offense necessarily included therein, of which he might have been
17   convicted under that indictment, information or complaint.
18       4.   In all cases where a jury is discharged or prevented from giving a
19   verdict by reason of [any] *an* accident or other cause, except where the

**9**

– 2 –

1   defendant is discharged during the progress of the trial or after the cause is
2 submitted to them, the cause may be again tried.
3     5. *The district attorney, or the attorney general in a case that he has*
4 *initiated, may voluntarily dismiss a complaint:*
5     *(a) Before a preliminary hearing if the crime with which the defendant is*
6 *charged is a felony; or*
7     *(b) Before trial if the crime with which the defendant is charged is a*
8 *misdemeanor,*
9 *without prejudice to the right to file another complaint, unless the court finds*
10 *that this would prejudice a substantial right of the defendant.* ⌈*After the*
11 *dismissal, the court may enter an order relating to the custody of the*
12 *defendant pending the filing of a new charge.*⌉
13     6. The district attorney [of any county] , *or the attorney general in a case*
14 *that he has initiated,* may voluntarily dismiss an indictment [, information or
15 complaint at any time prior to] *or information before* the actual arrest or
16 incarceration of the defendant without prejudice to the right to bring another
17 indictment [, information or complaint.] *or information.* After *the* arrest or
18 incarceration of the defendant, [he may do so,] *the district attorney or*
19 *attorney general may voluntarily dismiss an indictment or information*
20 without prejudice to [such right,] *the right to bring another indictment or*
21 *information* only upon good cause shown to the court and upon written
22 findings and a court order to that effect.
23    **Sec. 2.**  NRS 178.562 is hereby amended to read as follows:
24     178.562  1.  [An] *Except as otherwise provided in NRS 174.085, an*
25 order for the dismissal of the action, as provided in NRS 178.554 and
26 178.556, [shall be] *is* a bar to another prosecution for the same offense.
27     2.  The discharge of a person accused upon preliminary examination [shall
28 be] *is* a bar to another complaint against him for the same offense, but [shall]
29 *does* not bar the finding of an indictment or filing of an information.



**MINUTES OF THE
ASSEMBLY COMMITTEE ON JUDICIARY**

**Sixty-ninth Session
June 13, 1997**

The Committee on Judiciary was called to order at 8:12 a.m., on Friday, June 13, 1997. Chairman Bernie Anderson presided in Room 3138 of the Legislative Building, Carson City, Nevada. Exhibit A is the Agenda. Exhibit B is the Guest List.

**COMMITTEE MEMBERS PRESENT:**

    Mr. Bernie Anderson, Chairman
    Ms. Barbara Buckley, Vice Chairman
    Mr. Clarence (Tom) Collins
    Ms. Merle Berman
    Mr. John Carpenter
    Mr. Don Gustavson
    Mr. Dario Herrera
    Mrs. Ellen Koivisto
    Mr. Mark Manendo
    Mr. Dennis Nolan
    Ms. Genie Ohrenschall
    Mr. Brian Sandoval
    Mrs. Gene Segerblom

**COMMITTEE MEMBERS ABSENT:**

    Mr. Richard Perkins        (Excused)

**GUEST LEGISLATORS PRESENT:**

    Senator Ernie Adler, Capital Senatorial District

**STAFF MEMBERS PRESENT:**

    Risa L. Berger, Committee Counsel
    Juliann K. Jenson, Senior Research Analyst
    Joi Davis, Committee Secretary

**11**

Assembly Committee on Judiciary
June 13, 1997
Page 3

access to public roads when such roads intersect private property. She added there was an amendment proposed by the Washoe County Public Administrator which would exempt the public guardian from liability in certain instances.

Mr. Anderson, having brought the legislation on behalf of a constituent and noting the punitive nature of the bill, announced that his constituent was not desirous of amending the bill. Mr. Collins stated his concern was at page 2 regarding dumping garbage and asked how that related to the intent of the bill. Mr. Anderson clarified the concern with that section of the bill was addressing individuals who had a tendency to leave large objects for which large fees would be required if taken to the landfill.

    ASSEMBLYMAN COLLINS MOVED DO PASS A.B. 167.

    ASSEMBLYWOMAN BUCKLEY SECONDED THE MOTION.

Mr. Gustavson expressed concern with the bill as written and therefore would not be supporting the legislation. He recalled testimony on the bill when heard, specifically the charging of a juvenile as an adult.

Mr. Carpenter asserted he agreed with many provisions in A.B. 167; however, without amendments he was unable to support the bill.

Chairman Anderson brought the motion back to the floor for a vote.

    THE MOTION FAILED.

* * * * *

    ASSEMBLYMAN CARPENTER MOVED TO INDEFINITELY POSTPONE A.B. 167.

    ASSEMBLYMAN GUSTAVSON SECONDED THE MOTION.

    THE MOTION CARRIED BY THOSE PRESENT.

**ASSEMBLY BILL 270** -    **Allows prosecution to dismiss criminal case without prejudice in certain situations.**

Ms. Jenson read from the Work Session document (Exhibit C) explaining the bill allowed for the dismissal of certain cases at the justice court level and the allowance for refiling of the case if further evidence was found. She indicated there was an amendment proposed by Ben Graham, Nevada District Attorney's

12

Assembly Committee on Judiciary
June 13, 1997
Page 4

Association (page 7, Exhibit C).  Mr. Graham explained that the proposed
amendment would delete language on page 2, lines 10-12 of the bill to address
the concern that the dismissal of cases with prejudice could potentially lead to
multiple refilings. He reminded the committee that the district attorney's office
could only refile the case if it did not interfere with the "substantial right of the
defendant."  In addition, he asked the committee to consider language that if a
person was in custody, the most that a preliminary hearing could be continued
would be two judicial days. He asserted the amendments were proposed in
consideration of the concerns from the defense bar, including John Morrow from
the Public Defender's office in Washoe County and David Gibson from the Public
Defender's office in Clark County.

Mr. Anderson indicated he would repost the bill on another agenda in order to
hear from the defense bar and to address Ms. Buckley's concerns pursuant to
her conversation with Senator Neal whereby A.B. 270 may affect a bill of his.

**ASSEMBLY BILL 416** -    **Revises provisions relating to intoxicating liquor and
controlled substances.**

Ms. Jenson read from page 2 of the Work Session document (Exhibit C) as to
A.B. 416, dealing with the blood alcohol concentration (BAC) level from .10 to
.08 and prohibited a defense of intoxication in actions for recovery of a gaming
debt or loss.

Risa Berger, Committee Counsel, pointed out an amendment to the bill
contained at pages 10-19, Exhibit C which took into consideration conflicts with
Assembly Bill 243.

Mr. Anderson stated the essence of the amendment was to clarify that the .08
BAC was applicable in the instance whereby an accident occurred; however,
when an individual was pulled over and given a sobriety test, the BAC
requirement remained at the .10 level. In addition, the amendment took into
consideration Mr. Sandoval's concerns as to causing property damage to
another.    Mr. Anderson indicated the subcommittee on A.B. 416 voted
unanimously for an amend and do pass with the proposed amendment.  He
stressed the bill was not a perfect piece of legislation and acknowledged that
Assemblyman Perkins would have liked a different standard to have been
applied.

ASSEMBLYMAN CARPENTER MOVED AMEND & DO PASS A.B. 416 TO
INCLUDE THE AMENDMENT AT PAGES 10-19 OF EXHIBIT C.

ASSEMBLYMAN SANDOVAL SECONDED THE MOTION.

**13**

## WORK SESSION

## ASSEMBLY COMMITTEE ON JUDICIARY

### June 13, 1997

The following measures will be considered for action during the work session:

■    **ASSEMBLY BILL 167** provides categories of willful or malicious acts. (BDR 15-275 was requested by Assemblyman Anderson.) Heard in committee on March 27, but no action was taken.

**Background Information**

Assemblyman Anderson testified that he requested this measure on behalf of a constituent who is the President of the Nevada Public Land Access Coalition. This measure specifically applies to back roads and is an effort to make public roads more accessible. Testimony indicated that some private land owners are restricting access to public roads when such roads intersect with private property. County commissioners and sheriffs were reported to be of little assistance with this access issue.

Representatives from Clark and Washoe County Public Defender's Office testified in opposition to the measure. They indicated that the bill was overly punitive, and constitutional concerns were raised. Other issues of concern included: certifying children as adults for violating this law; parental liability, especially the custodial parent; discretion of the district attorney; forfeiture; plea bargaining; and presumptions about the driver of the vehicle.

*Proposed Amendment*

Washoe County requested an amendment that would exempt Public Guardians or other public officers serving as guardians for the willful or malicious acts of their ward. **(See memorandum to Assembly Judiciary Committee, from Washoe County Public Administrator and Public Guardian.)**

■    **ASSEMBLY BILL 270** allows prosecution to dismiss criminal case without prejudice in certain situations. (BDR 14-658 was requested by the Assembly Committee on Judiciary on behalf of Clark County.) Heard in committee on April 7, but no action was taken.

**Background Information**

Ben Graham testified that this measure allows for the dismissal of certain cases in justice court without prejudice, which provides that these same cases could be refiled if further evidence was found. Under existing law, if the state moves to dismiss, the state is then

Submitted to the Committee on Judiciary on 6/13/97

by Juliann Jenson, Legislative Counsel Bureau

**EXHIBIT C  14**

barred from bringing forth an indictment or further information. Testimony indicated that this measure was prompted by a series of sexual assault cases in Clark County and would be used sparingly.

Committee members expressed concerns that this measure would allow for cases to be filed before they are ready. Questions also were raised about this bill giving the prosecution an unfair advantage.

A representative from the Washoe County Public Defender's Office testified in opposition to the bill. He testified that prosecuting attorneys, under existing law, can file written or oral motions to reinstate a case after dismissal. He expressed concerns that the bill is covering for unprepared prosecutors.

*Proposed Amendment*

The Clark County District Attorney's Office has prepared an amendment to the measure to address concerns raised about multiple filings. **(See memorandum, dated June 11, from Ben Graham to Chairman Anderson and Judiciary Committee regarding Proposed Amendments to A.B. 270.)**

■   **ASSEMBLY BILL 416** revises provisions relating to intoxicating liquor and controlled substances. (BDR 43-1078 was requested by Assemblyman Manendo.) **Heard in** committee on May 12 and was assigned to a subcommittee (Assemblymen Anderson [Chairman], Carpenter, and Perkins.)

**Background Information**

This measure lowers the blood alcohol concentration (BAC) level from .10 to .08 for drinking and driving. The measure also addresses increased penalties for drinking and driving and prohibits a defense of intoxication in actions for a recovery of a gaming debt or loss.

*Proposed Amendment*

A copy of the proposed amendment was distributed at the June 6 work session for committee review. No action was taken at that time. The subcommittee reconvened on June 12 to further discuss such changes and receive further testimony. As a result, the subcommittee recommends the adoption of the amendment by the full committee. **(See "Proposed Amendment to A.B. No. 416" prepared by Risa Berger, Committee Counsel.)**

15

**MINUTES OF THE
ASSEMBLY COMMITTEE ON JUDICIARY**

**Sixty-ninth Session
June 20, 1997**

The Committee on Judiciary was called to order at 8:15 a.m., on Friday, June 20, 1997. Chairman Bernie Anderson presided in Room 3138 of the Legislative Building, Carson City, Nevada. Exhibit A is the Agenda. Exhibit B is the Guest List.

**COMMITTEE MEMBERS PRESENT:**

Mr. Bernie Anderson, Chairman
Ms. Barbara Buckley, Vice Chairman
Mr. Clarence (Tom) Collins
Ms. Merle Berman
Mr. John Carpenter
Mr. Don Gustavson
Mr. Dario Herrera
Mrs. Ellen Koivisto
Mr. Mark Manendo
Mr. Dennis Nolan
Ms. Genie Ohrenschall
Mr. Richard Perkins
Mr. Brian Sandoval
Mrs. Gene Segerblom

**GUEST LEGISLATORS PRESENT:**

Senator Ernest E. Adler, Capital Senatorial District

**STAFF MEMBERS PRESENT:**

Risa L. Berger, Committee Counsel
Juliann K. Jenson, Senior Research Analyst
Brenda Olson, Committee Secretary

**OTHERS PRESENT:**

Mace Yampolsky, Representing Nevada Attorney's for Criminal Justice

**16**

Assembly Committee on Judiciary
June 20, 1997
Page 2

David S. Gibson, Representing Office of the Public Defender, Clark
County
Richard Gammick, District Attorney, Washoe County
John C. Morrow, Chief Administrative Deputy, Washoe County Public
Defender
Stan R. Olsen, Lieutenant, Las Vegas Metropolitan Police Department
Samuel P. McMullen, Representing Las Vegas Chamber of Commerce
Kara J. Kelley, Representing Las Vegas Chamber of Commerce
May Shelton, Director, Washoe County Social Services
Adrienne Cox, Representing Clark County Family & Youth Services
Danny Thompson, Representing Nevada State AFL-CIO
Stewart Bell, Representing Clark County District Attorney's Office
Ben Graham, Representing Nevada District Attorney's Association
Dr. Michael Fitting, Medical Director, Department of Prisons

After roll call Mr. Anderson opened the hearing on the amendments to S.B. 33
(Exhibit C) and the summary of the amendment (Exhibit D) proposed by Risa
Berger, Legal Counsel, Legislative Council Bureau.

**SENATE BILL 33** -     **Makes various changes to provisions relating to
possession and use of tobacco products by minors and
advertising of tobacco products near schools.**

Ms. Berger proceeded to present an overview of the amendment (Exhibit C) and
the summary (Exhibit D). Section 1 was broken out into various subsections
and was amended to separate the prohibition against a child under 18 years of
age purchasing or misrepresenting his age to purchase cigarettes or other
tobacco products and the prohibition of such a child to have possession of such
products. Ms. Berger continued to break out each section and changes of the
amendment and bill.

Mr. Carpenter stated he had a problem with section 2 of the bill with included
the 300 feet of the property line of the school property. In many communities
this would involve private homes and property rights and thought this was one
of the things that was eliminated from the bill. Ms. Buckley commented this
was discussed at great length and it was decided not to include it.     Mr.
Carpenter recalled in the testimony that Ms. Segerblom made the comment that
it should be just school property.

Ms. Berger responded regarding the 300 feet that this was her
misunderstanding when drafting the amendment.

Assembly Committee on Judiciary
June 20, 1997
Page 13

**ASSEMBLY BILL 356 -**    **Revises provisions governing protection of children from abuse or neglect.**

Mr. Anderson stated Assemblywoman Koivisto, Assemblyman Anderson and Carpenter served on the subcommittee that heard A.B. 356.

Ms. Koivisto stated the subcommittee met several times with Child Protective Services and their concerns were primarily with response times. The concerns were addressed and in the amendment they changed 3 working days to 3 days and would have an immediate response. On page 2, section 2, subsection (1) where it stated, "upon receipt of a report concerning the possible abuse or neglect of a child, an agency which provides protective services or a law enforcement agency shall promptly notify the appropriate licensing authority", was changed to "an agency shall immediately initiate an investigation".

Mr. Carpenter stated he thought the only change was if a child was 5 years or under and the amendment page 2, section 2, subsection (a) did not state that.

Mr. Anderson stated the amendment (Exhibit K) would have to be amended.

> ASSEMBLYWOMAN KOIVISTO MOVED TO AMEND AND DO PASS A.B. 356 WITH THE AMENDMENT TO BE EXHIBIT K AND TO CHANGE PAGE 2, SECTION 2, SUBSECTION (A) TO READ; "THE CHILD IS FIVE YEARS OF AGE OR UNDER".

> ASSEMBLYMAN CARPENTER SECONDED THE MOTION.

> THE MOTION CARRIED UNANIMOUSLY.

**ASSEMBLY BILL 270 -**    **Allows prosecuting attorney to dismiss criminal case without prejudice in certain situations.**

Stewart Bell, representing Clark County District Attorney, stated agreements had been met with amendments (Exhibit L) and (Exhibit M) approved by all of the District Attorneys, the Public Defender in Reno and Clark County. He commented it was a fair and workable bill and would give them a tool to handle jail management and case management. Mr. Bell any further testimony would not be necessary.

> ASSEMBLYMAN HERRERA MOVED TO AMEND AND DO PASS A.B. 270 WITH THE AMENDMENT TO BE EXHIBIT L AND EXHIBIT M.

**18**

Assembly Committee on Judiciary
June 20, 1997
Page 14

ASSEMBLYMAN NOLAN SECONDED THE MOTION.

THE MOTION CARRIED UNANIMOUSLY.

Mr. Anderson stated A.B. 530 and S.B. 31 would be moved to the following days work session.

With no further business before the committee the meeting adjourned at 11:10.

RESPECTFULLY SUBMITTED:

Brenda Olson,
Committee Secretary

APPROVED BY:

Assemblyman Bernie Anderson, Chairman

DATE: Aug. 11, 1997

**19**

AB 270 -Amendment- delete lines 9-12, page 2 and substitute ...

C)    ... without prejudice to the right to file another complaint unless the State of
Nevada has had a prior complaint filed and dismissed against the defendant at
the prosecuting attorney's request.  Upon dismissal the defendant shall be
released from custody on that charge.  If the State files a subsequent
complaint related to the same event, the defendant shall not be required to
post bail as long as the defendant appears at all scheduled court appearances.
Initial notice of the subsequent complaint shall be by summons and an arrest
warrant shall issue only if the defendant fails to appear in response to a
properly issued summons.

*# relating to the*
*same event*

– 2 –

1    defendant is discharged during the progress of the trial or after the cause is
2    submitted to them, the cause may be again tried.
3        5.  The district attorney, or the attorney general in a case that he has
4    initiated, may voluntarily dismiss a complaint:
5        (a) Before a preliminary hearing if the crime with which the defendant is
6    charged is a felony; or
7        (b) Before trial if the crime with which the defendant is charged is a
8    misdemeanor,
9    without prejudice to the right to file another complaint, unless the court finds
10   that this would prejudice a substantial right of the defendant. After the
11   dismissal, the court may enter an order relating to the custody of the
12   defendant pending the filing of a new charge.
13       6.  The district attorney [of any county] , or the attorney general in a case
14   that he has initiated, may voluntarily dismiss an indictment [, information or
15   complaint at any time prior to] or information before the actual arrest or
16   incarceration of the defendant without prejudice to the right to bring another
17   indictment [, information or complaint.] or information. After the arrest or
18   incarceration of the defendant, [he may do so,] the district attorney or
19   attorney general may voluntarily dismiss an indictment or information
20   without prejudice to [such right,] the right to bring another indictment or
21   information only upon good cause shown to the court and upon written
22   findings and a court order to that effect.
23       Sec. 2.  NRS 178.562 is hereby amended to read as follows:
24       178.562  1.  [An] Except as otherwise provided in NRS 174.085, an
25   order for the dismissal of the action, as provided in NRS 178.554 and
26   178.556, [shall be] is a bar to another prosecution for the same offense.
27       2.  The discharge of a person accused upon preliminary examination [shall
28   be] is a bar to another complaint against him for the same offense, but [shall]
29   does not bar the finding of an indictment or filing of an information.

\* prosecuting Attorney

\*\* no Amendment to S. 6 –

2

ASSEMBLY BILL NO. 270

PROPOSED AMENDMENT

**Amend section 1 of the bill to read as follows:**

**Section 1.**   NRS 174.085 is hereby amended to read as follows:

174.085   1.   If [the] *a* defendant was formerly acquitted on the ground of *a* variance between the indictment, information or complaint and proof, or the indictment, information, or complaint was dismissed upon an objection to its form or substance, or in order to hold [the] *a* defendant for a higher offense without a judgment of acquittal, it is not an acquittal of the same offense.

2.   [Whenever the] *If a* defendant is acquitted on the merits, he is acquitted of the same offense, notwithstanding [any] *a* defect in *the* form or substance in the indictment, information, or complaint on which the trial was had.

3.   When [the] *a* defendant is convicted or acquitted, or has been once placed in jeopardy upon an indictment, information or complaint, except as *otherwise* provided in [subsection 5,] *subsections 5 and 6,* the conviction, acquittal or jeopardy is a bar to another indictment, information or complaint for the offense charged in the former, or for an attempt to commit the same, or for an offense necessarily included therein, of which he might have been convicted under that indictment, information or complaint.

Legal Draft      Submitted to the Committee on Judiciary on 6-20-97
by STEWART Bell, C.C. DA.
EXHIBIT M 22

4.   In all cases where a jury is discharged or prevented from giving a verdict by reason of [any] *an* accident or other cause, except where the defendant is discharged during the progress of the trial or after the cause is submitted to them, the cause may be again tried.

5.   *The district attorney, or the attorney general in a case that he has initiated, may voluntarily dismiss a complaint:*

*(a) Before a preliminary hearing if the crime with which the defendant is charged is a felony <u>or gross misdemeanor</u>; ~~or~~*

*(b) Before trial if the crime with which the defendant is charged is a misdemeanor~~,~~* <u>:</u> <u>or</u>

<u>*(c) After another complaint is filed against the defendant if the defendant is in custody,*</u> *without prejudice to the right to file another complaint, unless the court finds that this would prejudice a substantial right of the defendant <u>or that the State of Nevada has had more than one prior complaint filed against the defendant dismissed. A preliminary hearing date must not be continued for more than 2 judicial days as the result of another complaint being filed against a defendant pursuant to this section.</u>* ~~After the dismissal, the court may enter an order relating to the custody of the defendant pending the filing of a new charge.~~

6.   The district attorney [of any county] *, or the attorney general in a case that he has initiated,* may voluntarily dismiss an indictment [, information or complaint at any time prior to] *or information before* the actual arrest or incarceration of the defendant without prejudice to the right to bring another indictment [, information or complaint.] *or*

—2—

Legal Draft

23

*information.* After *the* arrest or incarceration of the defendant, [he may do so,] *the district attorney or attorney general may voluntarily dismiss an indictment or information* without prejudice to [such right,] *the right to bring another indictment or information* only upon good cause shown to the court and upon written findings and a court order to that effect.

—3—

Legal Draft

**24**

Amendment adopted.
Bill ordered reprinted, engrossed and to third reading.

Assembly Bill No. 270.
Bill read second time.
The following amendment was proposed by the Committee on Judiciary:
Amendment No. 773.

Amend section 1, page 2, line 3, by deleting: "*district attorney, or the attorney general*" and inserting "*prosecuting attorney*".

Amend section 1, page 2, line 6, by deleting "*felony;*" and inserting: "*felony or gross misdemeanor;*".

Amend section 1, page 2, by deleting lines 9 through 13 and inserting: "*without prejudice to the right to file another complaint, unless the State of Nevada has previously filed a complaint against the defendant which was dismissed at the request of the prosecuting attorney. After the dismissal, the court shall order the defendant released from custody or, if he is released on bail, exonerate the obligors and release any bail.*



*6. If a prosecuting attorney files a subsequent complaint after a complaint concerning the same matter has been filed and dismissed against the defendant:*

*(a) The case must be assigned to the same judge to whom the initial complaint was assigned; and*

*(b) A court shall not issue a warrant for the arrest of a defendant who was released from custody pursuant to subsection 5 or require a defendant whose bail has been exonerated pursuant to subsection 5 to give bail unless the defendant does not appear in court in response to a properly issued summons in connection with the complaint.*

*7. The [district attorney of any county] prosecuting attorney in a case*".

Amend section 1, page 2, lines 18 and 19, by deleting: "*district attorney or attorney general*" and inserting "*prosecuting attorney*".

Assemblyman Anderson moved the adoption of the amendment.
Remarks by Assemblyman Anderson.
Amendment adopted.
Bill ordered reprinted, engrossed and to third reading.

Assembly Bill No. 453.
Bill read second time and ordered to third reading.

Assembly Bill No. 578.
Bill read second time.
The following amendment was proposed by the Committee on Commerce:
Amendment No. 784.

Amend the bill as a whole by adding a new section designated sec. 18.5, following sec. 18, to read as follows:

"Sec. 18.5.  Chapter 684A of NRS is hereby amended by adding thereto a new section to read as follows:

*1. The commissioner may issue a limited license to an adjuster licensed in an adjoining state who has contracted with a domestic insurer that has its principal place of business in this state to adjust and pay claims on business*

**(REPRINTED WITH ADOPTED AMENDMENTS)**
**FIRST REPRINT**                    **A.B. 270**

ASSEMBLY BILL NO. 270–COMMITTEE ON JUDICIARY

(ON BEHALF OF CLARK COUNTY)

MARCH 13, 1997

Referred to Committee on Judiciary

SUMMARY—Allows prosecuting attorney to dismiss criminal case without prejudice in certain situations. (BDR 14-658)

FISCAL NOTE:    Effect on Local Government: No.
Effect on the State or on Industrial Insurance: No.



EXPLANATION – Matter in italics is new; matter in brackets [ ] is material to be omitted.

AN ACT relating to criminal procedure; allowing a prosecuting attorney to dismiss a case without prejudice in certain situations; and providing other matters properly relating thereto.

THE PEOPLE OF THE STATE OF NEVADA, REPRESENTED IN
SENATE AND ASSEMBLY, DO ENACT AS FOLLOWS:

1    **Section 1.**  NRS 174.085 is hereby amended to read as follows:
2    174.085  1.  If [the] *a* defendant was formerly acquitted on the ground
3  of *a* variance between the indictment, information or complaint and proof,
4  or the indictment, information, or complaint was dismissed upon an
5  objection to its form or substance, or in order to hold [the] *a* defendant for a
6  higher offense without a judgment of acquittal, it is not an acquittal of the
7  same offense.
8    2.  [Whenever the] *If a* defendant is acquitted on the merits, he is
9  acquitted of the same offense, notwithstanding [any] *a* defect in *the* form or
10  substance in the indictment, information, or complaint on which the trial was
11  had.
12    3.  When [the] *a* defendant is convicted or acquitted, or has been once
13  placed in jeopardy upon an indictment, information or complaint, except as
14  *otherwise* provided in [subsection 5,] *subsections 5 and 6,* the conviction,
15  acquittal or jeopardy is a bar to another indictment, information or complaint
16  for the offense charged in the former, or for an attempt to commit the same,
17  or for an offense necessarily included therein, of which he might have been
18  convicted under that indictment, information or complaint.



**26**

\

– 2 –

1    4. In all cases where a jury is discharged or prevented from giving a
2  verdict by reason of [any] *an* accident or other cause, except where the
3  defendant is discharged during the progress of the trial or after the cause is
4  submitted to them, the cause may be again tried.

5    *5. The prosecuting attorney in a case that he has initiated, may*
6  *voluntarily dismiss a complaint:*

7    *(a) Before a preliminary hearing if the crime with which the defendant is*
8  *charged is a felony or gross misdemeanor; or*

9    *(b) Before trial if the crime with which the defendant is charged is a*
10  *misdemeanor,*

11  *without prejudice to the right to file another complaint, unless the State of*
12  *Nevada has previously filed a complaint against the defendant which was*
13  *dismissed at the request of the prosecuting attorney. After the dismissal, the*
14  *court shall order the defendant released from custody or, if he is released on*
15  *bail, exonerate the obligors and release any bail.*

16    *6. If a prosecuting attorney files a subsequent complaint after a*
17  *complaint concerning the same matter has been filed and dismissed against*
18  *the defendant:*

19    *(a) The case must be assigned to the same judge to whom the initial*
20  *complaint was assigned; and*

21    *(b) A court shall not issue a warrant for the arrest of a defendant who*
22  *was released from custody pursuant to subsection 5 or require a defendant*
23  *whose bail has been exonerated pursuant to subsection 5 to give bail unless*
24  *the defendant does not appear in court in response to a properly issued*
25  *summons in connection with the complaint.*

26    7. The [district attorney of any county] *prosecuting attorney in a case*
27  *that he has initiated,* may voluntarily dismiss an indictment [, information
28  or complaint at any time prior to] *or information before* the actual arrest or
29  incarceration of the defendant without prejudice to the right to bring another
30  indictment [, information or complaint.] *or information.* After *the* arrest or
31  incarceration of the defendant, [he may do so,] *the prosecuting attorney*
32  *may voluntarily dismiss an indictment or information* without prejudice to
33  [such right,] *the right to bring another indictment or information* only upon
34  good cause shown to the court and upon written findings and a court order
35  to that effect.

36    **Sec. 2.** NRS 178.562 is hereby amended to read as follows:

37    178.562 1. [An] *Except as otherwise provided in NRS 174.085, an*
38  order for the dismissal of the action, as provided in NRS 178.554 and
39  178.556, [shall be] *is* a bar to another prosecution for the same offense.

40    2. The discharge of a person accused upon preliminary examination
41  [shall be] *is* a bar to another complaint against him for the same offense, but
42  [shall] *does* not bar the finding of an indictment or filing of an information.






04 be

ı.

taken

**(** î

ʏs and

bering

:erting

:curity
social
is not

ʌ new
tion] ,

ec. 6,

**( )**

n. on

.afety;
entifi-
viding

, Mr.

**(** ⸂

Assembly Bill No. 248.
Bill read third time.
Remarks by Assemblyman Herrera.
Roll call on Assembly Bill No. 248:
YEAS—42.
NAYS—None.

Assembly Bill No. 248 having received a constitutional majority, Mr.
Speaker declared it passed, as amended.
Bill ordered transmitted to the Senate.

Assembly Bill No. 270.
Bill read third time.
Remarks by Assemblywoman Koivisto.
Roll call on Assembly Bill No. 270:
YEAS—42.
NAYS—None.

Assembly Bill No. 270 having received a constitutional majority, Mr.
Speaker declared it passed, as amended.
Bill ordered transmitted to the Senate.

Assembly Bill No. 342.
Bill read third time.
Remarks by Assemblywoman Berman.
Roll call on Assembly Bill No. 342:
YEAS—42.
NAYS—None.

Assembly Bill No. 342 having received a constitutional majority, Mr.
Speaker declared it passed, as amended.
Bill ordered transmitted to the Senate.

Assembly Bill No. 578.
Bill read third time.
Assemblyman Perkins moved that Assembly Bill No. 578 be taken from
the General File and re-referred to the Committee on Ways and Means.
Motion carried.

Assembly Bill No. 589.
Bill read third time.
Remarks by Assemblyman Anderson.
Roll call on Assembly Bill No. 589:
YEAS—42.
NAYS—None.

Assembly Bill No. 589 having received a constitutional majority, Mr.
Speaker declared it passed, as amended.
Bill ordered transmitted to the Senate.

Assembly Bill No. 608.
Bill read third time.
Remarks by Assemblymen Bache and Perkins.

**MINUTES OF THE
SENATE COMMITTEE ON JUDICIARY**

**Sixty-ninth Session
June 30, 1997**

The Senate Committee on Judiciary was called to order by Chairman Mark A. James, at 8:45 a.m., on Monday, June 30, 1997, in Room 2149 of the Legislative Building, Carson City, Nevada. Exhibit A is the Agenda. Exhibit B is the Attendance Roster.

## COMMITTEE MEMBERS PRESENT:

Senator Mark A. James, Chairman
Senator Jon C. Porter, Vice Chairman
Senator Mike McGinness
Senator Maurice Washington
Senator Ernest E. Adler
Senator Valerie Wiener

## COMMITTEE MEMBERS ABSENT:

Senator Dina Titus (Excused)

## GUEST LEGISLATORS PRESENT:

Assemblywoman Ellen Marie Koivisto, Clark County Assembly District No. 14
Assemblyman John J. Lee, Clark County Assembly District No. 3

## STAFF MEMBERS PRESENT:

Allison Combs, Committee Policy Analyst
Brad Wilkinson, Committee Counsel
Maddie Fischer, Administrative Assistant
Barbara Moss, Committee Secretary

## OTHERS PRESENT:

Robey B. Willis, Justice of the Peace, Carson City, and Lobbyist, Nevada Judges
    Association
Ben Graham, Lobbyist, Legislative Representative, Nevada District Attorneys'
    Association
Dwight L. W. Gover, Lobbyist, State of Nevada Peace Officers Association

**29**

Senate Committee on Judiciary
June 30, 1997
Page 2

John C. Morrow, Chief Administrative Deputy, Washoe County Public Defender
David S. Gibson, Lobbyist, Legislative Representative, Clark County Public
    Defenders Office
Mark W. Knobel, Attorney, Reno
James J. Halley, Attorney, Reno
Dean Heller, Secretary of State
Michael Lee, Deputy Secretary of State, Commercial Recordings Division, Office
    of the secretary of State
Carolyne Edwards, Lobbyist, Clark County School District (CCSD)

Senator James requested a motion for committee introduction of Bill Draft
Request 41-1856.

BILL DRAFT REQUEST 41-1856:    Requires the Nevada athletic commission
        to impose penalty against contestant who
        commits mayhem during contest or
        exhibition of unarmed combat.

    SENATOR PORTER MOVED TO INTRODUCE BDR 41-1856.

    SENATOR MCGINNESS SECONDED THE MOTION.

    THE MOTION CARRIED. (SENATOR TITUS WAS ABSENT FOR THE
    VOTE.)

*****

Senator James referred to an amendment to Assembly Bill (A.B.) 170 which
would delete the date limitation in the central repository, and asked for
committee authorization for the amendment.

ASSEMBLY BILL 170:    Makes various changes concerning domestic
        violence. (BDR 14-571)

Senator McGinness asked if a fiscal note would be required. Senator James
answered grant money was available, therefore, a fiscal note would not be
required.

**30**

Senate Committee on Judiciary
June 30, 1997
Page 5

SENATE BILL 40:          Limits time that arrested person may be held before he is
                         brought before magistrate. (BDR 14-155)

    THE MOTION CARRIED. (SENATOR TITUS WAS ABSENT FOR THE
    VOTE.)

\* \* \* \* \*

Senator James opened the hearing on Assembly Bill (A.B.) 270.

ASSEMBLY BILL 270:       Allows prosecuting attorney to dismiss criminal case
                         without prejudice in certain situations. (BDR 14-658)

Mr. Graham submitted a memorandum to Mr. Graham, from Stewart L. Bell,
District Attorney (Clark County), dated May 27, 1997, in support of A.B. 270;
and a memorandum to Assemblyman Bernard (Bernie) Anderson (Washoe
County Assembly District No. 31), from Mr. Graham, dated June 11, 1997,
approving certain amendments to A.B. 270 (Exhibit C). He explained A.B. 270
would allow the district attorney's office one opportunity to dismiss a case in
justice court without prejudice. Currently, should there be a technical deficiency
and uncertainty the right person had been apprehended, even with probable
cause, if the state dismisses the case the attorney general's office cannot refile
and must proceed under a grand jury. Mr. Graham pointed out most
jurisdictions do not have a grand jury on a regular basis.

Mr. Graham pointed out the issue arose from a case in Las Vegas wherein a man
confessed to a series of sexual assaults, and it turned out he was not the true
offender. The state sought to dismiss the charges and file later if it was proven
the man was the actual culprit. Mr. Graham maintained A.B. 270 was as much
a benefit to the defense as it was to the state. The way the amendment was
written, if a case was dismissed the defendant would be released from custody
and his/her bail would be exonerated. At a later date, if a new charge was filed,
he/she would be summoned to court; if he/she answered the summons and came
to court, there would be no requirement for bail. Mr. Graham said it was
anticipated the amendment would be used very rarely.

Mr. Graham indicated there had been extensive discussions and negotiations
with members of the "defense bar." The deputy public defenders, both in
northern and southern Nevada, agreed with the language of A.B. 270; however,

**31**

Senate Committee on Judiciary
June 30, 1997
Page 6

there was a continuing barrage of differing opinions from elements of the "defense bar." Recently Mace J. Yampolsky, representing the Nevada Attorneys for Criminal Justice, visited the Legislature and agreed to the language of A.B. 270.

In conclusion, Mr. Graham averred A.B. 270 was good, sound legislation. Assembly Bill 270 allowed the state one dismissal and in no way prejudiced a defendant, assuring him/her the opportunity of a preliminary hearing more than any other procedure. It had been requested by prosecutors because it was a tool that had never before been available to them. Mr. Graham declared it was especially important to the rural counties, and pointed out if a prosecutor requested a dismissal without a grand jury, the case was lost. He indicated there were no amendments necessary on A.B. 270 and urged passage of it.

Senator James asked Mr. Graham if he agreed with the changes. Mr. Graham answered affirmatively and stated he had met with Mr. Bell who was also in agreement. Senator James inquired if assigning the case to the same judge was feasible. Mr. Graham indicated there was a concern prosecutors might go "forum shopping;" however, he gave assurance it would not be the case. In the relatively few cases there might be, it would not be difficult to channel the case back to the same justice of the peace.

Senator James indicated he would accept a motion on A.B. 270.

    SENATOR PORTER MOVED TO DO PASS A.B. 270.

    SENATOR MCGINNESS SECONDED THE MOTION.

    THE MOTION CARRIED. (SENATOR TITUS WAS ABSENT FOR THE VOTE.)

                              * * * * *

Senator James opened the hearing on Assembly Bill (A.B.) 210.

ASSEMBLY BILL 210:    Revises provisions governing discovery in criminal cases. (BDR 14-171)

Mr. Graham indicated A.B. 210 was an old issue revisited, and the issue was reciprocal discovery. He declared it an honor to come to the table with David



## OFFICE OF THE DISTRICT ATTORNEY
## CLARK COUNTY, NEVADA

J. CHARLES THOMPSON
*Assistant District Attorney*

JOHNNIE RAWLINSON
*Assistant District Attorney*

**STEWART L. BELL**
*District Attorney*

# MEMORANDUM

**TO:**       **BEN GRAHAM, CHIEF DEPUTY DISTRICT ATTORNEY**

**FROM:**   **STEWART L. BELL, DISTRICT ATTORNEY**

**DATE:**    **MAY 27, 1997**

**SUBJECT:  AB 270**

---

As you are aware, AB 270 is a very important bill to law enforcement. It is, however, my opinion that it is a bill to which there is no objection by the defense bar.

AB 270 gives this office the ability, when necessary, to dismiss a case, allow a defendant to be released from custody, but to refile if circumstances change.

The genesis of this bill was a case where a mentally deficient man was arrested for a sexual assault occurring in Northeast Las Vegas. He confessed to the police, was arrested and later indicted. While he was in custody, three (3) more rapes with the identical modus operandi occurred. It was unclear to law enforcement whether or not the defendant in custody had perpetrated the first sexual assault, and the subsequent assaults were by a copycat defendant, or, alternatively, the wrong person had been arrested, his confession notwithstanding.

This office tried to stipulate to an OR release while we sorted out the situation, but the judge declined our stipulation because of the nature of the charge. The office then tried to get the public defender to stipulate to allow us to dismiss without prejudice to refiling the charges if it became clear by subsequent investigation that the defendant was in fact the perpetrator of the first sexual assault. Although they eventually did stipulate, this took a week to effectuate. Had our office had the ability to dismiss and refile, we could have done this immediately. In fact in that case it has not been necessary to refile, nor will such very often occur.

EXHIBIT C

As a practical matter, in Clark County, it is not unusual for a complaint to be dismissed wherein the matter is presented to the grand jury and an indictment secured. If a case needed to be dismissed, but reinitiated, almost all defense lawyers would prefer our office to have the ability to file a second complaint, rather than being required to use the grand jury, because of the advantage to defense counsel of a preliminary hearing over an indictment.

In fact, now, when a complaint is filed and a superseding indictment secured, our office cannot dismiss the original complaint because of the law as it exists. If we were to do so, and the indictment were procedurally defective for any reason, we would then be precluded from pursuing subsequent charges against a person who may be a severe threat to the community. We would like the ability to simply dismiss the complaint knowing that that procedural avenue would be available if for any reason the indictment did not pass procedural muster.

In fact, AB 270 is even more important to rural areas where there are no grand juries, because the alternative of an indictment after dismissal of a criminal complaint is not available.

No question about it, AB 270 is one the three or four most important bills to this office and law enforcement in general this legislative session

Your efforts are most appreciated.

34

# MEMO

**To:**       Chairman Bernie Anderson
              Assembly Judiciary
**From:**     Ben Graham
              Nevada District Attorneys' Association
**Subject:**  AB270 - Dismissal in Justice Court
**Date:**     June 11, 1997

I am respectfully requesting AMEND AND DO PASS action on the above referenced matter.

As previously represented this would allow the prosecution one (1) dismissal of criminal charges in Justice Court without prejudice. There are safeguards to protect the rights of a defendant and proposed amendments further address potential abuse to bring the language in line with our intent.

There are benefits to the state and defendants' availability of a preliminary hearing is much more likely under this proposed legislation.

Thank you for your affirmative consideration.

35

SENATE DAILY JOURNAL    6/30/97

— 51 —

Assembly Bill No. 242 having received a constitutional majority, Mr. President declared it passed.
Bill ordered transmitted to the Assembly.


Presi-

Assembly Bill No. 260.
Bill read third time.
Roll call on Assembly Bill No. 260:
YEAS—21.
NAYS—None.

Assembly Bill No. 260 having received a constitutional majority, Mr. President declared it passed.
Bill ordered transmitted to the Assembly.


/, Mr.

Assembly Bill No. 266.
Bill read third time.
Remarks by Senators Augustine and Raggio.
Roll call on Assembly Bill No. 266:
YEAS—21.
NAYS—None.

Assembly Bill No. 266 having received a constitutional majority, Mr. President declared it passed, as amended.
Bill ordered transmitted to the Assembly.


in the

Assembly Bill No. 270.
Bill read third time.
Remarks by Senators O'Donnell and James.
Roll call on Assembly Bill No. 270:
YEAS—20.
NAYS—Coffin.

, Mr.

Assembly Bill No. 270 having received a constitutional majority, Mr. President declared it passed.
Bill ordered transmitted to the Assembly.

Assembly Bill No. 279.
Bill read third time.
Roll call on Assembly Bill No. 279:
YEAS—21.
NAYS—None.

, Mr.

Assembly Bill No. 279 having received a constitutional majority, Mr. President declared it passed.
Bill ordered transmitted to the Assembly.



Assembly Bill No. 470.
Bill read third time.
Roll call on Assembly Bill No. 470:
YEAS—21.
NAYS—None.



children whose native language is not English, that are funded by the appropriation made pursuant to subsection 3 of section 1 of this act, and report its findings to the 70th session of the Nevada Legislature on or before March 15, 1999. The report must include an evaluation of the effect such programs have had on meeting the special needs of such children and increasing the participation of such children in school programs that assist them in achieving high educational standards.

Sec. 4.  This act becomes effective upon passage and approval or on June 30, 1997, whichever occurs earlier.

Assembly Bill No. 268–Committee on Ways and Means

## CHAPTER 503

AN ACT making an appropriation to the account for local cultural activities; and providing other matters properly relating thereto.

[Approved July 16, 1997]

THE PEOPLE OF THE STATE OF NEVADA, REPRESENTED IN
SENATE AND ASSEMBLY, DO ENACT AS FOLLOWS:

**Section 1.**  There is hereby appropriated from the state general fund to the account for local cultural activities created by NRS 233C.100 the sum of $150,000.

Sec. 2.  Any remaining balance of the appropriation made by section 1 of this act must not be committed for expenditure after June 30, 1999, and reverts to the state general fund as soon as all payments of money committed have been made.

Sec. 3.  This act becomes effective upon passage and approval or on June 30, 1997, whichever occurs earlier.

Assembly Bill No. 270–Committee on Judiciary

## CHAPTER 504

AN ACT relating to criminal procedure; allowing a prosecuting attorney to dismiss a case without prejudice in certain situations; and providing other matters properly relating thereto.

[Approved July 16, 1997]

THE PEOPLE OF THE STATE OF NEVADA, REPRESENTED IN
SENATE AND ASSEMBLY, DO ENACT AS FOLLOWS:

**Section 1.  NRS 174.085** is hereby amended to read as follows:

174.085  1.  If [the] *a* defendant was formerly acquitted on the ground of *a* variance between the indictment, information or complaint and proof, or the indictment, information, or complaint was dismissed upon an objection to its form or substance, or in order to hold [the] *a* defendant for a

higher offense without a judgment of acquittal, it is not an acquittal of the same offense.

2.　[Whenever the] *If a* defendant is acquitted on the merits, he is acquitted of the same offense, notwithstanding [any] *a* defect in *the* form or substance in the indictment, information, or complaint on which the trial was had.

3.　When [the] *a* defendant is convicted or acquitted, or has been once placed in jeopardy upon an indictment, information or complaint, except as *otherwise* provided in [subsection 5,] *subsections 5 and 6,* the conviction, acquittal or jeopardy is a bar to another indictment, information or complaint for the offense charged in the former, or for an attempt to commit the same, or for an offense necessarily included therein, of which he might have been convicted under that indictment, information or complaint.

4.　In all cases where a jury is discharged or prevented from giving a verdict by reason of [any] *an* accident or other cause, except where the defendant is discharged during the progress of the trial or after the cause is submitted to them, the cause may be again tried.

5.　*The prosecuting attorney in a case that he has initiated, may voluntarily dismiss a complaint:*

*(a) Before a preliminary hearing if the crime with which the defendant is charged is a felony or gross misdemeanor; or*

*(b) Before trial if the crime with which the defendant is charged is a misdemeanor,*

*without prejudice to the right to file another complaint, unless the State of Nevada has previously filed a complaint against the defendant which was dismissed at the request of the prosecuting attorney. After the dismissal, the court shall order the defendant released from custody or, if he is released on bail, exonerate the obligors and release any bail.*

6.　*If a prosecuting attorney files a subsequent complaint after a complaint concerning the same matter has been filed and dismissed against the defendant:*

*(a) The case must be assigned to the same judge to whom the initial complaint was assigned; and*

*(b) A court shall not issue a warrant for the arrest of a defendant who was released from custody pursuant to subsection 5 or require a defendant whose bail has been exonerated pursuant to subsection 5 to give bail unless the defendant does not appear in court in response to a properly issued summons in connection with the complaint.*

7.　The [district attorney of any county] *prosecuting attorney in a case that he has initiated,* may voluntarily dismiss an indictment [, information or complaint at any time prior to] *or information before* the actual arrest or incarceration of the defendant without prejudice to the right to bring another indictment [, information or complaint.] *or information.* After *the* arrest or incarceration of the defendant, [he may do so,] *the prosecuting attorney may voluntarily dismiss an indictment or information* without prejudice to [such right,] *the right to bring another indictment or information* only upon good cause shown to the court and upon written findings and a court order to that effect.

Sec. 2. **NRS 178.562** is hereby amended to read as follows:

178.562   1.   [An] *Except as otherwise provided in NRS 174.085, an* order for the dismissal of the action, as provided in NRS 178.554 and 178.556, [shall be] *is* a bar to another prosecution for the same offense.

2.   The discharge of a person accused upon preliminary examination [shall be] *is* a bar to another complaint against him for the same offense, but [shall] *does* not bar the finding of an indictment or filing of an information.

---

Assembly Bill No. 279–Assemblymen Ernaut, Hettrick, Carpenter, Hickey, Tiffany, Von Tobel, Amodei, Cegavske, Gustavson, Braunlin, Lambert, Humke, Nolan, Berman, Mortenson, Chowning and Sandoval

### CHAPTER 505

AN ACT relating to compensation for unemployment; revising provisions governing the disqualification of a person to receive benefits when he voluntarily leaves employment to seek other employment; providing an exception to charging benefits against the record of the base-period employer; and providing other matters properly relating thereto.

[Approved July 16, 1997]

THE PEOPLE OF THE STATE OF NEVADA, REPRESENTED IN SENATE AND ASSEMBLY, DO ENACT AS FOLLOWS:

**Section 1.   NRS 612.380** is hereby amended to read as follows:

612.380   1.   Except as otherwise provided in subsection 2, a person is ineligible for benefits for the week in which he has voluntarily left his last or next to last employment:

(a) Without good cause, if so found by the administrator, and until he earns remuneration in covered employment equal to or exceeding his weekly benefit amount in each of 10 weeks.

(b) To seek [better] *other* employment and for all subsequent weeks until he secures [better] *other* employment or until he earns remuneration in covered employment equal to or exceeding his weekly benefit amount in each of 10 weeks, if so found by the administrator.

2.   A person is not ineligible for benefits solely because he left employment which was not suitable to enter training approved pursuant to 19 U.S.C. § 2296.

3.   As used in subsection 2, employment is "suitable" if the work is of a substantially equal or higher level of skill than the person's past adversely affected employment, and the wages are not less than 80 percent of his average weekly wage at his past adversely affected employment.

**Sec. 2.   NRS 612.551** is hereby amended to read as follows:

612.551   1.   Except as otherwise provided in [subsection 2,] *subsections 2 and 3,* when the division has determined that a claimant has earned 75 percent or more of his wages during his base period from one employer, it shall notify the employer of its determination and advise him that he has a

EXHIBIT  F ~ " Grand Jury

GRAND JURY

37 Pages

1                    INDEX OF WITNESSES

2                                                Examined

3

4    MARISSA VALDEZ-PICKETT                          7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                     INDEX OF EXHIBITS

2

3    Grand Jury Exhibits                           Identified

4     1 — PROPOSED INDICTMENT                           5

5     2 — PHOTOGRAPH                                   32

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          LAS VEGAS, NEVADA, MARCH 21, 2013

2                  * * * * * * *

3

4              DANETTE L. ANTONACCI,

5       having been first duly sworn to faithfully

6       and accurately transcribe the following

7       proceedings to the best of her ability.

8

9          MS. WECKERLY:  Good morning.  We'll be

10    presenting this morning the case of the State of Nevada

11    versus Ammar Harris.  This is Grand Jury Case Number 12

12    BGJ088X.  I think you have a copy of the proposed

13    Indictment which will be Exhibit 1.

14              In this presentment there are three counts

15    of sexual assault.  The elements of sexual are

16    subjecting another individual to sexual penetration,

17    however slight, against the will of the other individual

18    or under circumstances where they are incapable of

19    giving consent.

20              The law on sexual assault is such that each

21    separate act of sexual assault can be charged as a

22    separate count.

23              Mr. Harris is also charged in the proposed

24    Indictment with robbery which is the taking of personal

25    property by force or threat of force.

6

1        Count 5 is second degree kidnapping which

2    is simply detaining an individual against their will.

3        And Count 6 is coercion with use of a

4    deadly weapon which is using force or the threat of

5    force against an individual with the intent to compel

6    the individual from doing something that they had a

7    right to do or with the intent to, preventing a person

8    from doing something they had a right to do.

9        Does anyone have any questions about the

10   elements of the offenses in the proposed Indictment?

11       MR. STANTON:  And just one final thing on

12   the proposed Indictment.  Counts 1 through 3 are alleged

13   to have occurred on a date different from the other

14   counts.  I'm sure you'll see that when you review the

15   elements of the Indictment.

16       MS. WECKERLY:  And our first witness is

17   Marissa Valdez-Pickett.

18       MR. STANTON:  Stand by the blue chair,

19   raise your right hand and be sworn by the foreperson.

20       THE FOREPERSON:  You do solemnly swear the

21   testimony you are about to give upon the investigation

22   now pending before this Grand Jury shall be the truth,

23   the whole truth, and nothing but the truth, so help you

24   God?

25       THE WITNESS:  Yes.

1          THE FOREPERSON:  Please be seated.

2          You are advised that you are here today to

3    give testimony in the investigation pertaining to the

4    offenses of three counts of sexual assault, one count

5    robbery, one count second degree kidnapping, and one

6    count coercion with use of a deadly weapon, involving

7    Ammar Harris.

8          Do you understand this advisement?

9          THE WITNESS:  Yes.

10          THE FOREPERSON:  Please state your first

11    and last name, spell both for the record.

12          THE WITNESS:  My first name is Marissa

13    M-A-R-I-S-S-A, last name Valdez-Pickett, V-A-L-D-E-Z,

14    hyphen P-I-C-K-E-T-T.

15                    MARISSA VALDEZ-PICKETT,

16    having been first duly sworn by the Foreperson of the

17    Grand Jury to testify to the truth, the whole truth,

18    and nothing but the truth, testified as follows:

19

20                         EXAMINATION

21

22    BY MS. WECKERLY:

23          Q.    Should I call you Miss Pickett?

24          A.    Valdez.

25          Q.    Miss Valdez?

8

```
 1          A.    Uh-huh.

 2          Q.    Back in June of 2010 where were you living?

 3          A.    In June of 2010 on 2nd day of June I moved

 4   with Ammar Harris with a girlfriend of mine that she had

 5   became friends with him.

 6          Q.    Let me just ask you a couple questions

 7   about that.  Okay?

 8          A.    Uh-huh.

 9          Q.    You were living in Las Vegas in June of

10   2000?

11          A.    Not 2000.

12          Q.    Or 2010.  Sorry.

13          A.    Yes.

14          Q.    Yes.  And you move in with Ammar Harris

15   around June 2nd of 2010?

16          A.    Yes.

17          Q.    And you move in with a girlfriend of yours

18   as well?

19          A.    Yes.

20          Q.    What was her name?

21          A.    Ashley Fassbender, F-A-S-S-B-E-N-D-E-R.

22          Q.    Why did you end up moving in with him just

23   generally?

24          A.    I had gotten kicked out of the house that I

25   was living in because of Ashley and I had brought her to
```

1   Vegas so I felt bad, I didn't want her to be in Vegas by

2   herself so I went with her, and she had ended up meeting

3   this guy, I guess she had met him through Twitter or

4   Facebook, however, and so he was the only person we knew

5   to go to.

6        Q.    Okay.  So you and Ashley move in with

7   Mr. Harris.  Where was he living?

8        A.    I'm not exactly sure.  Off Flamingo.  I

9   don't know what the place was called.

10       Q.    Okay.

11       A.    It's like a fully, fully furnished condo.

12       Q.    A condo off Flamingo.  Obviously in Las

13  Vegas, Clark County.

14       A.    Yes.

15       Q.    And you move in, your friend Ashley moves

16  in?

17             Is that yes?

18       A.    Yes.

19       Q.    Was there anybody else living there besides

20  you three?

21       A.    Bri.

22       Q.    Bri?  Is that B-R-I?

23       A.    Uh-huh.  That's how I know her as, yes.

24       Q.    You don't know her last name?

25       A.    No.

1      Q.      When you move in who sleeps where in the

2   condo?

3      A.      When I first got there we were staying in

4   Jaiduh's room, that's what I know him as, Jaiduh.  We

5   were staying in Ammar Harris' room, me and Ashley were

6   in his room, and I don't know where Bri slept.

7      Q.      Did Mr. Harris sleep in the same room as

8   you and Ashley?

9      A.      The first night he did, whenever I first

10  got there he slept here, Ashley slept in the middle, I

11  slept on the far side.

12     Q.      Of the same bed?

13     A.      Yes.

14     Q.      And then Bri had her own room?

15     A.      I suppose so, yeah.  She wasn't in the

16  room.

17     Q.      And you move in I think you said on

18  June 2nd?

19     A.      Uh-huh.

20     Q.      Is that yes?

21     A.      Yes.

22     Q.      Sorry.

23     A.      Sorry.

24     Q.      Nothing out of the ordinary happens on

25  June 2nd?

1      A.    No, everything seems fine.

2      Q.    What happens on June 3rd?

3      A.    I would get -- I was in the shower and he

4  came into the shower with me.

5      Q.    Let me just back up a little bit so we get

6  some context.

7            Were you at the apartment on June 3rd?

8      A.    Yes.

9      Q.    And the incident that you're about to

10  describe, did it occur during the daytime or the

11  nighttime?

12      A.    I'm going to say the daytime.  It wasn't

13  too late at night I don't think.

14      Q.    And this is on June 3rd though, right?

15      A.    Uh-huh.

16      Q.    Is that yes?

17      A.    Yes.

18      Q.    Who was home in the apartment?

19      A.    Maybe it was just me and Bri and him.  I

20  don't remember Ashley being there.  Because if she was

21  there I don't think it would have happened.

22      Q.    So you're there, Jaiduh, you call

23  Mr. Harris Jaiduh, he was there, and you think Bri was

24  there?

25            Is that yes?

1      A.    Yes.

2      Q.    But you don't think Ashley was there?

3      A.    No.

4      Q.    Okay.  You were describing that you take a

5   shower?

6      A.    Uh-huh.

7      Q.    Is that yes?

8      A.    Yes, I was in the shower.

9      Q.    So you're in the shower.  And is this the

10   shower off like, associated with the bedroom that you

11   had slept in?

12      A.    Yes.  Uh-huh.  Yes.

13      Q.    Okay.  What happens as you're taking a

14   shower?

15      A.    I see him come into the bathroom and I can

16   see through the pane, the glass pane, and I just see

17   him, I see him there moving around obviously, he's

18   taking his clothes off or whatever he's doing and he

19   steps in the shower with me.

20      Q.    So I assume the shower kind of has a

21   see-through glass door?

22      A.    Uh-huh.

23      Q.    Is that yes?

24      A.    Yes.  Sorry.

25      Q.    And so you're in there taking your shower,

13

1    you can kind of see him coming in through the glass?

2        A.    Yes.

3        Q.    And he takes off his clothes?

4        A.    Yes.

5        Q.    Is that yes?

6        A.    Yes.

7        Q.    And comes in the shower?

8        A.    Yes.

9        Q.    What happens?  I mean were you shocked or

10   what happens as he does this?

11       A.    I was shocked but I didn't know what to do

12   because I'm already naked in the shower and this is his

13   place and I didn't know what to do.  I just stayed in

14   the shower.  I mean I didn't freak out, I didn't scream

15   for help or anything.

16       Q.    Okay.

17       A.    Yeah, I was just there.

18       Q.    What happens as he comes into the shower?

19       A.    He comes in the shower, he starts touching

20   me.

21       Q.    I'm not trying to embarrass you, but when

22   he starts to touch you, is it in a sexual manner?

23       A.    Yes.  He starts touching with his fingers

24   on my vagina.

25       Q.    Inside?

1      A.     Yes.

2      Q.     What are you saying as he's doing this?

3      A.     I'm just trying to get through it, just let

4    it go as fast as it can.  I didn't know what to do.  I

5    just stood there.

6      Q.     Are you responding to him at all or like

7    you know --

8      A.     No.  No.

9      Q.     -- giving back attention or anything like

10   that?

11     A.     No.  No.  After he had stopped he wanted me

12   to give him oral sex and I didn't want to so I was

13   trying to be more affectionate with him and like kiss

14   him so he'll stop, maybe he'll just want to do something

15   else, he won't make me give him oral sex.  But he pushes

16   me down like you know, down kind of, so eventually I do

17   do it and then I stop and, I stop and I stand up and

18   he's just, he turns me around.

19     Q.     How do you know that, does he say something

20   about wanting oral sex or does he just kind of move you

21   in that direction?

22     A.     He just moves me in the direction.

23     Q.     And were you willing to do that?

24     A.     No.

25     Q.     Or were you --

15

1      A.    No.  I just, I mean like I said I tried to

2  get out of it but the shower is very small, you know,

3  and he's pushing me and so I just, I, uhm, go down

4  eventually.

5      Q.    Did he like put himself in your mouth or

6  how did that happen?

7      A.    Yeah.  Yes.  He, I started giving him oral

8  sex, that's what he wanted, and I guess he wanted to,

9  how do you say, come, I don't know what the word for it,

10  finish I guess, but I told him, or I guess he wanted to

11  come in my mouth and I told him no and so we had just

12  stopped and I stood up and he turned me around and he

13  put his penis in me.

14      Q.    So he says he wants to ejaculate in your

15  mouth?

16      A.    He was telling me to open my mouth, yes.

17      Q.    And what are you saying or doing?

18      A.    No.  Just like no.

19      Q.    And are you kind of in the --

20      A.    I'm down still, uh-huh.

21      Q.    In the corner of the shower?

22      A.    Uh-huh.

23      Q.    Is that yes?

24      A.    Yes.

25      Q.    So he says that, you say no.  Does he

1    ejaculate at all?

2          A.    Yeah.

3          Q.    When does he ejaculate?

4          A.    Before, maybe before I get up off the

5    floor.  I don't remember the exact details.  My

6    statement says that he did ejaculate on my face.  I

7    didn't let him ejaculate in my mouth.  And that was it.

8    After that he stood me up and turned me around.

9          Q.    Did you want him to do that?

10         A.    No.

11         Q.    So after he had --

12         A.    But I didn't want to be on my knees, I

13   didn't want to be giving him oral sex.  I was just

14   trying to get out of there as fast as I can, just not to

15   fight him.  I didn't make a big scene or anything.  I

16   just was trying to be nice about it.  I don't know.

17         Q.    So after he ejaculates, you said he stands

18   you up?

19         A.    Uh-huh.

20         Q.    And you're both in the shower still?

21         A.    Yes.  And he turns me around.

22         Q.    So now your back is to him?

23         A.    Uh-huh.

24         Q.    Is that yes?

25         A.    Yes.

17

```
 1          Q.    Are you standing up?

 2          A.    Yes.

 3          Q.    And what happens at that point?

 4          A.    He puts his penis in me and starts having

 5   sex with me and then it ends quickly.

 6          Q.    When you say he puts his penis in you, is

 7   that in your vagina?

 8          A.    Yes.

 9          Q.    And did you want to have sex with him?

10          A.    No.

11          Q.    Did you say anything to him?

12          A.    I told him, I tried telling him like you're

13   Ashley's friend and like I'm not here for you, but

14   nothing, it didn't matter.

15          Q.    Did he respond at all when you were saying

16   look, you're Ashley's friend?

17          A.    He was just like, come on, come on, come

18   on, do it.

19          Q.    Okay.  "Come on"?

20          A.    Just saying come on, just trying to

21   convince me, just trying to persuade me to do it.

22          Q.    Did you respond at all favorably?

23          A.    No.  Not -- you mean that I wanted to

24   like -- no.

25          Q.    Okay.  So when you, I think you said that
```

1  he was sort of quick after he puts his penis in your

2  vagina.

3       A.    Uh-huh.

4       Q.    Is that yes?

5       A.    Yes.

6       Q.    When you're saying quick, like how long?

7       A.    Maybe a couple minutes more and then he

8  stops and we get out of the shower.  And I don't

9  remember the details of that day.

10       Q.    What did you do after you got out of the

11  shower?

12       A.    We just -- I was by myself.  I just dried

13  off and probably just sat on the bed by myself.  I

14  didn't have anywhere to go, I didn't have anyone to talk

15  to, I was just there.

16       Q.    Well, that was kind of my next question.

17  Did you tell anybody about what he did?

18       A.    After I left I told Ashley, after I left.

19  I flew back to San Antonio for my birthday and my

20  sister's graduation and while I was over there I told

21  her, and for whatever reason she didn't want to go back,

22  she told me that I guess he assaulted her too and she

23  didn't want to go back.  But I wasn't afraid so.

24       Q.    I want to instruct the Grand Jury that the

25  witness mentioned other actions that would be considered

19

1    bad acts done by this defendant with regard to Ashley.

2    You should disregard that comment.  Is there anyone in

3    the Grand Jury that could not disregard that statement?

4              Okay.  After, like immediately after it

5    happened, you said you were kind of by yourself and you

6    didn't call anyone.  You didn't call the police?

7        A.    Huh-uh.

8        Q.    Is that --

9        A.    No, I didn't.

10       Q.    Correct, you did not?

11       A.    No.

12       Q.    Why didn't you call the police?

13       A.    Because he was in the same apartment as me

14   and I didn't want to be on the phone talking to police.

15   And I couldn't tell them where I was because I didn't

16   know where I was, I didn't know the address, I couldn't

17   ask him for the address.  I couldn't go outside.

18       Q.    Did you have, besides Ashley, was there

19   anyone else that you knew in Las Vegas that could have

20   helped you?

21       A.    I did meet, I had this friend Justin, I had

22   met him at the club and I had been texting him during

23   this, while all this was happening.  I asked him if he

24   could call the police for me and help me.  But I didn't

25   know where I was so he couldn't really do anything.

1          Q.      That all happens on the 2nd?

2                  Is that yes?

3          A.      Yes.

4          Q.      And then I think you mentioned --

5          A.      The sexual assault was not the same day as

6     I was texting Justin, no, that was not the same day.

7     That was whenever I came back.  What had happened, I

8     know I left, after that assault I left and I went back

9     to San Antonio.  I told Ashley about it.  She told me

10    the same thing happened to her and she was afraid to

11    come back, that's why she didn't come back.  I mean it

12    happened to me but I just, I wasn't afraid of him.  I

13    felt like I could come back and get my things because it

14    was all of my things, all of my belongings, and hers

15    too.

16         Q.      Now you said a lot there.  You go, after

17    the sexual assault -- are you okay?

18                 We can take a minute.  Are you all right?

19                 Are you okay to keep going?

20         A.      Uh-huh.

21         Q.      So after the stuff that happened in the

22    shower --

23         A.      Uh-huh.

24         Q.      -- you said you go home?

25         A.      Yes.

21

```
1        Q.    To Texas.  And that's obviously where your
2   family is because you mentioned some family activities.
3        A.    Yes.
4        Q.    During that time period, I don't want to
5   know what you said, but you have a conversation with
6   Ashley?
7        A.    Uh-huh.
8        Q.    Correct?
9        A.    Uh-huh.  Yes.
10       Q.    And then you come back to Las Vegas?
11       A.    Yes.
12       Q.    Is that right?  And you go back to that
13  same apartment?
14       A.    Yes.
15       Q.    How do you get back there?
16       A.    He picked me up from the airport.  She gave
17  me his number so I could get in contact with him because
18  he had all of our things, me and her things at his
19  apartment.  So I had his number, I called him and he
20  picked me up from the airport.
21       Q.    Do you remember about when this was?  Like
22  how long were you in Texas?
23       A.    I was in Texas for maybe almost two weeks.
24  I think I was there for awhile because I didn't come
25  back, I believe my statement says until the 18th or the
```

22

1    19th.

2          Q.    So the 18th or 19th of June you come back?

3          A.    Uh-huh.

4          Q.    He picks you up.  And you said that you

5    kind of wanted to get your stuff?

6          A.    Uh-huh.  That's the reason I had came back

7    to get my things.  I didn't want to leave everything.  I

8    only went to San Antonio for a short amount of time so I

9    could come back and work and save money and get my own

10   place, but it just didn't happen that way.

11         Q.    Were you afraid of him?

12         A.    I can't say I was afraid that I felt like

13   he -- I mean -- I just guess I just didn't let it bother

14   me.  I just knew I had to go back and get my things.  I

15   know he did whatever he did but I just, I didn't want

16   Ashley to go back so I had to go back.

17         Q.    When he picked you up at the airport and

18   you go back around the 18th, is Ashley still living

19   there then?

20         A.    Her things are there but she isn't there.

21   I think she was in Chicago or somewhere else.  She

22   wasn't there when I came back.

23         Q.    Is Bri there?

24         A.    Uh-huh.

25         Q.    Is that yes?

23

1       A.      Yes.

2       Q.      Okay.  And then at that time period are

3  you, and maybe before, are you working?

4       A.      Yes.

5       Q.      Where were you working?

6       A.      Little Darlings.

7       Q.      And you're a dancer there?

8       A.      Yes.

9       Q.      On the 20th, what happens on that day, on

10  the 20th of June?

11       A.      If he had picked me up that day then we

12  just hung out the day, nothing happened during the day.

13  He dropped me off at work.  I went to work maybe about

14  9 o'clock at night and got off at 5:00 in the morning.

15  He picked me up, we came home, I went to sleep.  I got

16  something to eat, went to sleep.  I woke up and he had

17  my wallet and he was telling me put your money right

18  here in this box and I told him, I told like no, like

19  why, I don't understand, why do I need to put my money

20  in this box, I'm going to keep my money with me.  And he

21  was just trying to convince me to put this money in this

22  box and then eventually took my wallet from me and my

23  money and he had taken, him and Bri, Bri I believe she

24  wrote down all my information, my social security, my

25  driver's license information.

24

1      Q.     So you came home with cash?

2      A.     Yes, I came home that morning, 5:00 in the

3  morning, and then I went to sleep and I woke up and

4  that's when -- he woke me up.  He was trying like, maybe

5  he didn't wake me up, but I woke up and he was telling

6  me to put my money in the box and whenever he took my

7  wallet I grabbed his arm just like, you know, why are

8  you taking my money, like give me my money back.  So he

9  would turn around once and he went like and got me off

10 of him and then I did it again and he like turned around

11 and he put his hands on my neck and put me against the

12 glass sliding door and was like bitch, if you come at me

13 again I'm going to knock you the fuck out.

14     Q.     And this is when he still has your wallet?

15     A.     Yes.

16     Q.     And when his hands are on your throat, are

17 you on like a bed or are you standing up?

18     A.     I'm standing against the glass door.

19     Q.     Against the glass door.  Where in the

20 apartment?

21     A.     It's, the bed is right here and then

22 there's this, the glass sliding door with the balcony is

23 right here and the bathroom's over here and then there's

24 a door right here.

25     Q.     So when his hands are on your throat you're

25

```
 1   by the --
 2          A.    Up against the glass door.
 3          Q.    The glass door for the balcony?
 4          A.    Yes.
 5          Q.    Is it when his hands are on your throat
 6   that he says if you come at me again?
 7          A.    Uh-huh.
 8          Q.    Is that yes?
 9          A.    Yes.
10          Q.    At this point he's got your wallet?
11          A.    Yes.
12          Q.    And just approximately how much money had
13   you made?
14          A.    I would say anywhere between, the most I
15   had was nine, anywhere between six and $900 he had taken
16   from me because I had a good night that night.
17          Q.    So it was your earnings from the night
18   before?
19          A.    Uh-huh.
20          Q.    Is that yes?
21          A.    Yes.
22          Q.    And you're trying to get your wallet back
23   and he's not giving it to you and finally he kind of
24   chokes you and says that?
25          A.    Uh-huh.
```

1          Q.     Is that yes?

2          A.     Yes.

3          Q.     Okay.  What happens as he's choking you?

4   What are you saying?

5          A.     I didn't say anything.  He just let go of

6   me and walked out of the room and I just sat on the bed.

7          Q.     When he walked out of the room does he have

8   the wallet still?

9          A.     Uh-huh.  Yes.

10         Q.     Yes?  What do you do then?

11         A.     I just sit on the bed and wait for a few

12   hours.  Eventually I think he gave me my cell phone back

13   because they didn't need it but they, and she gave me my

14   wallet back but no money was in it, just my ID and all

15   my papers were messed up.  I had my wallet set up a

16   specific way like so if I wanted to hide money in just

17   like a little thing it would be in there, and everything

18   was taken out of the wallet and all my stuff, no money.

19   Just my wallet and my phone they gave it back.

20         Q.     You mentioned they gave back your phone.

21   My first question on that is they, are you referring to

22   Jaiduh --

23         A.     Yes.

24         Q.     -- and Bri?

25         A.     Yes.

27

1    Q.    How did your phone get taken in all of
2 this?
3    A.    I guess whenever I went to sleep he had
4 taken it because I know I didn't have it whenever we
5 were arguing.  Eventually he gave it back to me and
6 that's when I could start texting my friend Justin.  But
7 I didn't have it the entire time.
8    Q.    So when you wake up and as you describe
9 he's got your wallet and is saying put your money in
10 this box, you don't have your phone at that point?
11    A.    Huh-uh.
12    Q.    Is that right?
13    A.    Yes.
14    Q.    And it's only several hours later that who
15 gives you the wallet back?
16    A.    Bri.
17    Q.    Bri gives you the wallet back but it's kind
18 of emptied out?
19    A.    Uh-huh.
20    Q.    Is that yes?
21    A.    Yes.
22    Q.    And there's no money?
23    A.    No.
24    Q.    And the way you had arranged your stuff is
25 wrong?

1       A.    Yes.

2       Q.    And then --

3       A.    Well she did it obviously.  I mean she let

4  me know that she had wrote down all my information, if I

5  wanted to do something about it they know where I live.

6       Q.    And that's when you see your phone again?

7       A.    Uh-huh.

8       Q.    Is that yes?

9       A.    Yes.

10      Q.    And then did you contact someone?

11      A.    Yes.

12      Q.    Who do you contact?

13      A.    My friend Justin that I had met at the club

14  before I left San Antonio.

15      Q.    Oh, okay.  So from a few --

16      A.    Like two weeks earlier.

17      Q.    So you text Justin and what do you do?  Do

18  you ask Justin for help?

19      A.    Yes.  I text him, I told him, I guess I

20  told him what was going on, that Jaiduh had taken my

21  money, asked him if he could help, if he could call the

22  police, if he could come to me.  But I didn't know the

23  address of where I was.  And he said that he couldn't

24  call the police because he wasn't there and the police

25  wouldn't just go if they, oh, someone needs help over

1   there, the police wouldn't do that so.

2       Q.    What did you do?

3       A.    I just waited for a few hours and then

4   eventually I think I told Jaiduh you can keep my money

5   but just let me go, can I go.  And he tried to convince

6   me not to leave, to stay, and I said I wanted to leave

7   anyway.  So Bri helped me pack all my things in the car

8   and dropped me off at the airport with like six trash

9   bags of things.

10       Q.    So you packed up all your clothes and your

11   belongings into trash bags?

12       A.    Yes.

13       Q.    Is Bri actually helping you put the --

14       A.    No, she just helped me put it in the car.

15       Q.    And then do they both drive you to the

16   airport?

17       A.    No, just her.

18       Q.    Just her.  When you spoke about him trying

19   to convince you not to go, what was he saying to you?

20       A.    .That he just thinks I shouldn't leave and

21   that I can stay there, have a place to sleep and I'll

22   have food and I'll have a ride to work.  But it's not

23   what I wanted.  I explained to him that I wasn't trying,

24   because I think he had mentioned before Atlanta and he

25   had girls or whatever they did for him, but I had

30

1   explained to him that's not what I was trying to do.  I

2   was just trying to make money.  I would give him money

3   gladly for letting me stay there and for gas and for

4   food.  I didn't want him to take care of me.  But I

5   didn't want to give him all my money and have me hang

6   out with him and me give him all my money, I wasn't

7   trying to do that.

8           Q.    Were you afraid to leave, like the

9   apartment physically?

10          A.    Uh-huh.

11          Q.    Is that yes?

12          A.    Yes.

13          Q.    And this is after the fight over the

14  wallet?

15          A.    Yes.

16          Q.    Why did you feel nervous about that?

17          A.    I just felt so threatened of how he was

18  being towards me that I just didn't know what to do.  I

19  didn't want to talk on the phone because the window

20  where, there's like, it was a living room and they had a

21  balcony itself, and that window or something was open

22  and so my bedroom, my bedroom was right here and I felt

23  like maybe he could hear me talking so I didn't want to

24  talk to anybody so where he could hear me and come in

25  and get upset.  I just felt threatened.  I mean I

1    definitely couldn't walk out of the front door past him

2    with six bags of things, like I'm going to have to go

3    back and forth and back and forth and something's going

4    to happen eventually, so I just didn't do anything.

5         Q.    You're aware of his presence in the

6    apartment?

7         A.    He's in the next room.

8         Q.    He's in the next room?

9         A.    Uh-huh, with Bri.

10        Q.    You're afraid to talk on the phone because

11   he might hear you?

12             Is that yes?

13        A.    Yes.

14        Q.    You're afraid to start hauling your stuff

15   out because you can't get it in one trip?

16        A.    Yes.

17        Q.    And you'd have to come back?

18        A.    And pass him, yes.  And I had no where to

19   go even if I wanted to go somewhere.

20        Q.    Right.  Did you ever see him with a weapon?

21        A.    I believe there was a gun by the bed.  But

22   he never threatened me with it.

23        Q.    Okay.  And did you, when you're kind of in

24   the apartment and you're thinking about like what your

25   options are, did you ever try to leave?  Did he ever

32

1    physically block you or anything like that?

2          A.    Huh-uh.

3          Q.    It was just more him being in the apartment

4    and you being nervous?

5          A.    Uh-huh.

6          Q.    Is that yes?

7          A.    Yes.  Scared.

8          Q.    Okay.  I'm showing you Grand Jury

9    Exhibit 2.  Do you recognize that person?

10          A.    Yes.

11          Q.    Is that Jaiduh?

12          A.    Uh-huh.

13          Q.    That's who did all this?

14          A.    Uh-huh.

15          Q.    Is that yes?

16          A.    Yes.

17                MS. WECKERLY:  Okay.

18    BY MR. STANTON:

19          Q.    You mentioned to me yesterday in the

20    description of the events that took place after the

21    wallet about the gun that you believe was next to his

22    bed and I asked you if you remembered it to be a handgun

23    and a long gun.  What's your recollection of what gun

24    was next ---

25          A.    I remember it being a long gun standing up,

33

1    like standing up propped up against the wall between the

2    bed and the --

3        Q.    So something like a rifle or a shotgun as

4    opposed to a handgun?

5        A.    Yes.

6            MR. STANTON:    Thank you.

7            MS. WECKERLY:    That's all the questions I

8    have for this witness.

9            THE FOREPERSON:    Karl.

10   BY A JUROR:

11       Q.    How long after he took your money did you

12   stay in the apartment before you asked to go?

13       A.    Probably like three hours.

14       Q.    Three hours.  During that time you did not

15   request to go?

16       A.    He -- no.  He was walking back and forth, I

17   mean walking around in the house talking, just like

18   nonchalant, like nothing happened, but I was still in

19   the room.  He never came back in the room or said

20   anything to me.

21       Q.    So you were in the room the whole time?

22       A.    Yes.

23       Q.    Were you locked in the room at all?

24       A.    No.

25       Q.    So you could have, if you wished, opened

34

1  the door, left the bedroom, even walked outside if you

2  wanted to?

3       A.    If I could have walked quickly enough, but

4  I couldn't have gotten any of my things with me.

5       Q.    Right.  And when you did request to leave

6  or to go, they --

7       A.    He tried to convince me to stay.

8       Q.    Okay.  And then after you weren't

9  convinced, then you were still asking to go and packed

10  your stuff up and then --

11       A.    He just, he told Bri to help me put my

12  things in the car.

13       Q.    All right.  So they did drive you to the

14  airport?

15       A.    He didn't.  He didn't.  Yeah, she did.

16            THE FOREPERSON:  Temple.

17  BY A JUROR:

18       Q.    During those three hours though that you

19  were there, were you afraid?

20       A.    Yes.

21       Q.    To leave?

22       A.    Yes.

23       Q.    No matter whether you had your stuff or

24  not, there was a point in that time that you were afraid

25  to leave?

35

```
 1         A.    I was afraid if I would have, maybe I would
 2    have walked out of the apartment and ran down the hall.
 3    But where am I going to go?  They have all my things and
 4    I have nobody.  So.
 5         Q.    Okay.  Thank you.
 6               THE FOREPERSON:  Mistee.
 7    BY A JUROR:
 8         Q.    Miss Pickett, at what point did you pack up
 9    your belongings inside the trash bags?
10         A.    Right after I told him I wanted to leave.
11    I finally got the courage to leave the room and tell
12    him, you know, you can keep my money, just let me go,
13    let me leave.  And he tried to convince me, I think
14    you're making a quick decision, I think you should stay,
15    I think you'll be fine here.  And I just told him no,
16    this is not what I want, I don't want someone to take my
17    money, I want to make my own money.  And so then I
18    started packing my things after he was convinced that I
19    wasn't staying.
20         Q.    So you were inside the room for
21    approximately three hours but you hadn't yet packed your
22    belongings; is that right?
23         A.    No, I was just sitting there.
24         Q.    Where did you get the bags to put your
25    belongings into?
```

36

```
 1        A.    Bri gave them to me from the kitchen.
 2        Q.    Thank you.
 3   BY A JUROR:
 4        Q.    How long before you made the report?
 5        A.    As soon as I left.  Whenever Justin picked
 6   me up from the airport and I got back to Justin's house
 7   I called the police and made a report.
 8              THE FOREPERSON:  Karl.
 9   BY A JUROR:
10        Q.    They drove you to the airport but you
11   didn't leave then?
12        A.    Bri drove me to the airport, yes.  She
13   dropped me off in the airport parking lot with all my
14   seven bags, just left them out of the car and drove
15   away.  And I had got in contact with Justin and luckily
16   Justin showed up with his mom and they helped me get all
17   my things in their vehicle and took me to their house.
18        Q.    And then you contacted the police at
19   Justin's house?
20        A.    Yes.  Uh-huh.
21              MR. STANTON:  Is that a yes?
22              THE WITNESS:  Yes.
23              MR. STANTON:  Thank you.
24              THE FOREPERSON:  Anymore questions?
25              By law, these proceedings are secret and
```

1   you are prohibited from disclosing to anyone anything

2   that has transpired before us, including evidence and

3   statements presented to the Grand Jury, any event

4   occurring or statement made in the presence of the Grand

5   Jury, and information obtained by the Grand Jury.

6           Failure to comply with this admonition is a

7   gross misdemeanor punishable by a year in the Clark

8   County Detention Center and a $2,000 fine.  In addition,

9   you may be held in contempt of court punishable by an

10  additional $500 fine and 25 days in the Clark County

11  Detention Center.

12          Do you understand this admonition?

13          THE WITNESS:  Yes.

14          THE FOREPERSON:  Thank you.  You are

15  excused.

16          THE WITNESS:  Thank you.

17          MR. STANTON:  Ladies and gentlemen, that

18  will conclude our presentation today.  Once again, as

19  with the other case, we're going to be presenting this

20  case again to you probably on the same day as the other

21  case, but at least we'll be at least two weeks time from

22  you based upon scheduling matters for me and Miss

23  Weckerly when we can get back in front of you.  So we

24  will not be asking you to deliberate on this case today

25  and we'll hopefully see all of you so that you can

1  deliberate on both of these cases in a couple weeks.

2  Thank you very much.

3          (Proceedings adjourned, to reconvene

4              At a later, undetermined time.)

5                  --oo0oo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39

REPORTER'S CERTIFICATE

STATE OF NEVADA          )
                         :  Ss
COUNTY OF CLARK          )


            I, Danette L. Antonacci, C.C.R. 222, do

hereby certify that I took down in Shorthand (Stenotype)

all of the proceedings had in the before-entitled matter

at the time and place indicated and thereafter said

shorthand notes were transcribed at and under my

direction and supervision and that the foregoing

transcript constitutes a full, true, and accurate record

of the proceedings had.

            Dated at Las Vegas, Nevada,

April 5, 2013


                        /s/ Danette L. Antonacci

                        _____
                        Danette L. Antonacci, C.C.R. 222

40

```
 1                      AFFIRMATION

 2              Pursuant to NRS 239B.030

 3

 4         The undersigned does hereby affirm that the
         preceding TRANSCRIPT filed in GRAND JURY CASE NUMBER
 5       12BGJ088X:

 6

 7

 8        X  Does not contain the social security number of any
         person,
 9

10                          -OR-

11       ___ Contains the social security number of a person as
         required by:
12
                 A.   A specific state or federal law, to-
13                    wit: NRS 656.250.

14                          -OR-

15               B.   For the administration of a public program
                      or for an application for a federal or
16                    state grant.

17

18       /s/ Danette L. Antonacci
         _____         4-5-13
19       Signature                        Date

20

21       Danette L. Antonacci
         Print Name
22

23       Official Court Reporter
         Title
24

25
```

EXHIBIT    G – "Dismiss"

MOTION TO DISMISS

14 Pages

Electronically Filed
06/06/2013 04:38:37 PM

**CLERK OF THE COURT**

1  MDSM
DAVID M. SCHIECK
2  SPECIAL PUBLIC DEFENDER
State Bar No. 0824
3  MONICA R. TRUJILLO
Deputy Special Public Defender
4  State Bar No. 11301
RANDALL H. PIKE
5  Assistant Special Public Defender
State Bar No. 1940
6  330 South Third Street, 8th Floor
Las Vegas, NV 89155
7  (702) 455-6265
Fax: 455-6273
8  trujilmr@clarkcountynv.gov
rpike@clarkcountynv.gov
9

10

11  Attorneys for Harris

12              **DISTRICT COURT**

13          **CLARK COUNTY, NEVADA**

14  THE STATE OF NEVADA,          )      CASE NO. C-13-289275-1
15                               )      DEPT. NO.  25
                                 )
16        Plaintiff,             )
                                 )
17  vs.                          )
                                 )
18  AMMAR HARRIS,                )
                                 )
19        Defendant.             )
                                 )
20  _____  )

21      **MOTION TO DISMISS INDICTMENT PURSUANT TO NRS 174.085**

22                  DATE: _____
23                  TIME: _____

24      Comes Now, Defendant Jeffrey Wilson, by and through his attorneys David M. Schieck,

25  Special Public Defender, Monica R. Trujillo, Deputy Special Public Defender, and Randall H.

26  Pike, Assistant Special Public Defender, and moves this Court to dismiss the Indictment filed

27  against Defendant Ammar Harris pursuant to NRS 174.085.

28

1

1    This motion is made and based on the pleadings and papers on file, the points and

2  authorities attached hereto, and any argument of counsel at the time of the hearing.

3                                NOTICE OF MOTION

4
    To:    The State of Nevada
5

6  To:    The District Attorney's Office

7
        PLEASE TAKE NOTICE that Defendant will bring a Motion on for Hearing on
8
   June 17, 2013 _____, at the hour of _____9:00AM_____, or as soon
9

10  thereafter as counsel can be heard.

11                            STATEMENT OF THE CASE

12
        Ammar Harris was previously charged by criminal complaint with the same allegations
13
   in the case before this Court in the Las Vegas Justice Court.    That case number was
14

15  10F12069X.    Public Defenders Julia Murray and Kathleen Hamers represented Mr. Harris in

16  that case.  Per CJIS, the preliminary hearing was scheduled for June 13, 2012 and on that date it

17  was dismissed pursuant to NRS 174.085.

18                          STATEMENT OF RELEVANT FACTS

19

20      A copy of the transcript in case number 10F12069x is attached hereto as Exhibit A.  The

21  transcript reveals that Marissa Valdez-Pickett and Detective C. Hui were subpoenaed by the

22  State, but did not appear at the preliminary hearing. Exh. A p. 2.

23      The prosecutor at that time appropriately subpoenaed the witnesses prior to the time of

24  the preliminary hearing.  In fact, CJIS records indicate that subpoenas were requested on March

25  12, 2013.  Chief Deputy Bernie Zadrowski decided to not seek a continuance due to the lack of

26  an essential element under Bustos v. Sheriff, 87 Nev. 622, 491 P.2d 1279 (1971).  He then

27  moved to dismiss the case "pursuant to statute".  Exh. A p. 2.  The State did not seek to refile a

28  criminal complaint in the Justice Court.

1    Thereafter, on March 21, 2013, the District Attorney presented the case before the grand

2  jury.  From that proceeding the instant Indictment was obtained.

3                                    LEGAL ARGUMENT

4

5    In case number 10F12069X, the State was unprepared to proceed at preliminary hearing

6  on June 13, 2012 and therefore dismissed the case pursuant to NRS 174.085 to avoid having the

7  case dismissed with prejudice.  This Court should dismiss the instant Indictment which is based

8  on the same facts underlying case number 10F12069X because NRS 174.085 (5)(a) allows a

9
   prosecutor to voluntarily dismiss a criminal complaint before a preliminary and reserves their
10

11  right to file another criminal complaint, not seek an indictment.

12    There are limited instances where the State can refile charges on a defendant relating to

13  facts arising from the same incident.  Most importantly, the Nevada Revised Statutes delineate

14
   the specific vehicles by which a State may refile those charges.  One such statute, NRS
15
   174.085, provides in part:
16

17        5. The prosecuting attorney, in a case that the prosecuting attorney has initiated,
           may voluntarily dismiss a complaint:
18          (a) Before a preliminary hearing if the crime with which the defendant is charged is a
                felony or gross misdemeanor; or
19          (b) Before trial if the crime with which the defendant is charged is a misdemeanor,
20              without prejudice to the right to file another complaint, unless the State of
                Nevada has previously filed a complaint against the defendant which was
21              dismissed at the request of the prosecuting attorney.  After the dismissal, the
                court shall order the defendant released from custody or, if the defendant is
22              released on bail, exonerate the obligors and release any bail.

23  NRS 174.085 (5)(a).

24
     Statutory interpretation is well settled in Nevada.  The Nevada Supreme Court has
25

26  consistently reaffirmed that it will attribute the plain meaning to unambiguous statutes.

27  Mendoza-Lobos v. State, 125 Nev. 634, 642; 218 P.3d 501, 506 (2009)(citing Sheriff v.

28  Witzenburg, 122 Nev. 1056; 145 P.3d 1002 (2006)).  Specifically, the Nevada Supreme Court

   has stated, "[w]hen interpreting statues, if the statute is clear, we do not look beyond the

                                           3

1    statute's plain language.  Sheriff v. Witzenburg, 122 Nev. 1056, 1061; 145 P.3d 1002, 1005

2    (2006).  If a statute is ambiguous, the next step requires courts to look to the legislative intent.

3    Criminal statutes are interpreted in a liberal manner and any ambiguities are construed in the

4    defendant's favor.  Mendoza, 125 Nev. at 642.

5
     In the instant case, the statute is clear and unambiguous.  When reviewing the remaining
6
     subsections in NRS 174.085, it is obvious the Legislature was careful to differentiate the
7
8    vehicles by which the State can charge defendants.  For example, subsection three (3) indicates

9    that:

10          [w]hen a defendant is convicted or acquitted, or has been once placed
            in jeopardy upon an indictment, information or complaint, except as
11          otherwise provided in subsections 5 and 6, the conviction, acquittal
            or jeopardy is a bar to another indictment, information or complaint
12          for the offense charged in the former, or for an attempt to commit
13          the same, or for an offense necessarily included therein, of which the
            defendant might have been convicted under that indictment, information
14          or complaint.

15
16   NRS 174.085 (3).  The Legislature's use of specific language referring to separate vehicles of

17   prosecution is further evidence that this statute is clear and unambiguous.

18
19          NRS 174.085 (6) further provides support that the Legislature only intended to allow the

20   State to refile charges by way of criminal complaint.  It states in pertinent part,

21          6.  If a prosecuting attorney files a subsequent complaint after
            a complaint concerning the same matter has been filed and
22          dismissed against the defendant:
            (a) The case must be assigned to the same judge to whom the
23          initial complaint was assigned...

24
25   Clearly, the statute requires that any new complaint be filed in the same Justice Court in which

26   it was originally dismissed.

27          Even assuming the language in NRS 174.085 subsection five (5) is ambiguous; the

28

                                                      4

1  legislative history clarifies both the existing law at the time of the amendment and the

2  Legislature's intent.  In the Background Information portion of Assembly Bill 270 Bill

3  Summary, the Legislature stated, "…existing law does not provide for the State to dismiss a

4  case without being barred from bringing forth a subsequent indictment or further information."

5  Exh. B p. 1; Exh. B. p. 14-15.  At that time, the Legislature acknowledged that the State could

6

7  not seek an indictment after a case was dismissed before preliminary hearing. The amendment

8  to this statute provided the State with an exception to the existing law. Ben Graham

9  representing the Nevada District Attorney's Association confirmed this by stating, "this

10  measure allows for the dismissal of certain cases in justice court without prejudice."  Exh. B p.

11
   14.  Because NRS 174.085 (5) provides that a prosecutor may voluntarily dismiss a complaint
12

13  before a preliminary hearing while reserving the right to file another complaint, this Court

14  should dismiss the instant Indictment as it was an improper vehicle by which to reinstate

15  charges against Mr. Harris concerning the same matter.

16                                     **CONCLUSION**

17
        Based on the foregoing, Ammar Harris respectfully requests that this Honorable Court
18
   dismiss the instant Indictment.
19

20        Dated:  June 6, 2013

21                                              RESPECTFULLY SUBMITTED:

22                                              DAVID M. SCHIECK
23                                              SPECIAL PUBLIC DEFENDER

24

25                                              /s/ MONICA R. TRUJILLO

26

27                                              _____
                                                MONICA R. TRUJILLO
28                                              RANDALL H. PIKE

                                          5

CERTIFICATE OF ELECTRONIC FILING

I hereby certify that service of the above and foregoing, was made on June 6, 2013, by

Electronic Filing to:

DISTRICT ATTORNEY'S OFFICE

email:  pdmotions@ccdanv.com

/s/ Kathleen Fitzgerald

Legal Executive Assistant for
Special Public Defender

6

Electronically Filed
06/12/2013 08:48:54 AM

1   **OPPM**
    STEVEN B. WOLFSON

2   Clark County District Attorney
    Nevada Bar #001565

3   DAVID L. STANTON
    Chief Deputy District Attorney

4   Nevada Bar #003202
    200 Lewis Avenue

5   Las Vegas, Nevada 89155-2212
    (702) 671-2500

6   Attorney for Plaintiff

CLERK OF THE COURT

7

8                   DISTRICT COURT
             CLARK COUNTY, NEVADA

9

10   THE STATE OF NEVADA,

11              Plaintiff,

12     -vs-

13   AMMAR HARRIS, aka
    Ammar Asimfaruq Harris,

14   #2753819

15              Defendant.

CASE NO:    C-13-289275-1

DEPT NO:    XXV

16     STATE'S OPPOSITION TO MOTION TO DISMISS INDICTMENT PURSUANT

17                      TO NRS 174.085

18            DATE OF HEARING: 6/17/13
           TIME OF HEARING: 9:00 A.M.

19

20       COMES NOW, the State of Nevada, by STEVEN B. WOLFSON, Clark County

21   District Attorney, through DAV ID L. STANTON, Chief Deput y District Attorney, and

22   hereby submits the attached Points and Authorities in Opposition to Defendant's Motion To

23   Dismiss Indictment Pursuant To NRS 174.085.

24       This opposition is made and based upon all the papers and pleadings on file herein,

25   the attached points and authorities in support hereof, and oral argument at the time of

26   hearing, if deemed necessary by this Honorable Court.

27   //

28   //

P:\WPDOCS\OPP\FOPP\303\30301301.doc

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**POINTS AND AUTHORITIES**

**STATEMENT OF FACTS**

Unlike the selectively edited "Statement of <u>Relevant</u> Facts" (emphasis added) as set forth in the instant motion, the following gives a more accurate factual presentation of the history of the case State v. Ammar Harris, 10F12069X.  Noticeably absent from the "Statement of Relevant Facts" is that after the probable cause arrest of Ammar Harris on June 23, 2010, the Defendant bailed out on the six (6) felony charges that evening.  The Defendant failed to appear at his initial appearance and immediately became a fugitive.  He remained so for two (2) years prior to him being taken into custody on the outstanding warrant for his arrest.

Two years later the State sought to find and subpoena the victim, who had, during the Defendant's fugitive run, moved back to her home state of Texas.  The State was unaware of her change of address and therefore, based upon the Defendant's protracted fugitive flight, was unable to serve and procure her attendance at the preliminary hearing apparently set for June 13, 2012, two years after the offense and the Defendant's initial arrest.

NRS 174.085 IS NOT A BASIS TO DISMISS THE INDICTMENT

The instant motion claims that NRS 174.085 (5) requires that this Court dismiss the Indictment because of the general language used in subsection (b), to wit, "without prejudice to the right to file another complaint...".  Allegedly to bolster this argument, the motion briefly cites to the legislative history of the statute and attaches some documents as "Exhibit B" to the motion.   The vast majority of the pages constituting Exhibit B are irrelevant/immaterial to the argument presented in the motion itself.  Further, the cited pages of Exhibit B do not stand for the proposition the motion seeks this Court to order, that pursuant to a voluntary dismissal under NRS 174.085 the <u>only</u> method for initiating the same charges is via a criminal complaint.

Once the matter is dismissed, there is no active case against a criminal defendant.  Thus, there is no impediment to pursuing charges via Complaint or Indictment.  In fact, review of the materials attached as Exhibit B, confirm this fact.  Prior to the amended NRS

2

1    174.085 by the 1997 legislature, the State was prohibited from bringing the same case again

2    if the criminal complaint was dismissed at or prior to the preliminary hearing. Exhibit B, pg.

3    5 and pg. 7.

4          The amendment of NRS 174.085 in 1997 made no change to the statute that does not

5    exist in the instant case. A dismissal of a criminal complaint at the preliminary hearing did

6    not bar the indictment of the same defendant on the same charges. Thus, it was always

7    within the right of the State to indict a criminal defendant on charges from the same event

8    prior to a dismissal at the justice court level. The amendments to NRS 174.085 did not

9    affect that right in any manner. Further, the purported legislative history supports that in that

10   there is no discussion whatsoever that the State's right in that regard was being modified or

11   restricted in any manner.

12         Instead, the instant motion now seeks for this Court to interpret NRS 174.085 in a

13   manner that had never been contemplated or discussed prior to or subsequent from the

14   legislative amendment in 1997.

15         DATED this _____ 17th _____ day of June, 2013.

16                             Respectfully submitted,

17                             STEVEN B. WOLFSON

18                             Clark County District Attorney
                          Nevada Bar #001565

19

20                             BY _____

21                               DAVID L. STANTON
                            Chief Deputy District Attorney
                            Nevada Bar #003202

22

23   //

24   //

25   //

26   //

27   //

28   //

                        3             P:\WPDOCS\OPP\FOPP\303\30301301.doc

1    **CERTIFICATE OF FACSIMILE TRANSMISSION AND/OR ELECTRONIC MAIL**

2        I hereby certify that service of State's Opposition to Defendant's Motion To Dismiss

3    Indictment Pursuant To NRS 174.085 is made this 12th day of June, 2013, by facsimile

4    transmission and/or e-mail to:

5                           MONICA R. TRUJILLO & DAVID SCHIECK, SPD

6                           trujilmr@clarkcountynv.gov; rpike@clarkcountynv.gov;
     kfitzger@clarkcountynv.gov

7

8                   BY:      _____

9                             J. Robertson
                             Employee of the District Attorney's Office

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    13F03013X/jr/mvu

                                4                  P:\WPDOCS\OPP\FOPP\303\30301301.doc

Electronically Filed
06/17/2013 08:30:13 AM

CLERK OF THE COURT

RPLY
DAVID M. SCHIECK
SPECIAL PUBLIC DEFENDER
State Bar No. 0824
MONICA R. TRUJILLO
Deputy Special Public Defender
State Bar No. 11301
RANDALL H. PIKE
Assistant Special Public Defender
State Bar No. 1940
330 South Third Street, 8th Floor
Las Vegas, NV 89155
(702) 455-6265
Fax: 455-6273
trujilmr@clarkcountynv.gov
rpike@clarkcountynv.gov

Attorneys for Harris

## DISTRICT COURT

## CLARK COUNTY, NEVADA

THE STATE OF NEVADA,

        Plaintiff,

vs.

AMMAR HARRIS,

        Defendant.

    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )

CASE NO. C-13-289275-1
DEPT. NO.  25

### DEFENDANT'S REPLY TO STATE'S OPPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO NRS 174.085

DATE:  6/17/2013
TIME:  9:00 a.m.

    COMES NOW, Defendant Ammar Harris, by and through his attorneys, David M.

Schieck, Special Public Defender, Monica R. Trujillo, Deputy Special Public Defender, and

Randall H. Pike, Assistant Special Public Defender, and submits the following in Reply to the

State's Opposition to Defendant's Motion to Dismiss Pursuant to NRS 174.085.

1

### HISTORY

Mr. Harris incorporates by reference the statement of facts and procedural history in his previously filed Motion to Dismiss the Indictment Pursuant to NRS 174.085.

### LEGAL ARGUMENT

If this Court finds that the statute itself is ambiguous, then NRS 174.085 must be read in light of the legislative intent. Thus, the legislative history provided by defense is absolutely relevant to the instant motion and this Court's analysis. The Legislature specifically found that "…existing law does not provide for the State to dismiss a case without being barred from bringing forth a subsequent indictment or further information." Exh A, p. 1[1]. Clearly the Legislature believed that the law as it existed in 1997 prohibited the State from seeking an indictment after a case had been dismissed before preliminary hearing. The amendment to NRS 174.085 carved out an exception to this general rule. Because this was an exception to the general rule, the Legislature allowed the State to only re-file a criminal complaint if it had previously dismissed a complaint prior to preliminary hearing.

The State argues in its Opposition that, "…it was always within the right of the State to indict a criminal defendant on charges from the same event prior to dismissal at the justice court level." However, the State cites absolutely no law supporting its argument. Furthermore, even though Ben Graham, the lobbyist for the Clark County District Attorney's Association expressed the State's desire to be able to re-file a case in justice court and claimed that the State could, at that time, still indict a defendant, contradictory testimony was presented to the Legislature. Exh. A, p. 5. Specifically, John Morrow, Chief Administrative Deputy from the Washoe County Public Defender's Office, advised the Legislature of the exact opposite stating, "In other words, once a prosecutor dismissed a case, the presumably innocent citizen could not be brought back into court again on that matter." Exh A, p. 6. Clearly Morrow and Graham had a different interpretation of the State's ability to secure an indictment after dismissal. However, the only interpretation that mattered was that of the Legislature. As previously discussed, the Legislature specifically found that, "existing law does not provide for the State to dismiss a case without being barred from bringing forth a subsequent indictment or further

---

[1] As attached to Defendant's Motion to Dismiss Pursuant to NRS 174.085.

1    information." Exh A, p. 1 (emphasis added).

2         In his testimony before the Legislature, Ben Graham promised that the amendment to

3    NRS 174.085 would be used "only in rare occasions" when the case was not developed prior to

4    preliminary hearing. Exh. A, pp. 5, 7. He assured the legislators that the NRS 174.085(5)

5    would not give prosecutors an "advantage that previously had not existed." Exh. A, p. 7. And

6    moreover, that the amendment was needed, not as a crutch for unprepared prosecutors, but

7    instead as a tool to dismiss "marginal" cases.

8         Defendant would like to point out that it is common practice in Las Vegas Justice Court

9    for unprepared prosecutors to avoid judicial dismissal of a case, i.e. with prejudice, by simply

10   availing themselves of NRS 174.085(5). Prosecutors routinely then serve notice of intent to

11   seek indictment upon the defendant or his / her counsel. The case is never re-filed in Justice

12   Court, thereby giving a defendant an opportunity to remain out of custody and an opportunity to

13   cross examine witnesses at the very important preliminary hearing. Rather, the State routinely

14   attempts to avail itself of the more secretive grand jury process.

15        Here, the State was unprepared to go forward at Mr. Harris' preliminary hearing. The

16   State dismissed the case pursuant to NRS 174.085(5), to avoid having the case dismissed with

17   prejudice. Mr. Harris was then released from custody. Mr. Harris would have appreciated the

18   opportunity to have a preliminary hearing in this case; however, instead of re-filing the criminal

19   complaint, the State chose to present the case to a grand jury. This effectively deprived

20   Defendant of his right to directly challenge the evidence against him at a preliminary hearing.

21        Mr. Harris asserts that in 1997 the Legislature clearly understood that once a case was

22   dismissed prior to preliminary hearing the State was prohibited from re-charging a defendant

23   for the same offense. In amending NRS 174.085, the Legislature created an exception to that

24   rule and allowed the State to dismiss a case one time without prejudice. If the State chose to re-

25   file, the Legislature allowed them to re-file a complaint. Accordingly, Mr. Harris requests that

26   this Court dismiss the instant indictment.

27   . . .

28

## CONCLUSION

Based on the foregoing, Petitioner respectfully requests that the Court dismiss the instant Indictment.

Dated:  June 17, 2013

RESPECTFULLY SUBMITTED:

DAVID M. SCHIECK
SPECIAL PUBLIC DEFENDER

/s/ MONICA R. TRUJILLO

_____

MONICA R. TRUJILLO
RANDALL H. PIKE

CERTIFICATE OF ELECTRONIC FILING

I hereby certify that service of the above and foregoing, was made on June 17, 2013, by Electronic Filing to:

DISTRICT ATTORNEY'S OFFICE

email: pdmotions@ccdanv.com

/s/ Kathleen Fitzgerald

_____

Legal Executive Assistant for
Special Public Defender

4

EXHIBIT    H    "Sept 4th"

SEPTEMBER 4th

22 Pages

Electronically Filed
11/06/2014 02:16:26 PM

CLERK OF THE COURT

1                  DISTRICT COURT

2            CLARK COUNTY, NEVADA

3

4                    COPY

5

6  THE STATE OF NEVADA,      )
                        )  Case No. C-13-289275-1

7            Plaintiff,   )
                        )  Dept. No.  XXV

8  vs.                   )
                        )

9  AMMAR ASIMFARUQ HARRIS,  )
                        )

10           Defendant.   )
                        )

11  _____)

12

13

14        BEFORE THE HONORABLE KATHLEEN DELANEY

15          SEPTEMBER 4, 2013, 9:30 A.M.

16           REPORTER'S TRANSCRIPT

17                 OF
                PROCEEDINGS

18

19

20  APPEARANCES:

21

22  (See separate page)

23

24

25  REPORTED BY:  BRENDA SCHROEDER, CCR NO. 867

                                        1

1    APPEARANCES:

2  For the Plaintiff:

3      DAVID STANTON, ESQ.
       Chief Deputy District Attorney
4      200 Lewis Avenue
       Las Vegas, Nevada 89155
5

      LISA LUZAICH, ESQ.
6      Chief Deputy District Attorney
       200 Lewis Avenue
7      Las Vegas, Nevada 89155

8

  For the Defendant:
9

      DAVID M. SCHIECK, ESQ.
10     Special Public Defender
      330 S. Third Street, Suite 800
11     Las Vegas, Nevada 89155

12     MONICA R. TRUJILLO, ESQ.
      Deputy Special Public Defender
13     330 S. Third Street, Suite 800
      Las Vegas, Nevada 89155
14

15

16

17

18

19

20

21

22

23

24

25

2

1                LAS VEGAS, CLARK COUNTY, NEVADA

2            WEDNESDAY, SEPTEMBER 4, 2013, 9:30 A.M.

3                        PROCEEDINGS

4                         *   *   *

5            THE COURT:  The State of Nevada versus Ammar

6     Harris.  Seeing Mr. Harris present in custody.  This

7     matter is on for calendar call.  We also have several

8     motions that are on file.  I did not receive responses to

9     the defendant's motion -- well, one is styled as an

10    Objection to The State's Motion to Admit Evidence.  We do

11    have a reply and response to that.  But the other motion,

12    the motion in limine to preclude the testimony about

13    human trafficking, I have not received a response.

14            MR. STANTON:  We have no objection to it.  We're

15    not planning on going into that subject matter

16    whatsoever.

17            THE COURT:  Okay.  That makes sense.  I just did

18    not know with the way it was filed if there was a chance

19    to get that in.

20            So let's go ahead and address that first then.

21    Defendant's Motion in Limine to Preclude Detective

22    Baughman or any Other State Witness from Testifying about

23    Human Trafficking, without objection from the State that

24    motion is granted.  There will be no testimony in that

25    regard.

                                                          3

1              With regard to the State's Motion to Admit

2      Evidence Pursuant to NRS 48.045(2), there are two matters

3      addressed there.  First and foremost, the failure to

4      appear, which the State is asking the Court to take

5      judicial notice of certain circumstances of defendant's

6      failure to appear.  The defendant objects to that

7      statement and that request indicating their circumstances

8      as to why they believe that the fugitive status and

9      flight status would be inappropriate.

10             Does anybody wish to make the initial argument

11     on that matter this morning?

12             MS. TRUJILLO:  Judge, I would just like to

13     provide you a copy of the letter from CCDC.  May I

14     approach?

15             THE COURT:  You may.  Has the State seen it?

16             MS. TRUJILLO:  (Handing it to the State.)

17             THE COURT:  Thank you.  The Court has been

18     provided with an August 30th in-custody letter, as it is

19     styled, confirming dates of incarceration back in 2010

20     and the basis for the release.

21             All right.  You have nothing further to add then

22     from the defense side?

23             MS. TRUJILLO:  No, Judge.  Just the fact that

24     the State is requesting judicial notice of that.  I think

25     it is a little disingenuous to say he fled when in fact

                                                              4

1    he was not under -- there was no criminal complaint at

2    the time.  And any reasonable person that would have been

3    in the position would not believe they would have had to

4    return to court when they received information from the

5    jail stating there was no complaint, the DA denial,

6    you're court order released.

7          I think that the situation definitely called for

8    Mr. Harris to not know that there was any other criminal

9    complaint, so I will submit it on that, Judge.

10         THE COURT:  Mr. Stanton.

11         MR. STANTON:  Judge, to begin with, I don't know

12    what is disingenuous about the State's argument.  Number

13    1, counsel says that she calls over to the jail and

14    there's no affidavit in her response, and has some

15    representations to make to the Court and provides this

16    letter saying that the defendant was released.

17         There is actually a document in the court file,

18    I believe in district court, which is part of the justice

19    court, that the defendant while released was given a

20    written admonishment that he had to appear in court.  And

21    I noticed that is completely absent in the defense

22    counsel's procedural history in explaining that the

23    State's argument is disingenuous.

24         What I think can reasonably be asserted is that

25    the defense has some argument saying that a reasonable

5

1    person under these various conditions would not have

2    known that charges were pending, and therefore, he was

3    not a fugitive.  That belies the court minutes, that

4    belies the procedural history of the case that the Judge

5    remanded him into custody and said in his presence that

6    he was to appear 48 hours later before the Court, which

7    is exactly when the next court hearing was and that

8    criminal complaint was on file at that time.

9         And further, the reference to the term fugitive,

10    as I mentioned in my reply, is completely taken out of

11    context statutorily, and therefore, inapplicable for

12    purposes of the State's argument before this jury that

13    the defendant was a fugitive based upon his conduct and

14    that it is proper flight evidence.

15         THE COURT:  All right.  Thank you.

16         Any rebuttal?

17         MR. TRUJILLO:  I will submit it.

18         THE COURT:  All right.  The record does seem to

19    sustain the information that the defendant was ordered to

20    return to court to appear.  Obviously, we have a letter

21    here that indicates it is dated now, but it's reflecting

22    what apparently can be seen by the detention services

23    division at CCDC that the release was related to a DA

24    denial, so we have some records that seem to conflict

25    here.

6

1          What the Court weighs in looking at this in

2     terms of ultimately whether this trial is going to be

3     about what is relevant evidence for this trial and

4     whether or not, ultimately, a jury instruction should be

5     placed with regard to flight, this Court feels that the

6     evidence here, again, is not sufficient for the Court to

7     find that we have a situation, a fugitive situation of

8     flight.  And, although, I typically determine ultimate

9     jury instructions at the time of trial based on what

10    evidence comes into trial, at this time I am going to

11    note the defendant's objection to the State's notice of

12    intent to admit evidence of fugitive status and flight

13    status and I am going to -- to the extent that there is a

14    motion to admit that evidence pursuant to 48.045(2), I am

15    going to deny that request.

16          I do not believe that that information is

17    relevant to this trial, that it has been supported by

18    sufficient evidence in this case, and ultimately I

19    believe that the prejudice of that would far outweigh any

20    relevance that the evidence would have.

21          This trial is going to be about the allegations

22    in this trial and not about an argument that there was a

23    flight circumstance in light of the conflicting evidence

24    that the Court has.

25          The other matter set forth in the State's Motion

                                                              7

1    to Admit Evidence Pursuant to NRS 48.045(2) at least with

2    regard to evidence that the defendant is a pimp.

3         MR. STANTON:  I have nothing further other than

4    the motion.  Just to clarify based upon the defense's

5    response, Your Honor, the State's intent relative to the

6    information regarding the pimp is kind of a combination

7    of two aspects of testimony that we anticipate at the

8    trial; number one, pursuant to our notice and the Court's

9    previous ruling on a motion in limine regarding the

10   expert testimony of Detective Baughman, we anticipate

11   that testimony to in part describe the process of a pimp

12   where he turns out a woman, that is where he confronts a

13   woman and through a process of several different coercive

14   tactics creates a relationship so that person would then

15   work for them.

16        It is the State's position on the evidence in

17   this case that there was not a pimp-prostitution

18   relationship between the defendant and the named victim

19   in this case.  In fact, quite the contrary.  But what is

20   relevant is to show and to put into context that the

21   behavior that the defendant exhibited to this woman over

22   a period of days, both the sexual assault as well the

23   physical assault and the taking of a substantial amount

24   of money is consistent with the behavior that a pimp does

25   in that culling process that Detective Baughman will

8

1    testify to.

2         In addition, Briana Wright's testimony, that is

3    no one that has any relationship other than was a friend

4    to the defendant and a co-occupant and leaseholder of the

5    condo or apartment where they lived, her testimony is

6    evidenced in her statement is such that it speaks

7    directly to the type of behavior that a pimp would

8    exhibit to another woman, and I referenced in my motion,

9    no looking at another man in the eyes, the physical

10   grabbing of her when she attempted to leave a party that

11   was occurring in her own apartment, which she was

12   completely within her right to do and yet somehow

13   offended the defendant.  It puts into context that

14   behavior I think and fairly describes what was occurring

15   at the time.

16        In addition, it also explains, I believe, or

17   puts into context the victim's behavior as far as the

18   reporting, the failed immediate reporting of at least the

19   sexual assault and so forth.  So for those reasons we

20   think it's relevant.

21        I just want to make one comment regarding the

22   opposition where they claim that this somehow was related

23   to the corpus delecti.  The corpus delecti doctrine

24   doesn't have an application to this whatsoever.  Number

25   1, the counsel cites the Dotta (phonetic) case.  I was a

9

1    prosecutor in the Dotta case.  Dotta reaffirms the State

2    of Nevada has the corpus delecti doctrine.  The Court

3    does not give much explanation as to why they want to

4    embrace the doctrine but it still exits.

5         In this particular case there isn't an

6    invocation of the corpus delecti doctrine, as Ms. Wright

7    and the victim will testify to the attendant acts,

8    therefore, it's not just the defendant's statement that

9    he is a pimp.  And of course the corpus delecti doctrine

10   the corroboration of which the doctrine speaks of doesn't

11   have to corroborate all elements of the statement.  Once

12   the corroboration is done, and I submit that is done by

13   Ms. Pickett and Ms. Wright's testimony, then the

14   statement comes in for all purposes.  So I would submit

15   it on that.

16        THE COURT:  Thank you.

17        Ms. Trujillo

18        MS. TRUJILLO:  Judge, I will submit it as to my

19   opposition pending in court if this court is going to

20   grant a Petrocelli hearing and then argument after that.

21        MR. STANTON:  Well, this is the time for the

22   Petrocelli hearing.  We had made an offer of what the

23   testimony is going to be.  Petrocelli doesn't require an

24   evidentiary hearing by its own terms, so I would submit

25   now is the time for this motion to be heard.

10

1          THE COURT:  I appreciate, Counsel, that you have

2     indicated in your pleadings that a Petrocelli standard or

3     a Petrocelli case with a hearing would be necessary.  In

4     this particular circumstance, though, I don't believe

5     that that's the case.  I believe that we have the

6     information necessary.  We have already discussed this

7     matter previously to some extent and degree in terms of

8     what the testimony was during the interview with

9     Detective Baughman and the circumstances related to the

10    other motions that we have heard in this case.

11         I believe that the evidence is relevant to the

12    theory of the State's case.  I believe that any prejudice

13    does not substantially outweigh that relevancy.  I

14    believe this is the information that needs to and will

15    come in.  And the corpus delicti doctrine does not apply,

16    and otherwise, I don't believe that the Petrocelli

17    hearing will be necessary because that is evidence that

18    will be testified to and the evidence will be coming in

19    at the time of trial establishing this in advance.

20         This is not necessarily bad acts that would be

21    required to have a Petrocelli hearing, but this is in

22    fact, again, evidence related to the theory of the

23    State's case and by defendant's own admission.  I do not

24    see any reason why we cannot proceed with trial in that

25    regard without a prior hearing.

                                                          11

1          MS. TRUJILLO:  And, Judge, just for the record,

2      are you finding that that evidence is clear and

3      convincing under Petrocelli?

4          THE COURT:  I want to structure this correctly

5      so that we don't find ourselves with any future

6      difficulties.  The evidence that has been put forward

7      with the Court before us at this time, which is in large

8      part at this time the defendant's own statement to police

9      is clear and convincing to this Court as to the

10      circumstances of defendant's prior actions, prior act.

11          The Court anticipates receiving information from

12      the witnesses that will testify at the time of trial and

13      anticipates that the standard will be met at that time.

14      That's obviously not the standard to convict on this case

15      itself but that is the standard in terms of the evidence

16      coming from these witnesses who are anticipated to

17      testify will testify in that regard, that, the Court

18      believes, more than meets the Petrocelli standard for us

19      to proceed.

20          Does the State want to speak to that latter

21      question or have any concerns that the Court did not

22      answer it adequately for the record.

23          MR. STANTON:  No.  State is satisfied, Your

24      Honor.

25          THE COURT:  All right.

                                                           12

1          MR. SCHIECK:  Judge, with regard to the Court

2     accepting the representations of what the statements say

3     from Briana Wright and from the alleged victim in this

4     case, I assume the State's expert is not going to be

5     allowed to testify based on those hearsay statements but

6     will have to base it on actual testimony that comes

7     forward in the courtroom to meet that clear and

8     convincing standard.

9          But you are not basing your decision in allowing

10     him to testify on uncorroborated hearsay that you are

11     going to require those witnesses to come to court to

12     testify.

13          THE COURT:  The witnesses are anticipated to

14     come to court to testify.  And, again, the predominant

15     clear and convincing evidence available to the Court at

16     this time is the defendant's own statement.

17          MS. TRUJILLO:  Right, Judge.  But if I may add,

18     specifically, as to the alleged victim, as to Briana

19     Wright, I think that that is the reason we feel that an

20     evidentiary hearing is necessary because the Court should

21     find prior to the admission at trial that that evidence,

22     which would be the statements told to those other two

23     people is clear and convincing before they get on the

24     stand and before the jury hears it.

25          THE COURT:  The objection is noted.  The

13

1   Petrocelli hearing will not be scheduled and we will

2   proceed with trial as indicated.

3         The motion is granted for the reasons the State

4   argued.  And if you will make note in your order,

5   Mr. Stanton, of the discussion that we have also had with

6   regard to clear and convincing determination, and the

7   intent to proceed without a Petrocelli hearing and the

8   statement that you made, which the Court concurs with, it

9   is not by itself mandating a hearing but gives us

10  direction as to when this hearing should be set.

11        Anything further with regard to this morning's

12  matter?

13        All right.  We do need also the order.  And I

14  will ask the State to prepare it.  Obviously, give the

15  defense the opportunity to see it with regard to the fact

16  that it will not allow the flight evidence and the flight

17  instruction and that way it comes from one source and the

18  other source can weigh in.  And if there is any objection

19  we'll deal with them at the time of trial.

20        MR. SCHIECK:  We also have the calendar call to

21  get to this morning.

22        THE COURT:  Yes, the calendar call.  We can take

23  care of that at this time.  I am prepared to proceed and

24  set the trial to start at 1:00 p.m. on Monday unless

25  there is any impediment to that.

                                                        14

1          MR. STANTON:  There is one asterisk, I guess,

2      Judge, from the State, otherwise, we are prepared to

3      announce ready.  I advised counsel last week that as it

4      relates to Ms. Briana Wright, Ms. Wright does not live in

5      the state of Nevada; she lives out of state.  And during

6      our contact with her it was our understanding that she

7      was going to be in travel for her work in either

8      Columbia, South Carolina or Columbus, Ohio.  And

9      unfortunately, the note that we received from our

10     coordinator to that effect was we had assumed that that

11     was in the United States.  As I advised defense counsel

12     last week, it's in fact in the country of Columbia for

13     her work and she will not be returning to the United

14     States until next Friday, the end of our week.  So the

15     first date that she is available is the following Monday.

16          So with that caveat, we are prepared to go to

17     trial with some accommodation, if necessary, for her

18     attending the following Monday.

19          THE COURT:  Well, we have already scheduled

20     because we anticipated last time we were in court not

21     only next week but the remaining week as well and the

22     following week as well.  So we have ample time for that

23     to be covered and we can make adjustments as needed.

24          Oh, thank you.  I have just been reminded,

25     however, that we do have a couple of days where the Court

                                                              15

1    is unavailable that following week, specifically, the

2    16th and the 17th because of work-related matters that

3    will keep us away from the courtroom. But we have the

4    remainder of this week, so we would have Wednesday the

5    18th is the first available date -- well, the 16th and

6    the 18th would be the first available date. We can

7    accommodate the trial schedule. I was clear that the

8    trial will go, but if we need to make some adjustments we

9    have some other matters that may require us to carry that

10   over to next week anyway. I just want to be clear that

11   we would be picking up the trial on the 18th and not the

12   16th.

13          MR. SCHIECK: Your Honor, and this gets back to

14   our concern that Briana Wright testifies as to what is

15   allegedly going to be her testimony prior to their expert

16   testifying and basing his opinion about the pimping thing

17   without having that testimony heard by the Court, so now

18   we have the fact that she is going to have to testify

19   before the expert testifies.

20          We have an expert that we have noticed that we

21   may be calling in response to Detective Baughman

22   depending on what he says, so we are scheduling our

23   expert in anticipation that Briana Wright would testify

24   first before their expert is allowed to testify and then

25   our expert would testify in our case in chief.

                                                          16

1          THE COURT:  We have noted your objection.  I

2    believe there is sufficient evidence to allow the expert

3    to testify and Ms. Wright's testimony to come in at the

4    time that it comes in.  If you need to reschedule your

5    expert, again, what we have blocked just to be clear for

6    this case, starting on the 9th of September, and if

7    necessary continuing to the 20th of September with the

8    16th and the 17th unavailable court dates.

9          So we will make these accommodations and you can

10   make the adjustments that you need to with your experts.

11   But the argument that the experts cannot testify until

12   Ms. Wright herself testifies, the Court does not agree

13   with that assessment based on the evidence that we have

14   and what we already discussed this morning and the other

15   testimony that we will have from the victim.  But if you

16   wish the experts to wait to testify until after then that

17   is your choice.

18          Mr. Stanton or Ms. Luzaich, anything else you

19   would like to add?

20          MS. LUZAICH:  No.  I was just going to ask can

21   the Court give us an indication on Tuesday and Thursday

22   next week will the Court go from 10:30 or earlier?

23          THE COURT:  We can start at 10:30 on Thursday.

24   Tuesday I have a couple of civil conference matters that

25   are scheduled at 10:30, which might go quickly but they

                                                          17

1    don't typically, so I think the earliest we could start

2    that day might be 11:00, and it might be more likely to

3    start after lunch.

4            MS. LUZAICH:  Okay.  And then what about

5    Wednesday?

6            THE COURT:  Wednesday, typical criminal calendar

7    day, but it's small so we could anticipate 10:30.

8            MS. LUZAICH:  And then might the Court go all

9    day Friday or still 10:30?

10           THE COURT:  It's a half day Friday because of an

11   evidentiary hearing that the Court has.  So just to

12   recap, Tuesday anticipate a start at the earliest 11:00,

13   possibly 1:00.  10:30 on Wednesday, 10:30 on Thursday and

14   1:00 p.m. on Friday.  That is what we are looking at for

15   next week.

16           MS. LUZAICH:  And then the 18th, 19th and 20th?

17           THE COURT:  We have a pretty heavy calendar call

18   and criminal calendar on the 18th because we don't have a

19   Monday calendar so it is kind of a double up.  So I would

20   say half day on the 18th, afternoon start.  And then we

21   could do 10:30 on the 19th and then if we are still in

22   need of the 20th, I have a hearing that morning that

23   could potentially take a little time and so we would be

24   looking at a 10:30 or 11:00 start or possibly afternoon

25   start on Friday.

                                                          18

1          MS. LUZAICH:  Thank you.

2          MR. SCHIECK:  Your Honor, with respect to the

3     jury list, I believe that the State transmitted the ones

4     we have agreed upon to Your Honor on the excused.  We

5     have an additional list as directed by your letter that

6     we will have to you today on the additional names that we

7     could not agree on that we believe should be excused.

8          THE COURT:  And does the State have a similar

9     list?

10         MR. STANTON:  The one we sent to the defense I

11    will send to the Court.

12         THE COURT:  The Court requested both the agreed

13    upon and if there were other objections not agreed upon

14    so we could try to expedite selection on Monday.

15         MS. LUZAICH:  Might the Court let us know before

16    Monday which ones the Court is not going to let us have

17    on Monday?

18         THE COURT:  Absolutely.

19         MS. LUZAICH:  Thank you.

20         MR. SCHIECK:  Your Honor, one other thing.  Just

21    a housekeeping matter --

22         THE COURT:  Do you have some orders for me to

23    sign?

24         MR. SCHIECK:  Yes, I do.  In preparation for

25    trial, Your Honor.

                                                        19

1              THE COURT:  Has the State had a chance to see

2     it?

3              MR. SCHIECK:  I advised the State that we had

4     the order for you to sign.

5              MR. STANTON:  We have no objection, Your Honor.

6              THE COURT:  All right.  My clerk is advising me

7     what the circumstances were.

8              All right.  Thank you.

9              (Proceedings were concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                         20

1                          REPORTER'S CERTIFICATE

2

3    STATE OF NEVADA                )
                                    )   ss.
4    COUNTY OF CLARK                )

5

6           I, BRENDA SCHROEDER, a certified court reporter

7    in and for the State of Nevada, do hereby certify that

8    the foregoing and attached pages 1-21, inclusive,

9    comprise a true, and accurate transcript of the

10   proceedings reported by me in the matter of THE STATE OF

11   NEVADA, Plaintiff, versus AMMAR HARRIS, Defendant, Case

12   No. C289275, on September 4, 2013.

13

14

15

16   Dated this 6th day of November, 2014.

17

18                    /s/ Brenda Schroeder
                      BRENDA SCHROEDER, CCR NO. 867
19

20

21

22

23

24

25

                                                              21



LAS VEGAS METROPOLITAN POLICE DEPARTMENT
LAW ENFORCEMENT SERVICES
DETENTION SERVICES OPERATION
RECORDS BUREAU

## MEMORANDUM

DATE: *6/25*

TO: CLARK COUNTY DISTRICT ATTORNEY'S OFFICE, SCREENING LIAISON

SUBJECT: REQUEST FOR PROSECUTION PACKET

CASE#: *10F12069K*

Attached are the documents that were received by CCDC Records, from the arresting/investigating officers. During the past 48 hours we have attempted to acquire a complete packet to finish out the booking package. However, in the interest of time, having failed to receive these outstanding documents as requested the attached is being scanned to your office as is.

The following annotations are provided regarding the incomplete R.F.P. packets:

     **✓**      No Arrest Report Received from Arresting Officer

     _____      No Supporting Documents (i.e. Incident Report, Voluntary Statement, etc.)

     _____      No Documentation for RFP

     _____      Other (EXPLANATION) _____

_____

Please contact the Arresting Officer or Agency for additional documentation or information.

For any additional concerns at CCDC, please contact my office
or Rec. Mngr. Miller at 671-3911 or Rec. Mngr. Hammond at 671-3745

Patricia A. Schmitt
Director of Records

Initiated by: *Williams 8089*
                   Last Name & P#

EXHIBIT    I-" Extraction"

MOBILE DEVICE EXTRACTION

7 Pages



## Summary

| Connection Type | Cable No. 110 |
|---|---|
| Extraction start date/time | 6/28/2013 11:59:13 AM |
| Extraction end date/time | 6/28/2013 12:27:40 PM |
| UFED Physical Analyzer version | 3.8.3.1 |
| Time zone settings (UTC) | UTC-7 |
| Case number | C-13-289275-1 |
| Case name | Ammar Harris |
| Examiner name | Robert Aguero |
| Notes | AI# 3445 - Daylight Savings Time |

## Image Hash Details (1)

| # | Name | Info | |
|---|---|---|---|
| 1 | Image | Path | iPhone3GS_4.0-4.0.2_Physical_28-06-13_11-59-13.img |
| | | Size (Bytes) | 16111890432 |

## Plugins

| # | Name | Author | Version |
|---|---|---|---|
| 1 | IPhonePhysicalInputIO<br>Identifies an iPhone physical input format | Cellebrite | 2.0 |
| 2 | DMGOpener<br>Decodes Apple DMG format | Cellebrite | 2.0 |
| 3 | MBRGeneric<br>Parses a Master Boot Record to generate a memory range for each partition listed in the MBR table | Cellebrite | 2.0 |
| 4 | ApplePartitionMap<br>Extracts partitions from the ApplePartitionMap | Cellebrite | 2.0 |
| 5 | GUIDPartitionTable<br>Parses the GUID partition Table (GPT) to extract FS Partitions | Cellebrite | 2.0 |
| 6 | TARArchiveOpener<br>Opens TAR files | Cellebrite | 2.0 |
| 7 | HFS<br>Decodes HFS (the Apple file system) | Cellebrite | 2.0 |
| 8 | IPhone Databases<br>Reads various databases on the iPhone, containing notes, calendar, locations, Safari bookmarks, cookies and history, Facebook friends and bluetooth pairings. | Cellebrite | 2.0 |
| 9 | QuicktimeMetadata<br>Extracts metadata from Apple quicktime movies | Cellebrite | 2.0 |
| 10 | iPhone device info<br>Decodes device infromation for iPhone devices | Cellebrite | 2.0 |
| 11 | Analytics<br>Generates the Analytics section information | Cellebrite | 2.0 |
| 12 | ContactsCrossReference<br>Cross references the phone numbers in a device's contacts with the numbers in SMS messages and Calls. Will fill in the Name field of calls and SMS if there's a match. | Cellebrite | 2.0 |
| 13 | DataFilesHandler<br>Tags data files according to extentions and file signatures | Cellebrite | 2.0 |

## Contents

| Type | Included in report | Total | |
|---|---|---|---|
| Application Usage | 0 | 57 | |
| Bluetooth Devices | 0 | 1 | |
| Chats | 0 | 386 | (4 Deleted) |
| Contacts | 1 | 201 | |
| ⊖ Uncategorized | 1 | 171 | |
| Cookies | 0 | 596 | |
| Emails | 0 | 770 | (207 Deleted) |
| Installed Applications | 0 | 54 | |
| Maps | 0 | 14 | |
| MMS Messages | 1 | 335 | (3 Deleted) |
| ⊖ Inbox | 1 | 194 | (2 Deleted) |
| Passwords | 0 | 24 | |
| Searched Items | 0 | 12 | |
| SMS Messages | 49 | 13502 | (183 Deleted) |
| ⊖ Inbox | 23 | 6898 | (99 Deleted) |
| ⊖ Sent | 26 | 6599 | (84 Deleted) |
| Timeline | 50 | 23786 | (204 Deleted) |
| User Accounts | 0 | 8 | |
| User Dictionary | 0 | 1272 | |
| Web Bookmarks | 0 | 2 | |
| Wireless Networks | 0 | 16 | |
| Data Files | 2 | 17938 | (134 Deleted) |
| ⊖ Applications | 0 | 304 | |
| ⊖ Audio | 0 | 183 | |
| ⊖ Configurations | 0 | 3194 | (101 Deleted) |
| ⊖ Databases | 0 | 130 | (26 Deleted) |
| ⊖ Images | 2 | 13860 | (7 Deleted) |
| ⊖ Text | 0 | 248 | |
| ⊖ Videos | 0 | 19 | |
| Carved Files | 0 | 0 | |
| Activity Analytics | 0 | 1475 | |
| Analytics Emails | 0 | 693 | |
| ⊖ jakluh@lc3d.net | 0 | 48 | |
| ⊖ me@jakluh.com | 0 | 38 | |
| ⊖ jakluh@gmail.com | 0 | 541 | |
| ⊖ Uncategorized | 0 | 66 | |
| Analytics Phones | 0 | 438 | |
| Entity Bookmarks | 0 | 0 | |

## Contacts (1)

### Uncategorized (1)

| # | Name | Entries | | | | Del? |
|---|------|---------|---|---|---|------|
| 1 | Marissa | Entries (1) | | | | |
| | | Domain | Category | Value | Del? | |
| | | 📧 | Mobile | (210) 902-9135 | | |

## MMS Messages (1)

### Inbox (1)

| # | |
|---|---|
| 1 | 🖼 No subject |
| | **Deleted: Intact**    **Timestamp: 8/17/2010 7:29:22 AM(UTC-7)**    **Priority: Normal**    **Status: Read** |
| | **From:** +12109029135 Marissa |
| | **To:** +14045631148 |
| | **Body:** |
| | Take off the braces and natural hair color |
| | 📎 text_0    📎 l_5df20c21876f4bafa21c8856c41aaad5    📎 smil |

## SMS Messages (49)

⚠ * These details are cross-referenced from this device's contacts

### Inbox (23)

| # | Party | Time | Status | Message | Del? |
|---|-------|------|--------|---------|------|
| 1 | 📲 +12109029135 Marissa* | 6/8/2010 4:22:12 PM(UTC-7) | Read | Wheres Ashley and why isn't she answering her phone?! | |
| 2 | 📲 +12109029135 Marissa* | 6/17/2010 5:34:28 AM(UTC-7) | Read | I didn't make that one next one is at 9 something my time. I'll let you know | |
| 3 | 📲 +12109029135 Marissa* | 6/17/2010 5:38:21 AM(UTC-7) | Read | 7:40 | |
| 4 | 📲 +12109029135 Marissa* | 6/17/2010 5:42:17 AM(UTC-7) | Read | Well should I start walking to Vegas then? Lol I'm having a good day so I'm not trippin:) | |
| 5 | 📲 +12109029135 Marissa* | 6/17/2010 7:09:03 AM(UTC-7) | Read | Didn't make that one either. Hopefully the next one at 11:50 | |
| 6 | 📲 +12109029135 Marissa* | 6/17/2010 7:10:22 AM(UTC-7) | Read | No negativity ok | |
| 7 | 📲 +12109029135 Marissa* | 6/17/2010 7:12:54 AM(UTC-7) | Read | Lol its cool nigga | |
| 8 | 📲 +12109029135 Marissa* | 6/17/2010 7:25:49 AM(UTC-7) | Read | I dropped my phone in water the day I got home so my cam doesn't work:( | |
| 9 | 📲 +12109029135 Marissa* | 6/17/2010 7:26:59 AM(UTC-7) | Read | Lol I'm anti iphone | |
| 10 | 📲 +12109029135 Marissa* | 6/17/2010 7:28:00 AM(UTC-7) | Read | Ha! Never that baby | |
| 11 | 📲 +12109029135 Marissa* | 6/17/2010 7:31:23 AM(UTC-7) | Read | Lol no silly that was in like September | |
| 12 | 📲 +12109029135 Marissa* | 6/17/2010 7:32:34 AM(UTC-7) | Read | eww Haha | |
| 13 | 📲 +12109029135 Marissa* | 6/17/2010 7:34:17 AM(UTC-7) | Read | Well I cant wait to get them off! | |
| 14 | 📲 +12109029135 Marissa* | 6/17/2010 11:34:12 AM(UTC-7) | Read | Absolutely not:) | |
| 15 | 📲 +12109029135 Marissa* | 6/17/2010 12:45:18 PM(UTC-7) | Read | Yeah | |
| 16 | 📲 +12109029135 Marissa* | 6/17/2010 12:49:53 PM(UTC-7) | Read | Ugh fuck! | |

| # | Party | Time | Status | Message | Del? |
|---|-------|------|--------|---------|------|
| 17 | +12109029135 Marissa* | 6/17/2010 1:14:03 PM(UTC-7) | Read | Idfk | |
| 18 | +12109029135 Marissa* | 6/17/2010 6:22:26 PM(UTC-7) | Read | Call me back please | |
| 19 | +12109029135 Marissa* | 6/18/2010 8:34:56 AM(UTC-7) | Read | I'm here. Call me. | |
| 20 | +12109029135 Marissa* | 6/18/2010 9:00:56 AM(UTC-7) | Read | Yeah at the end | |
| 21 | +12109029135 Marissa* | 6/19/2010 5:03:08 AM(UTC-7) | Read | Yeah I wanna leave in a little while. I'll cal you when I'm ready | |
| 22 | +12109029135 Marissa* | 6/19/2010 5:04:24 AM(UTC-7) | Read | Yes please | |
| 23 | +12109029135 Marissa* | 6/19/2010 5:24:51 AM(UTC-7) | Read | You here yet? | |

Sent (26)

| # | Party | Time | Status | Message | Del? |
|---|-------|------|--------|---------|------|
| 1 | (210) 902-9135 Marissa* | 6/3/2010 10:33:50 PM(UTC-7) | Sent | Her phone died txt me | |
| 2 | +12109029135 Marissa* | 6/17/2010 5:36:15 AM(UTC-7) | Sent | Ok. What time is it ya time? | |
| 3 | +12109029135 Marissa* | 6/17/2010 5:39:09 AM(UTC-7) | Sent | Man that sucks to sit in the airport that long... I know u not finna sit there right | |
| 4 | +12109029135 Marissa* | 6/17/2010 7:09:41 AM(UTC-7) | Sent | Baby u might not make none of them.. Especially if the 5 o clock shit was packed. | |
| 5 | +12109029135 Marissa* | 6/17/2010 7:12:22 AM(UTC-7) | Sent | Sorry | |
| 6 | +12109029135 Marissa* | 6/17/2010 7:24:14 AM(UTC-7) | Sent | Send me a pix of u now, Miss ya face | |
| 7 | +12109029135 Marissa* | 6/17/2010 7:26:20 AM(UTC-7) | Sent | You can have my IPhone baby ;) | |
| 8 | +12109029135 Marissa* | 6/17/2010 7:27:25 AM(UTC-7) | Sent | *cough* jealous | |
| 9 | +12109029135 Marissa* | 6/17/2010 7:30:25 AM(UTC-7) | Sent | U got ya braces off? | |
| 10 | +12109029135 Marissa* | 6/17/2010 7:31:58 AM(UTC-7) | Sent | Okay bout to say... I actually like the braces ;) | |
| 11 | +12109029135 Marissa* | 6/17/2010 7:33:33 AM(UTC-7) | Sent | I think they cute on ya so hush. | |
| 12 | +12109029135 Marissa* | 6/17/2010 11:27:15 AM(UTC-7) | Sent | U miss me? ;) | |
| 13 | +12109029135 Marissa* | 6/17/2010 12:44:51 PM(UTC-7) | Sent | U at George bush international | |
| 14 | +12109029135 Marissa* | 6/17/2010 12:49:12 PM(UTC-7) | Sent | 466 | |
| 15 | +12109029135 Marissa* | 6/17/2010 1:12:45 PM(UTC-7) | Sent | So what u doin baby? | |
| 16 | +12109029135 Marissa* | 6/18/2010 9:00:11 AM(UTC-7) | Sent | At passenger pick up? | |
| 17 | +12109029135 Marissa* | 6/19/2010 5:02:22 AM(UTC-7) | Sent | You good? | |
| 18 | +12109029135 Marissa* | 6/19/2010 5:03:29 AM(UTC-7) | Sent | I was on my way there now want me to wait? | |
| 19 | +12109029135 Marissa* | 6/19/2010 5:03:36 AM(UTC-7) | Sent | Just walked out the spot | |
| 20 | +12109029135 Marissa* | 6/19/2010 5:03:43 AM(UTC-7) | Sent | But. Haven't got on elevator | |
| 21 | +12109029135 Marissa* | 6/19/2010 5:04:40 AM(UTC-7) | Sent | Ok | |
| 22 | +12109029135 Marissa* | 6/19/2010 5:25:09 AM(UTC-7) | Sent | Don't u wanted me to wait? | |
| 23 | +12109029135 Marissa* | 6/19/2010 5:28:59 AM(UTC-7) | Sent | In route | |
| 24 | +12109029135 Marissa* | 6/19/2010 5:30:23 AM(UTC-7) | Sent | Five mins | |
| 25 | +12109029135 Marissa* | 6/19/2010 5:36:14 AM(UTC-7) | Sent | Here | |
| 26 | +12109029135 Marissa* | 6/20/2010 6:03:20 AM(UTC-7) | Sent | Here | |

Timeline (50)

| # | Type | Timestamp | Party | Description | Del? |
|---|------|-----------|-------|-------------|------|
| 1 | SMS Messages | 8/3/2010 10:33:50 PM(UTC-7) | To: (210) 902-9135 Marissa | Her phone died txt me | |
| 2 | SMS Messages | 8/8/2010 4:22:12 PM(UTC-7) | From: +12109029135 Marissa | Wheres Ashley and why isn't she answering her phone?! | |
| 3 | SMS Messages | 6/17/2010 5:34:28 AM(UTC-7) | From: +12109029135 Marissa | I didn't make that one next one is at 9 something my time, I'll let you know | |
| 4 | SMS Messages | 6/17/2010 5:36:15 AM(UTC-7) | To: +12109029135 Marissa | Ok. What time is it ya time? | |
| 5 | SMS Messages | 6/17/2010 5:38:21 AM(UTC-7) | From: +12109029135 Marissa | 7:40 | |
| 6 | SMS Messages | 6/17/2010 5:39:09 AM(UTC-7) | To: +12109029135 Marissa | Man that sucks to sit in the airport that long... I know u not finna sit there right | |
| 7 | SMS Messages | 6/17/2010 5:42:17 AM(UTC-7) | From: +12109029135 Marissa | Well should I start walking to Vegas then? Lol I'm having a good day so I'm not trippin:) | |
| 8 | SMS Messages | 6/17/2010 7:09:03 AM(UTC-7) | From: +12109029135 Marissa | Didn't make that one either. Hopefully the next one at 11:50 | |
| 9 | SMS Messages | 6/17/2010 7:09:41 AM(UTC-7) | To: +12109029135 Marissa | Baby u might not make none of them.. Especially if the 6 o clock shit was packed. | |
| 10 | SMS Messages | 6/17/2010 7:10:22 AM(UTC-7) | From: +12109029135 Marissa | No negativity ok | |
| 11 | SMS Messages | 6/17/2010 7:12:22 AM(UTC-7) | To: +12109029135 Marissa | Sorry | |
| 12 | SMS Messages | 6/17/2010 7:12:54 AM(UTC-7) | From: +12109029135 Marissa | Lol its cool nigga | |
| 13 | SMS Messages | 6/17/2010 7:24:14 AM(UTC-7) | To: +12109029135 Marissa | Send me a pix of u now, Miss ya face | |
| 14 | SMS Messages | 6/17/2010 7:26:40 AM(UTC-7) | From: +12109029135 Marissa | I dropped my phone in water the day I got home so my cam doesn't work:( | |
| 15 | SMS Messages | 6/17/2010 7:26:20 AM(UTC-7) | To: +12109029135 Marissa | You can have my iPhone baby ;) | |
| 16 | SMS Messages | 6/17/2010 7:26:59 AM(UTC-7) | From: +12109029135 Marissa | Lol I'm anti Iphone | |
| 17 | SMS Messages | 6/17/2010 7:27:25 AM(UTC-7) | To: +12109029135 Marissa | *cough* jealous | |
| 18 | SMS Messages | 6/17/2010 7:28:00 AM(UTC-7) | From: +12109029135 Marissa | Ha! Never that baby | |
| 19 | MMS Messages | 6/17/2010 7:29:22 AM(UTC-7) | +12109029135 To: +14045631148 | Take off the braces and natural hair color | |
| 20 | SMS Messages | 6/17/2010 7:30:25 AM(UTC-7) | To: +12109029135 Marissa | U got ya braces off? | |
| 21 | SMS Messages | 6/17/2010 7:31:23 AM(UTC-7) | From: +12109029135 Marissa | Lol no silly that was in like September | |
| 22 | SMS Messages | 6/17/2010 7:31:58 AM(UTC-7) | To: +12109029135 Marissa | Okay bout to say... I actually like the braces ;) | |
| 23 | SMS Messages | 6/17/2010 7:32:34 AM(UTC-7) | From: +12109029135 Marissa | eww Haha | |
| 24 | SMS Messages | 6/17/2010 7:33:33 AM(UTC-7) | To: +12109029135 Marissa | I think they cute on ya so hush. | |
| 25 | SMS Messages | 6/17/2010 7:34:17 AM(UTC-7) | From: +12109029135 Marissa | Well I cant wait to get them off! | |
| 26 | SMS Messages | 6/17/2010 11:27:15 AM(UTC-7) | To: +12109029135 Marissa | U miss me? ;) | |
| 27 | SMS Messages | 6/17/2010 11:34:12 AM(UTC-7) | From: +12109029135 Marissa | Absolutely not;) | |
| 28 | SMS Messages | 6/17/2010 12:44:51 PM(UTC-7) | To: +12109029135 Marissa | U at George bush International | |
| 29 | SMS Messages | 6/17/2010 12:45:18 PM(UTC-7) | From: +12109029135 Marissa | Yeah | |
| 30 | SMS Messages | 6/17/2010 12:49:12 PM(UTC-7) | To: +12109029135 Marissa | 466 | |
| 31 | SMS Messages | 6/17/2010 12:49:53 PM(UTC-7) | From: +12109029135 Marissa | Ugh fuck! | |
| 32 | SMS Messages | 6/17/2010 1:12:45 PM(UTC-7) | To: +12109029135 Marissa | So what u doin baby? | |
| 33 | SMS Messages | 6/17/2010 1:14:03 PM(UTC-7) | From: +12109029135 Marissa | Idfk | |
| 34 | SMS Messages | 6/17/2010 6:22:26 PM(UTC-7) | From: +12109029135 Marissa | Call me back please | |
| 35 | SMS Messages | 6/18/2010 8:34:56 AM(UTC-7) | From: +12109029135 Marissa | I'm here. Call me. | |
| 36 | SMS Messages | 6/18/2010 9:00:11 AM(UTC-7) | To: +12109029135 Marissa | At passenger pick up? | |
| 37 | SMS Messages | 6/18/2010 9:00:56 AM(UTC-7) | From: +12109029135 Marissa | Yeah at the end | |
| 38 | SMS Messages | 6/19/2010 5:02:22 AM(UTC-7) | To: +12109029135 Marissa | You good? | |
| 39 | SMS Messages | 6/19/2010 5:03:08 AM(UTC-7) | From: +12109029135 Marissa | Yeah I wanna leave in a little while. I'll call you when I'm ready | |

| 40 | ⇨ SMS Messages | 6/19/2010 6:03:29 AM(UTC-7) | To: +12109029135 Marissa | I was on my way there now want me to wait? | |
| 41 | ⇨ SMS Messages | 6/19/2010 6:03:38 AM(UTC-7) | To: +12109029135 Marissa | Just walked out the spot | |
| 42 | ⇨ SMS Messages | 6/19/2010 6:03:43 AM(UTC-7) | To: +12109029135 Marissa | But. Haven't got on elevator | |
| 43 | ⇦ SMS Messages | 6/19/2010 6:04:24 AM(UTC-7) | From: +12109029135 Marissa | Yes please | |
| 44 | ⇨ SMS Messages | 6/19/2010 6:04:40 AM(UTC-7) | To: +12109029135 Marissa | Ok | |
| 45 | ⇦ SMS Messages | 6/19/2010 5:24:51 AM(UTC-7) | From: +12109029135 Marissa | You here yet? | |
| 46 | ⇨ SMS Messages | 6/19/2010 6:25:09 AM(UTC-7) | To: +12109029135 Marissa | Don't u wanted me to wait? | |
| 47 | ⇨ SMS Messages | 6/19/2010 6:29:59 AM(UTC-7) | To: +12109029135 Marissa | In route | |
| 48 | ⇨ SMS Messages | 6/19/2010 6:30:23 AM(UTC-7) | To: +12109029135 Marissa | Five mins | |
| 49 | ⇨ SMS Messages | 6/19/2010 6:36:14 AM(UTC-7) | To: +12109029135 Marissa | Here | |
| 50 | ⇨ SMS Messages | 6/20/2010 6:03:20 AM(UTC-7) | To: +12109029135 Marissa | Here | |

## Data Files (2)

### Images (2)

| # | File Info | | Additional file Info | | Thumbnail | Del? |
|---|-----------|--|----------------------|--|-----------|------|
| 1 | Name: 12131-0.jpg Path: /Data/mobile/Library/SMS/Parts/48/03/1213 1-0.jpg SHA256: 9b3f07eaa3c8d7242e9acd1ac30031b7 7f38026666ce1e115cf316193c5b28c8 | | Size (Bytes): 19005 Created: 6/17/2010 7:29:55 AM(UTC-7) Modified: 6/17/2010 7:29:55 AM(UTC-7) Accessed: 6/17/2010 7:29:55 AM(UTC-7) | |  | |
| 2 | Name: 12131-0-preview Path: /Data/mobile/Library/SMS/Parts/48/03/1213 1-0-preview SHA256: 0e16b958bfe4b65224c0152300dfdfcd 5c17d4cfa62bca9c494f44fd33e30041 | | Size (Bytes): 23353 Created: 6/17/2010 7:29:55 AM(UTC-7) Modified: 6/17/2010 7:29:55 AM(UTC-7) Accessed: 6/17/2010 7:29:55 AM(UTC-7) | |  | |

6

EXHIBIT   J - "Fassbender"

ASHLEY FASSBENDER

5 Pages

***CONFIDENTIAL WORK PRODUCT ***
NOT FOR DISSEMINATION



OFFICE OF THE SPECIAL PUBLIC DEFENDER

# Memo

To:     David M Schieck, Monica Trujillo, Randall Pike

CC:     Joseph Perez, Maribel Yanez

From:   J C Galiano

Date:   09/06/13

Re:     09/04/13 Interview of Ashley Rose Fassbender CS# 3043717

---

On Wednesday, September 4, 2013, Attorney Chris Rasmussen accompanied his client, Ashley Rose Fassbender (ARF) to the SPD Offices where David, Monica and I had a chance to speak with her. Rasmussen remained present for the duration of the interview. I was unable to remain for its entirety due to prior commitments.

ARF indicated that initially, Marissa Valdez-Pickett (MVP) came to Las Vegas on her own. Afterwards, ARF joined MVP in response to the "job" advertisement posted by persons at the residence located at 475 Toucan Ridge (TR). She believed the period to be around January of 2010.   ARF claimed that the work related responsibilities at the TR residence revolved around being "party-goers" during the functions planned / arranged by their superiors. She claimed that "Carmen" aka Jenny Quintana and Jordan Williams were in charge.  ARF also stated that they were to "make money" at the parties, but did not indicate how the money was earned. Other girls (Jessica and Jenny) were already . working there.  *Note: It was clear we were discussing the topic of prostitution with regards to the TR residence; however, ARF denied participating in or being aware of such activities during her time at the residence.*

They were also instructed (by Carmen and Jordan) to encourage other girls to join them at the TR residence by way of communicating through online advertisements posted on Craigslist and MySpace. ARF did not go into great detail on how they convinced new girls to join them. She indicated that part of the selling point was in encouraging new girls to visit the TR residence. ARF claimed that the TR residence belonged to Carmen as she stated it was "obvious" that both Carmen and Jordan were in charge of the goings-on at the TR residence. Usually, it was Carmen who conducted interviews of the new girls while in the company of other regular girls. ARF recalled Jessica was usually present during interviews of new girls.

ARF claimed that all of the girls had their own bedrooms, but eventually they had to share rooms as their numbers swelled. In particular, she recalled a single event or "party" that ARF claimed ended up becoming a "photo shoot". ARF claimed that their numbers would fluctuate and vary significantly. In particular, following the police raid at the TR residence, their numbers became very low. Rasmussen made mention of a police raid involving a girl named Anna Olsteen (sic) who used to

***CONFIDENTIAL WORK PRODUCT***
NOT FOR DISSEMINATION

***CONFIDENTIAL WORK PRODUCT ***
NOT FOR DISSEMINATION

work at the TR residence. Olsteen (and her father) provided police with information regarding the activities at the TR residence. ARF claimed that the police did not charge her with anything. Again, ARF denied having knowledge surrounding Carmen and Williams being involved in prostitution. She was aware that Williams had weapons in the home, but claimed she never saw them.

ARF ended up meeting Ammar Harris (Jalduh) via messages on MySpace. ARF claimed that there were certain rules the girls were supposed to adhere to and mentioned that they (girls) were not allowed to leave. During the period when she first met Harris, she admittedly stopped caring for the rules. According to ARF, "…people said things were going to happen and things weren't happening…" ARF was clear that she was dissatisfied with how things were going at the TR. Though she did not elaborate, it seemed that the business suffered following the raid and therefore, their venture was no longer as lucrative as she had once been led to believe.

ARF chuckled as she told us about how she allowed Harris to visit the TR residence, even though it was against the rules. ARF claimed that Carmen would have kicked her out if she had known about Harris coming over. She claimed the girls were not permitted to "flirt" or send messages to men on a personal basis. She believed another girl, Gabriella, was present while Harris was there visiting. She gave Harris a tour of the home and they smoked "…a lot of weed."

ARF recalled that Harris did not discuss the nature of his business in Las Vegas, but she recalled he made it apparent that he "…had money." On one occasion, Harris came by the TR residence to pick her up. ARF explained that the rules at the TR residence had relaxed significantly following the raid. She claimed that when Harris arrived he had the top down on his vehicle. Subsequently, Carmen argued with ARF as to why she was bringing this "Black guy" to the neighborhood. She was ultimately kicked out without any compensation.

She collected her personal belongings, which consisted of clothing and contacted Harris to pick them up. ARF stated, "He (Harris) did me a favor taking us (MVP) with all of our stuff." This was the first time that Harris met MVP. She recalled they went hanging out on the strip. Afterwards, Harris took both she and MVP to his apartment where they met a female "roommate" named Brianna. Brianna worked as a district manager for some business. Brianna had her own room while ARF and MVP slept in Harris' room with him. During their time at Harris' all 3 hung out regularly. She did not recall leaving MVP alone with Harris as they all maintained similar schedules.

ARF admitted that she had an intimate relationship with Harris, which she did not conceal from MVP. She claimed that she and MVP were very close and would talk about anything. On one occasion, while ARF was in the bedroom watching television, she observed as Harris entered the bathroom. ARF indicated that MVP was already inside bathing. ARF indicated that she listened to see what they were doing. She did not hear any sounds to suggest they were having sex. She claimed that she did not hear anything. She assumed Harris was helping her bathe, as he had done with her (ARF) in the past.

A short period later, MVP exited the bathroom and "…she seemed her normal self." ARF recalled that MVP did not "…complain or anything…" ARF claimed that she had no reason to suspect that anything was the matter. Eventually, ARF and MVP found work at a strip clubs. ARF told us that

***CONFIDENTIAL WORK PRODUCT***
NOT FOR DISSEMINATION

***CONFIDENTIAL WORK PRODUCT ***
**NOT FOR DISSEMINATION**

she had a negative attitude since she "...expected to have everything given..." to her. Harris showed her a free classifieds website named "backpage" (see 2 page attachment). She explained that Harris revealed to her that women (in Las Vegas) were selling themselves for money and that was the reality of what she could expect in this town. Furthermore, ARF claimed that Harris encouraged her to go back home to Texas where she would be better off.

Later, ARF lied to Harris and explained that she had to leave to Texas to be with her grandmother who was ill. ARF laughed and told us this was not true. ARF ended up going to California, for a few weeks, where she ended up with MVP again. ARF told us that MVP did have periods where she would return to Texas to have her braces adjusted. ARF claimed being "...intimidated..." by Harris and did not want to be left alone with him. She explained that due to both of their stubborn personalities, she was afraid of what might happen if they argued.

It was in California that MVP mentioned that Harris had raped her. ARF specified that MVP did not mention the rape and then proceeded to provide details. According to ARF, MVP only mentioned that Harris raped her and that "...was it..." ARF told us that she later heard that the alleged rape occurred in the shower, but she did not hear this from MVP. She admitted being shocked that MVP mentioned this only after they were in California. ARF indicated that they confided in each other and when "...one moved..." (residences) "...the other moved..." as well.

Also, while in California, ARF and MVP began "...staying with..." 2 different men on separate occassions. First, they began living with an individual named Christian. ARF claimed that things "...got crazy..." with Christian after MVP departed to attend a graduation (for her sibling in Texas?) After Christian, ARF then began staying with another individual named Justin. Details surrounding the nature of their relationships with these 2 individuals were not provided.

After their return to Las Vegas, both women began working at strip clubs. ARF indicated that MVP particularly enjoyed the strip club settings as she was highly social and enjoyed meeting new people and partying. ARF claimed that she personally did not enjoy her work at strip clubs as she (ARF) did not know what she was doing.

Following the initial allegation, MVP then began using racial epithets whenever she wanted to refer to Harris. ARF told us that she remains unsure or puzzled by MVP's claims of rape. ARF stated, "...she (MVP) is not the type to get raped." When asked what she meant, she indicated that both she and MVP "...liked boys..." and "...were promiscuous..." ARF indicated that while working at the strip clubs, MVP was the type of girl that would go with men to their hotel rooms "...for free..." to "...party with them." Furthermore, ARF believed that all 3 (ARF, MVP, and Harris) were all flirtatious with one another.

She doesn't recall Harris' reaction to the rape claims, but she did recall that Brianna was highly upset about it. ARF also told us that she would not be surprised to find out that MVP and Harris were maintaining an intimate relationship during the time she was doing the same with him.

With respect to "handing over" money to Harris, ARF claimed that there were never any arrangements made between them. ARF explained that she voluntarily deposited all of her earnings inside of Harris' drawer because she wanted to contribute to the household expenses. ARF felt this

***CONFIDENTIAL WORK PRODUCT***
**NOT FOR DISSEMINATION**

*** CONFIDENTIAL WORK PRODUCT ***
NOT FOR DISSEMINATION

was reasonable since they were living there. She also suggested that she found it prudent since it would be Harris who would "help" if "...anything happened..."

Rasmussen asked when was the last time she (ARF) had contact with MVP. She responded that it had now been about a year and a half.  Presently, they do not talk and their friendship ended in bad terms. ARF explained that MVP had told their common (school) friends that she (ARF) had put her (MVP) onto prostitution. ARF later messaged MVP via Facebook to talk about the rumors and asked her directly as to why people were saying such things. ARF claimed MVP responded, "I don't know what you're talking about." Lastly, though ARF did not elaborate, she stated that she subsequently began working on "backpage" here in town.

*Note: I was unable to stay for the remainder of the interview due to prior commitments; however, David, Monica and Rasmussen remained with ARF to continue their conversation upon my departure.*

*** CONFIDENTIAL WORK PRODUCT ***
NOT FOR DISSEMINATION

**09/19/13 8:30 PM**

| Confirmation #: | 449852 | Status: Completed | Visitation Time: 09/19/13 8:30 PM-8:55 PM | |
|---|---|---|---|---|
| **Inmate ID**<br>2753819 | **Inmate Name**<br>Harris, Ammar Asim Faruq | **Inmate Station**<br>ST-2J-3 | **Inmate Housing**<br>ST-4J:0X | |
| **Visitation Center**<br>Clark County Visitation | | **Visitor Station**<br>VS-10 | | |
| **Visitor ID**<br>P0FV-30900 | **Visitor Name**<br>Ashley Fassbender | **Relationship To Inmate**<br>Friend | **Check-in Time** | **Check-out Time** |

**09/22/13 10:00 AM**

| Confirmation #: | 450385 | Status: Completed | Visitation Time: 09/22/13 10:00 AM-10:25 AM | |
|---|---|---|---|---|
| **Inmate ID**<br>0002753819 | **Inmate Name**<br>Harris, Ammar Asim Faruq | **Inmate Station**<br>ST-2J-3 | **Inmate Housing**<br>ST-4J:0X | |
| **Visitation Center**<br>Clark County Visitation | | **Visitor Station**<br>VS-48(Priv.) | | |
| **Visitor ID**<br>P0FV-30900 | **Visitor Name**<br>Ashley Fassbender | **Relationship To Inmate**<br>Friend | **Check-in Time**<br>9:55 AM | **Check-out Time** |

EXHIBIT      K - " Reversed "

CONVICTION REVERSED

5 Pages

IN THE SUPREME COURT OF THE STATE OF NEVADA

AMMAR ASIM FARUQ HARRIS A/K/A
AMMAR ASIMFARUQ HARRIS,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 65377

**FILED**

DEC 15 2016

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY ___S. Young___
DEPUTY CLERK

*ORDER OF REVERSAL AND REMAND*

This is an appeal from a judgment of conviction, pursuant to a
jury verdict, of three counts of sexual assault and one count of robbery.
Eighth Judicial District Court, Clark County; Kathleen E. Delaney, Judge.

Appellant Ammar Harris claims the district court abused its
discretion by denying his motion for self-representation.[1]  We agree.

Having reviewed the transcript of the *Faretta* canvass and
considered the parties' arguments, we conclude that the district court
denied the motion based solely on its belief that Harris lacked the legal
skills and knowledge to represent himself.[2]  This was an improper basis

___

[1]Because we conclude that reversal is required due to the erroneous
denial of Harris' motion for self-representation, we need not reach Harris'
remaining contentions.

[2]To the extent that either party references portions of the record not
before this court, it is clear from the record before this court that the
*continued on next page . . .*

for denying the motion. *See Tanksley v. State*, 113 Nev. 997, 1000-01, 946 P.2d 148, 150 (1997) (holding that the right to self-representation is an unqualified right, so long as the waiver of counsel is intelligent and voluntary, and "may *not* be denied solely because the court considers the defendant to lack reasonable *legal* skills or because of the inherent inconvenience often caused by *pro se* litigants" (internal quotation marks omitted)); *see also Vanisi v. State*, 117 Nev. 330, 341, 22 P.2d 1164, 1172 (2001) ("[A] criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." (internal quotation marks omitted)). Even assuming we could consider the State's proffered alternative reasons for denying the motion, which were not relied upon by the district court,[3] we conclude that there is no basis in the record to affirm the district court's decision based on the alternative

... *continued*

district court's decision was based solely on Harris's lack of legal knowledge and skills.

[3]*Compare State v. Braswell*, 123 A.3d 835, 847-48 (Conn. 2015) (concluding the record demonstrated that the lower court's only basis for denying the defendant's motion for self-representation was an improper basis and rejecting the State-proffered alternative justification for denial because it was not the reason for the lower court's denial), *and Oviuk v. State*, 180 P.3d 388, 391 (Alaska Ct. App. 2008) (finding it improper to affirm a lower court's denial of a defendant's motion for self-representation on a basis not found by the lower court), *with People v. Dent*, 65 P.3d 1286, 1288-89 (Cal. 2003) ("Even though the trial court denied the request [to proceed in propria persona] for an improper reason, if the record as a whole establishes defendant's request was nonetheless properly denied on other grounds, we would uphold the trial court's ruling.").

reasons. As the "[d]eprivation of the right to self-representation is reversible, never harmless, error," *Vanisi*, 117 Nev. at 338, 22 P.3d at 1170, we

ORDER the judgment of the district court REVERSED AND REMAND this matter to the district court for proceedings consistent with this order.

_____ , J.
Cherry

_____ , J.
Douglas

_____ , J.
Gibbons

cc:    Hon. Kathleen E. Delaney, District Judge
       Robert L. Langford & Associates
       Oronoz, Ericsson & Gaffney, LLC
       Attorney General/Carson City
       Clark County District Attorney
       Eighth District Court Clerk

## IN THE SUPREME COURT OF THE STATE OF NEVADA

AMMAR ASIM FARUQ HARRIS A/K/A
AMMAR ASIMFARUQ HARRIS,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

**Supreme Court No. 65377**
District Court Case No. C289275


**FILED**
FEB 02 2017
ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
DEPUTY CLERK

### REMITTITUR

TO:   Steven D. Grierson, Eighth District Court Clerk

Pursuant to the rules of this court, enclosed are the following:

    Certified copy of Judgment and Opinion/Order.
    Receipt for Remittitur.

DATE: January 11, 2017

Elizabeth A. Brown, Clerk of Court

By: Dana Richards
    Deputy Clerk

cc (without enclosures):
    Hon. Kathleen E. Delaney, District Judge
    Robert L. Langford & Associates
    Oronoz, Ericsson & Gaffney, LLC
    Clark County District Attorney
    Attorney General/Carson City

### RECEIPT FOR REMITTITUR

Received of Elizabeth A. Brown, Clerk of the Supreme Court of the State of Nevada, the
REMITTITUR issued in the above-entitled cause, on _____JAN 18 2017_____.

                                    **Deputy**  District Court Clerk

**RECEIVED**
JAN 1 7 2017
CLERK OF THE COURT

RECEIVED
JAN 23 2017
ELIZABETH A. BROWN
CLERK OF SUPREME COURT
DEPUTY CLERK
1

17-00934

## IN THE SUPREME COURT OF THE STATE OF NEVADA

AMMAR ASIM FARUQ HARRIS A/K/A
AMMAR ASIMFARUQ HARRIS,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

**Supreme Court No. 65377**
District Court Case No. C289275

## CLERK'S CERTIFICATE

STATE OF NEVADA, ss.

I, Elizabeth A. Brown, the duly appointed and qualified Clerk of the Supreme Court of the State of Nevada, do hereby certify that the following is a full, true and correct copy of the Judgment in this matter.

## JUDGMENT

The court being fully advised in the premises and the law, it is now ordered, adjudged and decreed, as follows:

"ORDER the judgment of the district court REVERSED AND REMAND this matter to the district court for proceedings consistent with this court."

Judgment, as quoted above, entered this 15th day of December, 2016.

IN WITNESS WHEREOF, I have subscribed my name and affixed the seal of the Supreme Court at my Office in Carson City, Nevada this January 11, 2017.

Elizabeth A. Brown, Supreme Court Clerk

By: Dana Richards
Deputy Clerk

1

EXHIBIT    L - " Indictment "

MOTION TO DISMISS INDICTMENT

4 Pages

Electronically Filed
11/19/2019 11:25 AM
Steven D. Grierson
CLERK OF THE COURT

1  **MOT**
CHRISTOPHER R. ORAM, ESQ.
2  Nevada State Bar #004349
520 S. Fourth Street, 2nd Floor
3  Las Vegas, Nevada 89101
(702) 384-5563
4
Attorney for Defendant
5  AMMAR HARRIS

6                    DISTRICT COURT

7                 CLARK COUNTY, NEVADA

8                        * * * * *

9  THE STATE OF NEVADA,            CASE NO.   C-13-289275-1
DEPT. NO.  25
10            Plaintiff,
HEARING REQUESTED
11  vs.

12

13  AMMAR HARRIS,

14            Defendant.

15           **MOTION TO DISMISS INDICTMENT.**

16        COMES NOW, Defendant, AMMAR HARRIS, by and through his attorney,

17  CHRISTOPHER R. ORAM, ESQ., and hereby requests that the above-entitled

18  matter be placed on the Court's calendar for the purpose of entertaining the instant

19  Motion to Dismiss Indictment.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

CHRISTOPHER R. ORAM, LTD.
520 SOUTH 4TH STREET | SECOND FLOOR
LAS VEGAS, NEVADA 89101
TEL. 702.384-5563 | FAX. 702.974-0623

1    This motion is made and based pleadings and papers on file herein, the

2    affidavit of counsel attached hereto, as well as any oral arguments of counsel

3    adduced at the time of hearing.

4    DATED this 19th day of November, 2019.

5                                              Respectfully submitted

6

7                                              /s/ Christopher R. Oram, Esq
                                               CHRISTOPHER R. ORAM, ESQ.
8                                              Nevada Bar #004349
                                               520 S. Fourth Street, 2nd Floor
9                                              Las Vegas, Nevada, 89101

10                                             Attorney for Defendant
                                               AMMAR HARRIS

11                          **NOTICE OF MOTION**

12    YOU, AND EACH OF YOU, will please take notice that the undersigned will

13    bring the foregoing **MOTION TO DISMISS INDICTMENT** on for hearing on the

14    _____ day of _____, 2019, at the Clark County Courthouse, 200 Lewis

15    Avenue in District Court, Department 25 at the hour of ____.m. or as soon thereafter

16    as counsel may be heard.

17                                             Respectfully submitted

18

19                                             /s/ Christopher R. Oram, Esq
                                               CHRISTOPHER R. ORAM, ESQ.
20                                             Nevada Bar # 004349
                                               520 S. Fourth Street, 2nd Floor
21                                             Las Vegas, NV 89101

22                                             Attorney for Defendant
                                               AMMAR HARRIS

23

24

25

26

27                          **PROCEDURAL HISTORY**

28    On April 25, 2013, the State obtained an Indictment charging Mr. Harris

CHRISTOPHER R. ORAM, LTD.
520 SOUTH 4TH STREET | SECOND FLOOR
LAS VEGAS, NEVADA 89101
TEL. 702.384-5563 | FAX. 702.974-0623

2

with three counts of sexual assault and one count or robbery. Mr. Harris pled not guilty, and his jury trial began on September 9, 2013. On September 20, 2103, Mr. Harris was found guilty of all counts. The Judgment of Conviction was filed on March 6, 2014.

After filing a timely appeal to the Nevada Supreme Court, the conviction was ultimately overturned on December 15, 2016 (NSC Case No. 65377). After remand, counsel was appointed to assist Mr. Harris with the instant case. Due to a potential conflict of interest, prior counsel was permitted to withdraw from this case and the undersigned was appointed to represent Mr. Harris on July 22, 2019.

## STATEMENT OF FACTS

Ms. Marissa Valdez-Pickett testified before the grand jury on March 21, 2013. In June of 2010, Ms. Valdez, along with her friend Ms. Ashley Fassbender, moved in with Mr. Harris (Grand Jury Transcript, "GJT" p. 8-9). On June 3, 2010, while Ms. Valdez was showering, she testified Mr. Harris entered the shower and began to touch her in a sexual manner (GJT p. 12-14). Ms. Valdez did not scream for help or anything of that nature (GJT p. 13). Ms. Valdez testified Mr. Harris wanted her to perform oral sex upon him, but when she was unwilling, he pushed her downward in the small shower, so she began to do as he requested (GJT p. 14-15). Ms. Valdez claimed she was saying "no. Just like no" while this was occurring (GJT p. 15).

After Mr. Harris ejaculated, Ms. Valdez claimed Mr. Harris stood her up from the shower and began to have sex with her (GJT p. 17). Ms. Valdez testified she did not want to have sex and attempted to explain why, but she did not feel it mattered (GJT p. 17). Ms. Valdez did not contact the police after the incident (GJT p. 19).

On June 21, 2010, when Ms. Valdez awoke, she claimed Mr. Harris took her wallet and her money (GJT p. 23-24). When Ms. Valdez attempted to stop Mr. Harris was taking her money, she claimed he placed his hands around her

CHRISTOPHER R. ORAM, LTD.
520 SOUTH 4TH STREET | SECOND FLOOR
LAS VEGAS, NEVADA 89101
TEL. 702.384-5563 | FAX. 702.974-0623

neck and pressed her against a sliding glass door (GJT p. 24-25). Ms. Valdez
estimated she had six hundred dollars in cash that was taken from her (GJT p. 25).
Ms. Valdez testified her cell phone was also taken from her while she was
sleeping (GJT p. 27). When the wallet was returned to her, it was empty (GJT p.
27).

Later that day, Ms. Valdez explained she told Mr. Harris he could keep her
money, but she wanted to leave (GJT p. 28-29). Ms. Valdez packed up her
belongings in trash bags and was driven to the airport (GJT p. 29). Once at the
airport, Ms. Valdez contacted a friend to come get her and then filed a police
report (GJT p. 36).

## ARGUMENT

**I.    MR. HARRIS IS ENTITLED TO DISMISSAL OF THE
INDICTMETN DUE TO THE FAILURE OF THE STATE TO
PRESENT EXCULPATORY EVIDENCE TO THE GRAND JURY IN
COMPLIANCE WITH NRS. 172.145.**

In this case, Mr. Harris submits he is entitled to dismissal of the Indictment
for the State's failure to present exculpatory evidence. Specifically, Mr. Harris
contends the State had an obligation to present his voluntary statement to the
grand jury, as the statement was exculpatory in nature.

### A.    THE STATE WAS REQUIRED TO PRESENT MR. HARRIS'
EXCULPATORY STATEMENT

Pursuant to NRS 172.145, prosecutors are required to submit known
exculpatory evidence to the grand jury if that evidence would explain away the
charge. *See also Schuster v. Eighth Judicial Dist. Court of Nev.*, 123 Nev. 187,
191 160 P.3d 873, 876 (2007); *King v. State*, 116 Nev. 349, 359, 998 P.2d 1172,
1178 (2000). The determination of whether evidence is exculpatory is left to the
discretion of the district court.

In *Ostman v. Eighth Judicial Dist. Court*, 107 Nev. 563, 564, 816 P.2d 458,
459 (1991), the Nevada Supreme Court granted a mandamus petition and
dismissed an indictment for the State's failure to present exculpatory evidence to

CHRISTOPHER R. ORAM, LTD.
520 SOUTH 4TH STREET | SECOND FLOOR
LAS VEGAS, NEVADA 89101
TEL. 702.384-5563 | FAX. 702.974-0623

CHRISTOPHER R. ORAM, LTD.
520 SOUTH 4TH STREET | SECOND FLOOR
LAS VEGAS, NEVADA 89101
TEL. 702.384-5563 | FAX. 702.974-0623

1  the grand jury. The *Ostman* case is extremely similar to the instant case. In

2  *Ostman*, the defendant's girlfriend testified to unwanted sexual activity during the

3  grand jury proceedings. *Id.* The defendant was not notified of the grand jury

4  proceedings, nor was his exculpatory statement, where he told police the sexual

5  activity was consensual in nature, presented to the grand jury. *Id.* As such, the

6  defendant's statement that the activity was consensual in nature, had a tendency

7  to explain away the charge. *Id.* The Nevada Supreme Court held that the State's

8  failure to present the exculpatory statement to the grand jury impaired the

9  independent function which the grand jury serves. *Id.* at 565.

10  　　The same premise holds true here. During the grand jury proceedings, Ms.

11  Valdez testified to unwanted sexual activity occurring between herself and Mr.

12  Harris. Although the State was aware of Mr. Harris' statement to police given

13  June 23, 2010, at 23:10 hours, the State failed to present this information to the

14  grand jury. Within Mr. Harris statement, he fully admitted to having sexual

15  relations with Ms. Valdez (Voluntary Statement "VS" 06/23/2010, p. 5, 10, 12-

16  15, 24). From the outset, Mr. Harris told detectives he and Ms. Valdez had

17  "messed around" referring to their intimate relationship (VS 06/23/2010, p. 5).

18  On the day of the alleged incident, Mr. Harris told detectives Ms. Valdez asked

19  him to shower with her and he did (VS 06/23/2010, p. 12). Mr. Harris explained

20  to the detectives in detail how the two engaged in consensual intercourse in the

21  shower (VS 06/23/2010, p. 12-15). Mr. Harris told detectives there was never any

22  indication from Ms. Valdez that she was not interested in engaging in sexual

23  relations (VS 06/23/2010, p. 24). Mr. Harris was adamant that he never forced

24  anyone to engage in sexual acts (VS 06/23/2010, p. 69).

25  　　As in *Ostman*, Mr. Harris' statement that he had consensual sex with Ms.

26  Valdez would have a tendency to explain away the charges and the State was

27  obligated to present this information to the grand jury. Mr. Harris' repeated and

28  consistent denials of the accusation would have been helpful to the grand jury.

The State's complete failure to present such information is in violation of clearly established case law and NRS 172.145. Mr. Harris is therefore entitled to dismissal of the indictment.

**B.    THIS COURT SHOULD ENTERTAIN THIS MOTION FOR ITS MERIT AS PRIOR COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE INDICTMENT ON THIS BASIS**

From the outset, counsel acknowledges that this issue could have been considered by the Court in a pretrial Petition for Writ of Habeas Corpus back in 2013. However, Mr. Harris' prior counsel failed to challenge the indictment on this basis.

To establish ineffective assistance of counsel, it must be demonstrated that counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington,* 466 U. S. 668, 104 S. Ct. 205 (1984). Once the defendant establishes that counsel's performance was deficient, the defendant must next show that, but for counsel's error the result of the trial would probably have been different. *Id.* at 694, 104 S. Ct. 2068; *Davis v. State*, 107 Nev. 600, 601, 602, 817 P. 2d 1169, 1170 (1991). The defendant must also demonstrate errors were so egregious as to render the result of the trial unreliable or the proceeding fundamentally unfair. *State v. Love,* 109 Nev. 1136, 1145, 865 P.2d 322, 328 (1993), citing *Lockhart v. Fretwell*, 506 U. S. 364,113 S. Ct. 838 122 2d, 180 (1993); *Strickland*, 466 U. S. at 687 104 S. Ct. at 2064.

In this case, effective counsel would have challenged the indictment due to the State's failure to present exculpatory evidence as required by statute. Prior counsel's failure to do so falls below an objective standard of reasonableness. Had prior counsel challenged the indictment on this basis, the result of the proceeding would have been different because dismissal of the indictment under both existing case law and NRS 172.145 would have been mandated. Further, based upon prior counsel's failure to challenge the Indictment, the preceding is

1    fundamentally unfair given the State's blatant violation of NRS 172.145.

2        Lastly, current counsel for Mr. Harris was recently appointed on this case,

3    warranting good cause for this Court to consider the instant Motion for its merit.

4                                **CONCLUSION**

5        Therefore, based upon the above and foregoing, Mr. Harris respectfully

6    requests this Court find the State has violated NRS 172.145 and he is entitled to

7    dismissal of the indictment.

8        DATED this 19th day of November, 2019.

9                                    Respectfully submitted:

10
                                     /s/ Christopher R. Oram, Esq
11                                   CHRISTOPHER R. ORAM, ESQ.
                                     Nevada State Bar #004349
12                                   520 S. Fourth Street, 2nd Floor
                                     Las Vegas, Nevada 89101
13
                                     Attorney for Defendant
14                                   AMMAR HARRIS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHRISTOPHER R. ORAM, LTD.
520 SOUTH 4TH STREET | SECOND FLOOR
LAS VEGAS, NEVADA 89101
TEL. 702.384-5563 | FAX. 702.974-0623

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of November, 2019, I served a true and correct copy of the foregoing document entitled **MOTION TO DISMISS INDICTMENT** to the Clark County District Attorney's Office by sending a copy via electronic mail to:

CLARK COUNTY DISTRICT ATTORNEY
motions@clarkcountyda.com
chad.lexis@clarkcountyda.com


BY:


/s/ Nancy Medina
An employee of Christopher R. Oram, Esq.

Ammar Harris #1116547
High Desert State Prison

United States District Court
District of Nevada

| Ammar Harris, | 2:22-CV-00560-RFB-NJK |
| Plaintiff, | |
| Vs. | |
| State of Nevada, ex rel.; | SUMMONS |
| Clark County, Clark County | |
| Sheriff, Steven B. Wolfson, David | |
| L. Stanton, Pamela C. Weckerly, Elissa | |
| Luzaich, Bernie Zadrowski, Karen | |
| Hughes, D. Hoier, Catherine Hui, A. | |
| Beas, Christopher Baughman, A. | |
| Baca, A. Ortiz, K. Bluth | |

TO THE ABOVE-NAMED DEFENDANTS:

You are hereby summoned and required to serve upon plaintiff, whose address is High Desert State Prison, P.O. Box 650, Indian Springs, NV 89070 an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service, or 60 days if the U.S. Government or officer/agent thereof is a defendant.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Clerk of the Court

Date:

Ammar Harris #1116347
High Desert State Prison

United States District Court
District of Nevada

Ammar Harris,                    2:22-CV-00560-RFB-NJK
          Plaintiff,

Vs.                              ORDER TO SHOW CAUSE FOR
State of Nevada, ex rel.;        A PRELIMINARY INJUNCTION
Clark County, et al.,            AND A TEMPORARY RESTRAINING
          Defendants.            ORDER

Upon the complaint, the supporting affidavit of plaintiff, and the
memorandum of law submitted herewith, it is:

ORDERED that defendants Clark County, Clark County Sheriff, Steven
B. Wolfson shall cause in room ___ of the United States Courthouse,
(address) on the ___ day of ___, 20__, at ___ o'clock, why a preliminary
injunction should not issue pursuant to Rule 65(a) of the Federal Rules
of Civil Procedure enjoining the defendants; their successors in office,
agents and employees and all other persons acting in concert and
participation with them, from Violating the Double Jeopardy Clause by
proceeding with Eighth Judicial District Court case no. C289275.

IT IS FURTHER ORDERED that effective immediately and pending the hearing and determination of this order to show cause, the defendants Clark County, Clark County Sheriff, Steven B. Wolfson and each of their officers, agents, employers, and all persons acting in concert or participation with them, are restrained from Proceeding with Eighth Judicial District Court case no. C289275 until resolution of this action.

IT IS FURTHER ORDERED that the order to show cause, and all other papers attached to this application, be served on the aforesaid Defendants by (    )

Dated:

United States District Court Judge

Ammar Harris #1116547
High Desert State Prison

United States District Court
District of Nevada

Ammar Harris,
    Plaintiff,

Vs.

State of Nevada, ex rel.;

Clark County, et al.,
    Defendants.

2:22-CV-00560-RFB-NJK

DECLARATION OF
AMMAR HARRIS

Ammar Harris hereby declares:

In the month of June, 2010, I was living in Clark County, NV and allowed two women named Ashley "Foosborder" and Marissa Valdez-Pickett to live with me after they were kicked out of the house they were living at.

I got into a dispute with Marissa Valdez-Pickett over her wanting to have an abortion and finances, I requested that she leave.

On June 23rd, 2010 I was arrested at my residence without a warrant, and requested an attorney once I had noticed the Camera Crew that was filming my arrest.

On June 25th, 2010 I was released after being informed the D.A. rejected the case by a CCDC official.

In May of 2012 I was arrested during a traffic stop and had no idea there was a warrant pending, in the process I lost my residence, car and employment.

On June 13th, 2012 I appeared in Justice Court and Zadrowski dismiss the case because of the facts of the case.

On February 24th, 2013 I was arrested in Los Angeles, CA for a warrant in Clark County, NV.

On September 14th, 2013 Faessbender visited me at CCDC and informed me that my attorneys did not ask any questions to challenge Marissa Valdez allegations, that she met with State Attorney's to get money she was promised.

On September 20th, 2013 I was convicted on all charges

On December 15th, 2016 My conviction was reversed and Remand.

On November 14th, 2019 My attorney filed a motion to dismiss indictment because the State withheld exculpatory evidence from the Grand Jury in violation of state law.

On July 24th, 2022 I filed a petition with the Supreme Court of Nevada challenging NRS 174.085, the State attorney misconduct withholding exculpatory evidence in violation of NRS 172.145 and in violation of Double Jeopardy.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Clark County, NV on August 10th, 2022.

/s/ Mr. Harris
Ammar Harris